```
1  IGNACIA S. MORENO
   Assistant Attorney General
2  Environment & Natural Resources Division
3  MICHAEL C. AUGUSTINI (DC BAR NO. 452526)
   michael.augustini@usdoj.gov
4  MEREDITH WEINBERG (VA BAR NO. 47516)
   meredith.weinberg@usdoj.gov
5  MARTHA C. MANN (FL BAR NO. 155950)
   martha.mann@usdoj.gov
6  ADAM J. KATZ (DC BAR NO. 502776)
   adam.katz@usdoj.gov
7  Environmental Defense Section
   U.S. Department of Justice
8  P.O. Box 23986
   Washington, DC 20026-3986
9  (202) 616-6519
   FAX: (202) 514-8865
10
   Attorneys for Defendant United States of America
11
```

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. CV-09-1734 AHM (RZx)<br><br>**DECLARATION OF MICHAEL AUGUSTINI IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S OPPOSITION TO AISLIC'S MOTION IN LIMINE**<br><br>Judge: A. Howard Matz<br>Hearing: February 7, 2011<br>Time: 10:00 AM<br>Location: Courtroom 14 |

**DECLARATION OF MICHAEL AUGUSTINI IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S OPPOSITION TO AISLIC'S MOTION IN LIMINE**

I, Michael Augustini, hereby declare as follows:

1. I am a Trial Attorney for the United States Department of Justice and am counsel of record for Defendant United States of America in this action. I submit this declaration in support of Defendant United States of America's Opposition to AISLIC's Motion in Limine.

2. A true and correct copy of excerpts from David Bauer's January 7, 2010 deposition in *American International Specialty Lines Insurance Company v. United States,* No. CV-09-1734 AHM (RZx), is attached hereto as Exhibit A.

Pursuant to 28 U.S.C. 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed January 14, 2011 in Washington, D.C.

By: */s/ Michael Augustini*
MICHAEL C. AUGUSTINI

**DECLARATION OF MICHAEL AUGUSTINI IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S OPPOSITION TO AISLIC'S MOTION IN LIMINE**

# Exhibit A

```
                    UNITED STATES DISTRICT COURT

                  CENTRAL DISTRICT OF CALIFORNIA


AMERICAN INTERNATIONAL SPECIALTY   )
LINES INSURANCE COMPANY,           )
                                   )
            Plaintiff,             )
                                   )
      vs.                          ) Case No.: CV 09-01734
                                   )           AHM (RZx)
UNITED STATES OF AMERICA,          )
                                   )
            Defendant.             )
_____)



                   DEPOSITION OF DAVID L. BAUER

                     Los Angeles, California

                    Thursday, January 7, 2010




Reported by:  Cheryl M. Parrish
Job No. 7571
```

1      Q   And then dumped it into residential
2  neighborhoods?
3      A   Not really.
4      Q   All right.
5      So, in addition to the nonfissioned
6  uranium, what else?
7      A   That involved a lot of secondary skill
8  development, this type of thing, working --
9  developing analytical techniques, working with
10 chromatography in order to do that work.  It's phase
11 diagrams with a variety of heavy metals and so
12 forth.
13     Q   Did you work with any volatile organic
14 compounds or perchlorate during that time?
15     A   Not perchlorate.  But volatile organic
16 compounds are just stock in trade in research
17 laboratories.  You have to work with them.
18     Q   Did you perform any research in connection
19 with the attributes or chemical characteristics of
20 VOCs during that time?
21     A   Well, the chemicals characteristics are so
22 well known, that wasn't necessary.  It was
23 understanding of those characteristics in order to
24 utilize the solvents correctly and handle them
25 safely.

1    Q    What were your responsibilities during
2  your tenure at IT Corp.?
3    A    I was -- on the engineering side, we --
4  they had half a dozen engineers.  And I was asked to
5  create a contract engineering shop, which we did
6  largely by acquisition of Hydroscience out of
7  Knoxville, Tennessee, plus local hires.  And I was
8  asked to try to get them in compliance with
9  environmental regulations, permit new facilities,
10 and do much the same thing that I had been doing at
11 Dow.
12   Q    What business was IT Corp. engaged in when
13 you went to work there?
14   A    They were -- when I went to work there,
15 they were in, exclusively, hazardous waste
16 management, including disposal, including treatment,
17 including transportation, including facility
18 cleaning, you name it.  Generation of waste to
19 ultimate disposal of waste.
20   Q    And how many hazardous waste management
21 disposal treatment facilities did IT Corp. have when
22 you went to work there in 1978?
23   A    Disposal, three.  Treatment, I think just
24 two.
25   Q    How about when you left?

1      A   When I left, we closed them down.  There
2  was only one treatment facility -- no, there was
3  two.  I added one.  There were still two, but it was
4  a different -- one of them was different.  And we
5  had one, two -- three additional treatment
6  facilities -- three additional disposal facilities.
7      Q   When you left, there were two treatment
8  facilities and three additional disposal facilities?
9      A   Yes.  So there would be six.
10     Q   So this company is involved in hazardous
11 waste management.  What does that mean?
12     A   That means that we'll manage your
13 hazardous waste for a fee.  If you're a refinery and
14 you have a tank that needs to be cleaned, we'll
15 clean the tank, we'll take the material that has to
16 be disposed of, we'll transport it, and then handle
17 it properly through disposal of it.  By the time I
18 left, however, they were largely an engineering
19 analytical shop as well.
20     Q   What type of engineering and analytical
21 work did they do?
22     A   Analytical was across the board.  The
23 engineering dealt with, again, hazardous waste
24 management.
25     Q   What aspects of hazardous waste management

1    on the engineering side?
2         A    Design of treatment facilities or
3    treatment units, as well as design of remediation
4    projects and control projects, this type of thing,
5    nationally.  When I went to work there, it was
6    California; when I left, it was national.
7         Q    So you provided design and engineering
8    services for other entities to construct facilities
9    engaged in the treatment or disposal of waste; is
10   that correct?
11        A    We did that.
12        Q    Okay.
13        A    We also did -- we were parallel to
14   A.T. Kearney, Inc.  We did that kind of work as
15   well.
16        Q    The one that did that fine RCRA report?
17        A    That wonderful report, yes.
18        Q    Now, many IT Corp. locations became
19   superfund sites; correct?
20        A    I'm not -- I'm not sure how true that is.
21        Q    Why are you not sure how true that is?
22        A    Because I haven't been to IT since 1986.
23        Q    Okay.
24             MR. HEIMBOLD:  Let's go off the record for
25   a second.

1  put in?
2      A    I don't know.  It's -- I've been working
3  on it off and on since last spring or summer.
4      Q    I think we've gone through your whole work
5  history from Idaho until the present; correct?
6      A    Well, you haven't done anything for
7  Targhee, but that's fine.
8      Q    During any of this time, did you do any
9  work for defense contractors?
10     A    IT worked for defense contractors all the
11 time.
12     Q    What sort of work?
13     A    Remediation design, disposal all the time
14 I was there, one after another.
15     Q    What sort of work did you do with defense
16 contractors while you were at IT?
17     A    A lot of times, I'd be on the site tour to
18 go out and look at remediation projects, help
19 design, from a safe environmental standpoint, how to
20 deal with certain materials, particularly chemicals,
21 what could be treated, what couldn't, and advise
22 the -- predominantly engineers with -- what the
23 environmental regulations were and the best way to
24 approach the problems.
25     Q    What DOD contractors did you work for --

```
 1   and they burned -- got a fire that involved about
 2   70,000 drums of hazardous waste.
 3        Q    When you say "they," who is "they"?
 4        A    "They" was the company that owned that
 5   site, and we were contracted by the EPA to correct
 6   it.
 7        Q    Is that a defense contractor site?
 8        A    No.  It was just the -- it was a -- the
 9   guys were stacking it up illegally.
10        Q    I want to talk just about defense
11   contractors.
12        A    I understand.
13        Q    Did you ever, as part of your duties,
14   design waste disposal programs for defense
15   contractors?
16        A    Well, even -- even Dow was a defense
17   contractor at one point.
18        Q    Okay.  Let's just narrow it a little more.
19             For any manufacturer of ordnance or
20   missiles or rockets, did you ever design any waste
21   disposal programs for them?
22        A    Well, when I was at Dow, late '60s, early
23   '70s, they were doing some work with high-energy
24   materials, and I set up the burn operation for the
25   waste and the excess there.  And we did it at
```

1  Pittsburg.
2     Q    High-energy materials.  What high-energy
3  materials?
4     A    Some of them were experimental.  Some of
5  them were the same type of materials that we're
6  dealing with here, where they were experimenting
7  with them for a variety of things.  Research people
8  were doing it, and they would have the material to
9  get rid of at the end.
10    Q    Can you name the materials?
11    A    One of them was Tazz, T-A-Z-Z, and that's
12 the one I remember.
13    Q    Now --
14    A    These were mixtures materials, even
15 hypergolic materials.
16    Q    But I'm asking questions about a company
17 that's actually engaged in the business of
18 manufacturing ordnance for the government.
19         Have you ever designed or consulted in
20 manufacture of ordnance for the government in
21 connection with its waste management practices?
22    A    At IT, we were taking some waste from,
23 like, Rockwell and others that were -- but that's
24 not ordnance.  That's rockets.
25    Q    Again --

1  Q   What opinions did you give in that case on
2  behalf of Fairchild?
3  A   I tracked the analytical data that was
4  available, and basically looked at the operations
5  that would have led to that contamination, and how
6  it would have gotten there.  And, basically, that's
7  it.
8  Q   Have you ever been engaged to testify
9  regarding the same issue that you're testifying in
10 this case?
11 A   Well, certainly perchlorate.
12 Q   All right.  In what regard have you
13 offered testimony in connection with perchlorate?
14 A   Groundwater contamination at Morgan Hill.
15 Q   Who hired you?
16 A   Man, I don't remember.
17 Q   Was it a plaintiff or a defendant?
18 A   It was a plaintiff in that case.  It was
19 the Duane Morris law firm here in the city.
20 Q   What sort of opinion did you give in that
21 case?
22 A   I opined as to how the perchlorate got
23 into the groundwater, with the operation aspects as
24 to what caused the it.
25 Q   So you've testified regarding

```
 1    perchlorates, but have you ever offered an expert
 2    opinion as to the appropriate standard of care to
 3    which a company should be held in connection with
 4    its disposal or maintenance of waste?
 5         A    Well, I certainly did in the Morgan Hill
 6    case.
 7         Q    Okay.  Other than Morgan Hill?
 8         A    The standard of care for -- in general?
 9              Can you tell me what -- when you say
10    "standard of care" what you mean?
11         Q    Well, in this case, your engagement is to
12    provide expert testimony of the appropriate standard
13    of care to which a defense contractor should be
14    compared in the context of this case; correct?
15         A    Yes.
16         Q    And that standard of care is the standard
17    of care in relation to the company's disposal and
18    handling of hazardous waste; correct?
19         A    Handling, disposal, yes.
20         Q    Okay.  So my question is:  Have you ever
21    offered expert testimony regarding the handling,
22    disposal of hazardous waste prior to this case?
23         A    Over and over.
24         Q    Okay.
25              Can you name -- on the list here, how many
```

1   of these cases did you offer opinion testimony
2   regarding the standard of care for the handling and
3   disposal of hazardous waste?
4        A    All of them.
5        Q    How many of them did you offer opinions
6   that the company had complied with the standard of
7   care for handling and disposal of hazardous waste?
8        A    It --
9             MS. MANN:  Excuse me, Counsel.  Are you
10  referring to just the list that's here?
11            MR. HEIMBOLD:  Yes.  On Appendix B.
12            THE WITNESS:  It breaks down that, when
13  you look at the actions, some of them comply and
14  some of them do not.  So, then, that's where you
15  come out.
16  BY MR. HEIMBOLD:
17       Q    Right.
18       A    And that's -- some operations are done
19  very well and comply and some do not.  And it's
20  usually a mixed -- mixed bag.  Some cases are not;
21  it's not a mixed bag at all.  I mean, it's just
22  deliberate and away you go.  You can't argue with
23  that.
24       Q    But --
25       A    At least I can't.