1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4    - - -

**COPY**

5

6

7    AMERICAN INTERNATIONAL            )
     SPECIALTY LINES INSURANCE         )
     COMPANY,                          )

8                  PLAINTIFF,          )
                                       )

9         vs.                          ) No. CV09-1734-AHM(RZx)
                                       )

10                                     )
     UNITED STATES OF AMERICA,         )

11                                     )
                   DEFENDANT.          )

12   _____)

13

14            REPORTER'S TRANSCRIPT OF TRIAL

15                 DAY 5 - VOLUME 2

16            LOS ANGELES, CALIFORNIA

17            TUESDAY, MARCH 2, 2010

18                 1:15 P.M.

19

20

21

22   _____

23            CINDY L. NIRENBERG, CSR 5059
              U.S. Official Court Reporter
24            312 North Spring Street, #438
              Los Angeles, California 90012
25                *www.cindynirenberg.com*

```
 1              MS. SPIRA:  Blue and green.

 2              MR. JANSSEN:  We did, and where they are, I don't

 3    have the slightest idea.

 4              Where are they?

 5              They're right there (indicating).

 6              THE COURT:  All right.  So here's where we stand,

 7    Counsel.  It's 10 to 3:00.  I'm going to try to review this

 8    deposition testimony and we'll resume tomorrow at 9 o'clock.

 9              And the only guidance I'm going to be able to give

10    you I'm going to give you now, because I have run out of time

11    to try to go back over what has transpired and come to my

12    attention since the trial began.

13              I think both sides would be very well advised to

14    focus their closing arguments on witnesses with percipient

15    information, and that would mean the contemporaneous witnesses.

16    Tigue is an example, but maybe not the only one.

17              Now, I know that both sides have labored under a huge

18    handicap here and it explains the peculiar way that this case

19    has been presented at trial, because you are trying to

20    re-create history that came to a stop a long time ago and it's

21    not easy.

22              But I don't find, as a general matter, the so-called

23    expert testimony and the conclusions and the references that

24    many of these witnesses made to what they had read and they had

25    seen to be as valuable -- let me put it that way -- as what
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Exhibit A, Page 4

1  somebody who is questioned and had a chance to be

2  cross-examined said about what was really going on out at the

3  plant.

4          Both sides drafted the declarations, which is, of

5  course, what lawyers do, put words into the declarants' minds

6  and mouths, and these people, when they wound up testifying,

7  especially if they were purportedly designated or, in fact,

8  functioning as experts, presented the same issues -- let me put

9  it that way -- as experts technically present in the minds and

10  ears of jurors.  And that's my take on them as a general

11  matter.

12          So you'd be very ill advised to try to make your

13  cases based upon the summary testimonies if there is a better

14  form of establishing the point.

15          The next thing is you really need to have hard-copy

16  exhibits available for me of the exhibits you're going to

17  display.  I may be able to see what you're referring to by use

18  of the monitors, but when I get off the bench at the end of the

19  arguments tomorrow, I'm not going to be switching on electronic

20  equipment and I want the set of whatever you're going to be

21  demonstrating to me that I can take back to chambers and look

22  at when I have the chance to do so.

23          The next thing is to the extent that there is this

24  fundamental issue of ownership, I haven't fully read the

25  Northrup case.  If that's the linchpin of the plaintiff's

1    argument -- and I have read part of it and Shepardized it --

2    then the government better be in a position to tell me why the

3    result that the plaintiffs think the Northrup case dictates

4    should not be the result here.  So you'd be very ill advised if

5    you blow off that case and the plaintiffs rely on it.

6            I mean, that's your key case, right?

7            MR. JANSSEN:  That is the key case for the production

8    side of this case, Your Honor, correct.

9            THE COURT:  Okay.  So I'm just giving you a little

10   guidance to -- I guess it's going to be you, Mr. Augustini, who

11   argues?

12           MR. AUGUSTINI:  Yes.

13           THE COURT:  I regret very much that with all the

14   money that's at stake here and the huge effort -- and I

15   appreciate the professionalism of both sides -- I really

16   regret, in retrospect, that you didn't spend the money to

17   fabricate a three-dimensional model that would have had

18   removable parts and would have enabled me to see how these

19   different features -- but don't spend a lot of time talking

20   about the diagrams anymore, because you're not going to succeed

21   in educating me any better than you already have.

22           If there are policy considerations that you think are

23   meaningful and direct and significant that will follow from

24   whichever way I rule -- and I currently have a totally open

25   mind -- you're welcome to argue the precedential implications

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    of this case.

2           If the insurance industry is going to collapse if I

3    rule for the government, you can say so.  If the government is

4    going to be ground to a sudden halt if I rule for AISLIC, you

5    can say so.  But you better be able to explain just why.

6           I think that one of the peculiar features of this

7    case, as I sit here and try and make sense out of it, is that

8    there is a counterintuitive, but shifting, dynamic underway.

9    Sometimes the government wants to stress evidence that show how

10   carefully Whittaker attempted to avoid releases, and at other

11   times, how sloppy it was at avoiding releases.

12           And I take it it's because the government is picking

13   and choosing as to what the equipment was or what the

14   circumstances were or where certain things were released, and

15   if it was government equipment or government had title, then it

16   couldn't have been possibly any release and that's because

17   Whittaker did a good job, and then the converse of that is

18   true.  And I think AISLIC did that, too.

19           I'll leave it to you lawyers to figure out how you

20   want to handle that apparent tension or else educate me why it

21   isn't a tension.  But I found it to be faintly humorous to see

22   how you would switch sides of the boxing ring depending on what

23   portion of the case you were focusing on.

24           Those are my suggestions, and I'll see you tomorrow

25   morning at 9 o'clock.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3         HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

 4                    - - -

 5

 6
    AMERICAN INTERNATIONAL          )
 7  SPECIALTY LINES INSURANCE       )
    COMPANY,                        )
 8                    PLAINTIFF,    )
                                    )
 9         vs.                      ) No. CV09-1734-AHM(RZx)
                                    )
10                                  )
    UNITED STATES OF AMERICA,       )
11                                  )
                      DEFENDANT.    )
12  _____)

13

14           REPORTER'S TRANSCRIPT OF JURY TRIAL

15                  DAY 2 - VOLUME 2

16               LOS ANGELES, CALIFORNIA

17              TUESDAY, FEBRUARY 23, 2010

18                     10:57 A.M.

19

20

21

22         _____

23              CINDY L. NIRENBERG, CSR 5059
                U.S. Official Court Reporter
24              312 North Spring Street, #438
                Los Angeles, California 90012
25                  www.cindynirenberg.com
```

**COPY**

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that allocation is purely an issue for the Court to decide and

2    that expert testimony is unnecessary.

3              Mr. Zoch has submitted two Rule 26 reports.  The

4    plaintiff went first.  He included allocation opinions in his

5    June '09 report, November '09 report.  Mr. Low submitted

6    rebuttal reports to Mr. Zoch.

7              So until Friday, when the objections to the witness

8    declarations and move to block testimony were due under the

9    Court's case management order, we have been preceding under the

10   assumption that allocation experts would be presented at trial.

11             If the Court does not --

12             THE COURT:  Which is a valid assumption.  I can spare

13   you some time.  Just because it's a Court issue doesn't mean

14   the Court can't receive or possibly be persuaded or influenced

15   by expert testimony.

16             I mean, the objection -- I haven't read the

17   objection, so maybe I'm misplaced in commenting on it, but it

18   doesn't seem to me like it's an objection that's valid.  Both

19   reports and both experts can testify, even if it's about issues

20   of allocation.

21             MR. HASSLER:  Your Honor, may I be heard just briefly

22   to make sure the Court has all the information that we think is

23   relevant on this?

24             THE COURT:  Yes.

25             MR. HASSLER:  Your Honor, the discussions you just

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    had, the colloquy with Mr. Janssen and Mr. Augustini, about the

 2    issues that were most important in your own mind, the issue of

 3    allocation came up in terms of the importance it might have in

 4    resolving the case.

 5              It's our view that, basically, the lawyers can argue

 6    the case more effectively than having witnesses on the stand

 7    arguing for them, is effectively what we think is going to

 8    happen.  And we brought our motion knowing full well that if

 9    Your Honor granted it as to Mr. Low, that it would also be

10    granted as to that portion of Mr. Zoch's testimony.

11              And so it's more than what I would call a

12    housekeeping matter, that it could very significantly affect

13    what's to come in both -- in terms of both our witness and

14    their witness.  I want to make clear we're not trying to have

15    it go one way.  We fully expect it will go both -- the same way

16    for both parties.

17              THE COURT:  Well, it will go -- rulings are

18    reciprocal.  And the impact may differ, but the concept is

19    going to be reciprocal.

20              And I don't know exactly what anybody is going to

21    tell me, as I already acknowledged, starting with Zoch.  I'm

22    behind you.

23              But I am not -- I'm assuming that nobody is going to

24    be asking for some legal opinion.  That's totally outside the

25    proper scope of inquiry.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Exhibit B, Page 10

1    hard-working, extremely burdened law clerk.  And when we have

2    breaks, I'm working with her on TROs and seizure orders that

3    are coming in and things like that.

4              So my initial thought, in going back and looking at

5    Mr. Zoch's declaration, is that I owe it to my job and I owe it

6    to you to review all this material before I permit any

7    cross-examination of Zoch.

8              But my more important point -- and this is the

9    guidance I'm giving you, because it's five to 3:00 now; I have

10   put back the criminal calendar until 3:30, but there is no

11   point in even starting -- is that it's now clear to me -- and I

12   regret that it couldn't have been or wasn't before -- that

13   there is no way this trial can be properly or fairly conducted

14   in the eight days I gave you, which is a lot more than I give,

15   that would cover all of the ground that you are attempting to

16   cover.  It's absolutely impossible.

17             And I think on the issues of allocation, the

18   appropriate, sensible, fair thing to do is to bifurcate those

19   issues, and if the government loses and liability is imposed on

20   either or both of the theories that AISLIC is pursuing, my

21   current plan is to appoint a special master.  I'm not going to

22   get into a hearing; I'm not going to get into evidence; I'm

23   going to require the parties to make their various cases before

24   a special master.  I'm going to invite a Report and

25   Recommendation from the special master, and I will review it as

1    carefully as I can.

2        And I have done this before and I'll do it

3    appropriately, and we'll see what the outcome is here.  We may

4    never get to that point and we may get to that point.

5        Some of what Mr. Zoch said in this declaration

6    appears to be very objectionable, but I may be wrong.  I have

7    to look at AISLIC's responses.

8        A lot of it is maybe lacking in foundation and

9    perhaps exceeding the scope of what relevant and applicable

10   testimony he can give and maybe not.  I'll tell you tomorrow

11   morning.

12       I'll also hear from you if you want to file something

13   from you overnight.  You can get all your armies of lawyers

14   together and put it together as to why I shouldn't bifurcate

15   the case.

16       Now, I understand on a personal and professional

17   level, Mr. Augustini already raises, "My God, Judge, we've

18   spent three years working on this case.  We're all geared up.

19   We're all here.  We've complied with your orders.  We filed all

20   these documents.  Don't bifurcate it now.  You didn't tell us

21   that you were planning to."

22       And there is some appeal to that argument, but I'm

23   not at all inclined to defer to it because you are not going to

24   get a fair trial if I try to do it in the eight days.  It's

25   just humanly and professionally and judicially impossible.  I

Case 2:09-cv-01734-AHM-RZ  Document 128-2  Filed 02/24/11  Page 11 of 37  Page
ID #:2869
Case 2:09-cv-01734-AHM-RZ  Document 97-3  Filed 02/08/10  Page 11 of 104  Page ID #:2449

1 IGNACIA S. MORENO
  Assistant Attorney General
2 Environment & Natural Resources Division

3 MICHAEL C. AUGUSTINI (DC BAR NO. 452526)
  michael.augustini@usdoj.gov
4 MEREDITH WEINBERG (VA BAR NO. 47516)
  meredith.weinberg@usdoj.gov
5 MARTHA C. MANN (FL BAR NO. 155950)
  martha.mann@usdoj.gov
6 ADAM J. KATZ (DC BAR NO. 502776)
  adam.katz@usdoj.gov
7 Environmental Defense Section
  U.S. Department of Justice
8 P.O. Box 23986
  Washington, DC 20026-3986
9 (202) 616-6519
  FAX: (202) 514-8865
10
   Attorneys for Defendant United States of America
11

12           **UNITED STATES DISTRICT COURT**

13           **CENTRAL DISTRICT OF CALIFORNIA**

14

15

16 AMERICAN INTERNATIONAL
   SPECIALTY LINES INSURANCE
17 COMPANY,                              Case No. CV-09-1734 AHM (RZx)

18            Plaintiff,                **DECLARATION OF MATTHEW
                                        LOW IN LIEU OF DIRECT
19      v.                              TESTIMONY**

20 UNITED STATES OF AMERICA,

21            Defendant.

22

23

24    1. I am an attorney and an engineer, and, of relevance to this matter, I have

25       used these disciplines for the past twenty-three years to address equitable

26       cost allocation issues in numerous CERCLA cases as an arbitrator, mediator,

27       settlement counselor, and expert witness. I have appeared before courts and

                                      1

ALLOCATION FRAMEWORK -- WJCS -- WHITTAKER-BERMITE SITE

ATTACHMENT 2 -- Revised

| Area | **CONTAMINANT CONTRIBUTION** | | | | | **DEGREE OF INVOLVEMENT ALLOCATION** | | | | | | | **OTHER FACTORS ADJUSTMENT** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cont. Soil (CY) | % of Cont. Soils | % of Cont. from Govt. Work | Adjusted % from Govt. Work | | Ownership of Land, Buildings, Infrastructure, Equipment | Involvement in Overall Facility Operations | Involvement in Use, Disposal and Release of Contaminants | Ownership of Contaminants or Work in Progress | Knowledge | Economic Benefit | Total Degree of Involvement % | U.S.% w/o Care or Coop. Adjust | Care Adjust. | Coop. Adjust. | Adjust. | Adjusted (Normalized) Degree of Involvement % | U.S. Allocation % | Decrease in U.S. % due to Care or Coop. Adjust. |
| | | | | | Weight % --> | 20% | 20% | 30% | 20% | 5% | 5% | 100% | | | | | | | |
| Northern Production Area (OU-5, OU-1Dn) | 1,163,953 | 15.82% | 50.00% | 7.91% | U.S | 5% | 0% | 10% | 0% | 10% | 0% | 4.50% | 0.356% | 1 | 1 | 4.50% | 4.11% | 0.325% | 0.031% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 90% | 100% | 90% | 100% | 95.50% | | 1.1 | 1 | 105.05% | 95.89% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.55% | 100.00% | | |
| Southern Production Area (OU-1A, B, C, Ds, E and OU-2) | 4,018,906 | 54.61% | 90.00% | 49.15% | U.S | 5% | 0% | 15% | 5% | 30% | 0% | 8.00% | 3.932% | 1 | 1 | 8.00% | 7.33% | 3.600% | 0.331% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 85% | 95% | 70% | 100% | 92.00% | | 1.1 | 1 | 101.20% | 92.67% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.20% | 100.00% | | |
| Burn Valley and Burn Area (OU-3) | 2,094,336 | 28.46% | 85.00% | 24.19% | U.S | 0% | 0% | 20% | 5% | 50% | 0% | 9.50% | 2.298% | 1 | 1 | 9.50% | 9.09% | 2.198% | 0.099% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 80% | 95% | 50% | 100% | 90.50% | | 1.05 | 1 | 95.03% | 90.91% | | |
| | | | | | | | | | | | | 0.00% | | | | 104.53% | 100.00% | | |
| Hula Bowl Landfills Area and Unpermitted Landfills (OU-4) | 82,561 | 1.12% | 85.00% | 0.95% | U.S | 0% | 0% | 0% | 0% | 10% | 0% | 0.50% | 0.0048% | 1 | 1 | 0.50% | 0.45% | 0.0043% | 0.0004% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 100% | 100% | 90% | 100% | 99.50% | | 1.1 | 1 | 109.45% | 99.55% | | |
| | | | | | | | | | | | | | 6.590% | | | 109.95% | 100.00% | 6.128% | 0.462% |
| | 7,359,756 | 100.00% | | 82.20% | | | | | | | | | | | | | | | |

ALLOCATION FRAMEWORK -- WHITTAKER-BERMITE SITE -- Perchlorates

ATTACHMENT 3 -- Revised

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 14 | 15 | 16 | 17 | 18 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CONTAMINANT CONTRIBUTION | | | | | DEGREE OF INVOLVEMENT ALLOCATION | | | | | | | | OTHER FACTORS ADJUSTMENT | | | | | |
| Area | Cont. Soil (CY) | % of Cont. Soils | % of Cont. from Govt. Work | Adjusted % from Govt. Work | | Ownership of Land, Buildings, Infrastructure, Equipment | Involvement in Overall Facility Operations | Involvement in Use, Disposal and Release of Contaminants | Ownership of Contaminants or Work in Progress | Knowledge | Economic Benefit | Total Degree of Involvement % | U.S. % w/o Care or Coop. Adjust. | Care Adjust. | Coop. Adjust. | Adjust. | Adjusted (Normalized) Degree of Involvement % | U.S. Allocation % | U.S. % decrease due to Coop. or Care or Coop. |
| | | | | | Weight % --> | 20% | 20% | 30% | 20% | 5% | 5% | 100% | | | | | | | |
| Northern Production Area (OU-5, OU-1Dn) | 144,566 | 23.73% | 50.00% | 11.87% | U.S | 5% | 0% | 10% | 0% | 10% | 0% | 4.50% | 0.534% | 1 | 1 | 4.50% | 4.11% | 0.487% | 0.047% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 90% | 100% | 90% | 100% | 95.50% | | 1.1 | 1 | 105.05% | 95.89% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.55% | 100.00% | | |
| Southern Production Area (OU-1A, B, C, Ds, E and OU-2) | 356,287 | 58.50% | 90.00% | 52.65% | U.S | 5% | 0% | 25% | 10% | 30% | 0% | 12.00% | 6.3175% | 1 | 1 | 12.00% | 11.03% | 5.8065% | 0.511% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 75% | 90% | 70% | 100% | 88.00% | | 1.1 | 1 | 96.80% | 88.97% | | |
| | | | | | | | | | | | | 0.00% | | | | 108.80% | 100.00% | | |
| Burn Valley and Burn Area (OU-3) | 104,426 | 17.14% | 85.00% | 14.57% | U.S | 0% | 0% | 30% | 5% | 50% | 0% | 12.50% | 1.822% | 1 | 1 | 12.50% | 11.98% | 1.745% | 0.076% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 70% | 95% | 50% | 100% | 87.50% | | 1.05 | 1 | 91.88% | 88.02% | | |
| | | | | | | | | | | | | 0.00% | | | | 104.38% | 100.00% | | |
| Hula Bowl Landfills Area and Unpermitted Landfills (OU-4) | 3,807 | 0.63% | 85.00% | 0.53% | U.S | 0% | 0% | 0% | 0% | 10% | 0% | 0.50% | 0.003% | 1 | 1 | 0.50% | 0.45% | 0.00% | 0.00% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 100% | 100% | 90% | 100% | 99.50% | | 1.1 | 1 | 109.45% | 99.55% | | |
| | | | | | | | | | | | | | 8.676% | | | 109.95% | 100.00% | 8.042% | 0.634% |
| | 609,086 | 100.00% | | 79.62% | | | | | | | | 400% | | | | | | | |

# EXPERT REPORT ON ALLOCATION WITH RESPECT TO THE WHITTAKER-BERMITE SITE

## MATTHEW A. LOW

### Project Performance Corporation

### August 24, 2009

## INTRODUCTION

The matter involves a claim against the United States by American International Specialty Lines Insurance Company (AISLIC), as subrogee of Whittaker Corporation, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for recovery of response costs associated with perchlorate contamination at the Whittaker-Bermite Site (Site).  On behalf of U.S. Department of Justice, I have been asked to provide my opinion in rebuttal to the Expert Report of Robert Zoch (Zoch report) on the issue of allocation.  This report addresses equitable allocation of claimed perchlorate response costs between the U.S. and Whittaker-Bermite (the Site owner/operator).

Assuming, arguendo, that the Court finds the U.S. liable under CERCLA, allocation entails considering and applying different facts to relevant allocation factors. Ultimately, the Court will make findings of fact and equity in reaching its allocation decision.  I am mindful that it is the province of the Court to decide which equitable factors are applicable and how they should be applied.  In my view, allocation experts can be of optimum assistance to the Court by:

1.  recommending the types of factors that they, in their experience, consider to be most applicable or useful to the Court in a particular case setting; and

2.  outlining an allocation methodology and framework that allows the Court some flexibility in determining how to fairly apply the equitable factors to the facts of the case.

My intent with this report is to both critique the Zoch report and offer an opinion concerning an appropriate allocation framework for alleged perchlorate costs associated with this Site.[1]  As I understand his report, Zoch's opinion is that the U.S. should be allocated between 79.8% and 100% of costs associated with perchlorate contamination at

---

[1] I am advised that the Court initially limited AISLIC's claim to perchlorate, but has since consolidated this action with AISLIC's second lawsuit regarding other contaminants allegedly at the Site.  I also am aware that the Court has ordered additional discovery regarding non-perchlorate issues and set different dates for expert reports regarding those contaminants.  Accordingly, this report does not address what allocation may be appropriate for those contaminants (assuming AISLIC establishes liability).

framework and there is no precedent for such a significant allocation for "arranger" liability in a case involving a manufacturing facility that was privately owned and operated.  When considering the respective degrees of involvement of site owner/operators and entities with which they contract, it is more appropriate to consider the totality of their course of dealing, without any category labels.  By contrast, Zoch appears to have ignored the totality of circumstances, including Whittaker-Bermite's total control of the Site and the extent to which contamination at the Site was the result of Whittaker-Bermite's waste handling practices.

Zoch also adds 15% to the U.S. allocation – in his illustration, 5% each for care, cooperation and benefits.  I agree with Zoch that these may be relevant allocation factors and they generally are subjective.  However, Zoch's method of incorporating them and his justification is based on an incomplete and one-sided view of the facts.

His reference to and reliance on World War II cases on the question of benefits is inappropriate  inasmuch as there is no evidence that perchlorate was used in any products manufactured under World War II contracts at the Site.  Perchlorate was used in both private and government contracts, and Whittaker-Bermite gained revenue and profits from its work under these contracts.  In presenting a one-sided view of the facts, Zoch inexplicably ignores any economic benefits realized by Whittaker.[18]

With respect to cooperation, Zoch again presents a one-sided view – overlooking the fact that the U.S. provided $7 million in funding for groundwater studies at the Site to examine the extent of perchlorate contamination.[19]  He also overlooks the fact that the U.S. acted to settle the matter with Steadfast for $33.85 million, while AISLIC declined to enter into a settlement.  Zoch also fails to note the extent to which Whittaker-Bermite resisted California regulatory authorities' efforts to have Whittaker-Bermite address groundwater issues at the Site until ordered or sued by local water purveyors.[20]  California regulators also believed that Whittaker-Bermite failed to disclose the full extent of the landfills and dumps present on the Site.[21]  The California Department of Toxic Substances Control was prompted to recommend that the California Attorney General pursue action against Whittaker for violations of California's Health and Safety Code.[22]  These were all Site-specific actions that, in my opinion should bear on an assessment of the parties' relative degrees of cooperation.[23]

---

[18] For example, Whittaker-Bermite's contracts with the government for rocket motors involved revenue of over $50 million.  See Expert Report of Jay Brigham and citations therein.

[19] See, e.g., Deposition of Karen Anderson, pp 58-61, 71-72.

[20] See Complaint, ST 46507.

[21] Deposition of Alan Sorsher, pp. 20-28, 43-49.

[22] ST030774.

[23] Although Zoch takes issue with the Department of Defense's general views and actions on perchlorate issues, those issues are less relevant to what the parties have done to address contamination at the Site.  Moreover,  Zoch does not note that Whittaker has actively advocated similar positions on regulatory issues,

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3    AMERICAN INTERNATIONAL         )

4    SPECIALTY LINES INSURANCE      )

5    COMPANY,                )No. CV 09-01734

6         Plaintiff,      )AHM(RZx)

7          v.          )

8    UNITED STATES OF AMERICA,     )

9         Defendant.      )

10        - - - - - - - - - - -

11

12        DEPOSITION OF MATTHEW A. LOW

13        Friday, January 22, 2010

14            Washington, D.C.

15

16

17

18    Reported by:  Cheryl A. Lord, RPR, CRR

19

20

21

22

23

24

25

1    across any provisions that suggest the United States

2    owned the work in progress?

3        A.    I'm familiar with the contract provision

4    that Zoch has cited.  I think I covered it in my

5    rebuttal -- in my supplemental report.

6        Q.    Right.

7            What I'd like to do is show you a copy of

8    what's been marked as exhibit 859.

9            Now, you mention in your report you're not

10   aware of any provisions in rocket motor contracts

11   indicating the U.S. owned the work in progress.

12           If it turned out that the United States did

13   in fact own the work in progress of the products that

14   contributed to the contamination at the site, would

15   that affect your allocation?

16       A.    It might.

17       Q.    Okay.  How would it affect it?

18       A.    Well, in the factor of ownership of

19   contaminants or work in progress?

20       Q.    M-hm.

21       A.    In my allocation, I took into account the

22   possibility of the U.S. owning some work in progress

23   in the southern -- in my allocation for the southern

24   production area.

25       Q.    Right.

Exhibit D, Page 19

1    A.   As you see --

2    Q.   Of 10 percent?

3    A.   -- 10 percent.

4         It may cause me to revisit that if the

5    court found that the United States owned the work in

6    progress --

7    Q.   All right.

8    A.   -- process.

9    Q.   Take a look at that 859.

10        On the second page, it says:  Immediately

11   upon the date of this contract, title to all parts,

12   materials, inventories, work in process, special

13   tooling -- skipping a few lines -- theretofore

14   acquired or produced by the contractor and allocated

15   or properly charged to this contract under sound and

16   generally accepted accounting principles and practices

17   shall forthwith vest in the government immediately

18   under date of the contract.

19        So reading this, if this provision were in

20   fact a schedule to the contracts under which Whittaker

21   was producing rocket motors, how would that affect

22   your allocation?

23   A.   Well, in a couple different ways.

24        I think that there are -- well, I've seen

25   this, and as I interpret this, it's really a provision

Low, Matthew A.  1/22/2010  9:25:00 AM

1    that allows the United States to protect itself

2    against progress payments it's made to a

3    contractor.  It's in the progress payment section, and

4    I think there's been a history of how this particular

5    type of provision has been relied on and used over

6    time.

7         So in essence, it's to protect the United

8    States security interest in the event that the company

9    goes bankrupt or the company can't fulfill its

10   provision.  So that's one point.

11        It wouldn't in my view relate to the waste,

12   because in fact as I mentioned in my report, this also

13   indicates that anything that's not delivered to the

14   government vests back to the contractor.  So in that

15   factor, I'm really talking about the ownership of

16   contaminants or work in process.  Ownership of the

17   contaminants is important.

18        Ownership of the waste, responsibility for

19   the waste is a very key component of that factor, and

20   it's not clear to me as I read this that it would

21   necessarily cover certain contaminants like TCE and

22   PCE.  I don't know to what extent TCE and PCE would be

23   allocable to the contracts that we're talking about,

24   the firm, fixed-price contracts.

25        So there would be a lot of issues that I

1    have to address to determine how I would change the

2    allocation for either perchlorate or for TCE and PCE.

3        Q.   You mention in the report that work in

4    progress -- ownership of work in progress, that's an

5    important factor.

6            Right?

7        A.   Yes.

8        Q.   This contract says they did own all the

9    work in progress.

10       A.   And I think the question is, how do you

11   interpret that, how do you interpret this provision.

12       Q.   Okay.  Do you have any reason to believe

13   that this provision would not result in the United

14   States owning the rocket motors while they're in the

15   process of being manufactured?

16       A.   Yeah.

17            I have reason to believe that it's at least

18   possible that a court would interpret it to mean that

19   this was more in the nature of a lien than it was a

20   work in -- absolute title vesting in the government.

21       Q.   Even though it says, immediately upon the

22   date of this contract, title to all materials shall

23   vest in the government?

24       A.   Yeah.

25            I've seen various articles or cases that

1  have interpreted this type of provision or this exact

2  same wording to mean less than absolute title.

3       Q.   All right.  And what decision have you seen

4  that suggests that this provision does not give the

5  government ownership of the work in progress?

6       A.   I'm familiar with some decisions.  I think

7  there's one called -- I'm not sure -- maybe it was

8  Marine Midland some time ago -- at least one decision

9  that I'm aware of that interprets this more as a lien

10  than absolute title.

11       Q.   Have you taken any steps to analyze the

12  effect of this contract on your allocation?

13       A.   I have not.

14       Q.   All right.  Is it possible that it might

15  change your allocation of the ownership?

16       A.   Yes.

17       Q.   Do you intend to review it and take into

18  account the effect that this might have on your

19  allocation?

20       A.   Yes.

21       Q.   Now, let's assume that this clause did in

22  fact -- or that the court found that this schedule did

23  give the United States title to all work in progress

24  for these rocket contracts.

25            How would that affect your ownership of

1  contaminants or work in progress allocations in this

2  report?

3      A.   As I mentioned, I would look at it for

4  perchlorate and look at it for TCE and PCE, at least

5  try to get some sense of whether it applied to TCE and

6  PCE.  My sense is that it might not, because they were

7  general storage supplies.

8      Q.   But on the perchlorate, would it result in

9  an increase in your allocation?

10      A.   It might.  I would take into account that

11  fact of absolute vesting, but as I mentioned before,

12  I've at least considered the prospect of the U.S.

13  having some ownership of work in progress for the

14  purpose of this.

15          So they didn't own -- I don't believe they

16  owned any of the waste, which as I said is pretty

17  important.

18      Q.   Let's look at that, because what it says

19  is -- it also says about three-quarters of the way

20  down -- page 9, dash 20, that current production scrap

21  may be sold by the contractor without approval of the

22  contracting officers and the proceeds shall be

23  credited against the costs of contract performance.

24          Do you see that?

25      A.   Let me -- it's one of these -- let me find

Case 2:09-cv-01734-AHM-RZ Document 199-2 Filed 01/24/11 Page 23 of 37 Page
Case 2:09-cv-01734-AHM-RZ Document 179 Filed 06/30/10 Page 15 of 37 Page ID #:2679
ID #:8461

1
2
3
4
5
6
7
8
9
10
11

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

12
13
14

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | Case No.: CV 09-01734 AHM (RZx) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL)** |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 2:09-cv-01734-GHK-RZ Document 199-2 Filed 04/24/11 Page 24 of 37 Page
Case 2:05-cv-04734-AHM-RZ Document 179 Filed 06/30/10 Page 45 of 57 Page
ID #:8462

1.    **The Government Owned All Work in Progress as a Result of the Title Vesting Clause**

52.    During the rocket motor manufacturing process at Bermite, title to all materials "allocable or properly chargeable" to the rocket motor contract vested in the United States.  Only after the entire contract was completed and the final payments were made, which could take years, would title to the allocable items not delivered to and accepted by the Government vest in the contractor.  Thus, during the entire manufacturing process, the Government was vested with title to all allocable items, whether delivered or not.  2/26/10 AM Tr. 744:3–745:5 (Tamada); Trial Ex. 1696.0130-0131 and Trial Ex. 6601 at p. 123.

53.    The Title Vesting Clause on its face applies to all work in progress and all allocable materials, including materials (such as perchlorate) lost to "attrition," testing or rejection of motors during the manufacturing process; it does not on its face exclude waste, or materials that may become waste.  2/26/10 AM Tr. 744:25–745:13 (Tamada), Trial Ex. 1696.0130-0131 and Ex. 6601.

54.    Under the contractual Vesting Clause provision, the United States took title to all rocket motors under production as work in progress.  The works in progress included both those rocket motors that ultimately satisfied the Government's manufacturing and testing specifications and those that ultimately failed to satisfy the specifications.  Trial. Exs. 1696.0129 and 6601.

2.    **As a Result of the Title Vesting Clause, The Government Owned All Perchlorate and Solvents Purchased for Use under the Surviving Rocket Motor Contracts**

55.    Raw materials purchased by Bermite to be used with respect to each surviving rocket motor contract included both ammonium perchlorate and VOCs.  Trial Ex. 1022.0296.  Ammonium perchlorate was a major constituent of N-29 propellant used in the rocket motors.  VOCs were required in order to clean production equipment, including mixers and mandrels as part of the rocket motor

10

79.     The mandrels were placed in the rocket motor tubes prior to casting to give form and shape to the propellant in the rocket motor tubes.  Tigue Depo. 82:19-25; Calkins Decl. ¶67.

80.     The cast and cure assemblies were GFE and used to cast propellant into the rocket motor tubes.  Trial Exs. 6564 (Propellant pouring photograph); 1629.0257-60; 2/24/10 AM Tr. 320:3-19 (Calkins); Calkins Decl. ¶ 68; Tigue Depo. 84:9-16.

81.     Fixtures were GFE and used to hold the casting mandrel to the rocket motor and mandrel assembly.  2/25/10 AM Tr. 501:20-25 (Zoch); Trial Ex. 6551; Zoch Decl. Table 1.

82.     Jigs were GFE and were used to guide machine tools or to hold a piece of work in place in the process of perchlorate.  2/25/10 AM Tr. 503:5-10 (Zoch); Trial Ex. 6551; Zoch Decl., ¶¶ 87-92 and Table 1.

83.     Compression molds were GFE and were used as a "shape onto which a material could be placed or into which a material could be injected to form an object."  2/25/10 AM Tr. 503:22-25 (Zoch); Trial Ex. 6551; Zoch Decl. Table 1.

84.     Compression molds were also used to push down the propellant after casting and curing process.  Tigue Depo. 85:4-15.

85.     Dies and tools were GFE and were used to shape the ends of the propellant grain in the manufacture of rocket motors.  2/25/10 AM Tr. 519:3-520:4, 520:12-20, 522:20-523:2 (Zoch).

### 3.     There Were "Disposals" and "Releases to the Environment" of Perchlorate and Solvent Waste at the GFE

86.     Generation, disposal, and release of perchlorate and VOC waste resulted from the use of the specialized government furnished equipment and tooling, including mandrels, cast and cure assemblies, jigs, molds, fixtures, and grinders.  2/25/10 AM Tr. 501:12-502:4, 504:14-18, 518:14-520:20 (Zoch).

FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL TRIAL)

87.    The manufacture of Sidewinder and Chaparral rocket motors resulted in the generation of 300 pounds of waste propellant per day when the Saugus plant was operating at full capacity.  Trial Ex. 168.

88.    Grinding of perchlorate was required to be conducted according to Government specification.  Tigue Depo. 26:1-27:5, 257:2-260:12 and Trial Ex. 18.

89.    Grinders, such as the Government owned and furnished Crusher, Multi-Swing Hammer, were used to grind ammonium perchlorate to Government specified sizes for use in rocket motors.  Tigue Depo. 26:9-18, 26:19-27:5; Calkins Decl. ¶ 66; 2/24/10 AM Tr. 272:10-273:2; 273:18-274:2 (Calkins); Trial Ex. 503.0002.

90.    The grinders created perchlorate dust, which was collected in either the bag house or fell to the floor. Tigue Depo. 27:6-19, and 127:25-128:22; 3/2/10 AM Tr. 982:21-23 (McLane).

91.    Perchlorate dust accumulated on the grinders and the grinders were cleaned with VOCs.  2/25/10 PM Tr. 574:10-575:9 (Zoch).

92.    Perchlorate dust could have blown out of the grinding buildings or been carried outside on the clothing or shoes of Bermite employees.

93.    The bag house was a type of vacuum that captured airborne perchlorate dust in the grinding buildings.  Tigue Depo. 31:14-24; 2/25/10 AM Tr. 522:10-17 (Zoch).

94.    Approximately 150 pounds of ammonium perchlorate dust was collected in the bag house every week.  Trial Ex. 281.

95.    The bag house was washed out and the waste water from the bag house was placed in a drum and burned in a burn pit.  Tigue Depo. 31:4-13; 131:2-17; 2/25/10 AM Tr. 531:25-532:4 (Zoch).  The transfer of materials from one vessel to another routinely results in releases of the material transferred.  2/25/10 PM Tr. 562:22-563:4 and 573:15-25 (Zoch).  The bag houses were regularly emptied.  They were located outside the grinding building.  3/2/10 PM Tr.

16

1063:17-19 and 1067:8-13 (McLane).  Any spills from transferring dust from the bag houses to drums would have occurred on ground outside the grinding building.

96.    Bermite employees swept up 2 or 3 pounds perchlorate dust that accumulated on the floor of the grinding building.  Tigue Depo. 26:7-18, 28:7-18, and 128:11-22.

97.    The remaining perchlorate dust on the walls and floors was washed out from the grinding buildings to the bare ground.  Tigue Depo.  27:20-28:6, 31:25-32:17, 47:14-23, 128:24-130:13; 2/25/10 AM Tr. 530:24-531:3 (Zoch); 2/25/10 Tr. 569:5-20 (Zoch); 3/2/10 PM Tr. 1000:7-10 (McLane).

98.    Perchlorate that was washed out of the grinding buildings was a release into the environment.  3/2/10 AM Tr. 1000:7-10 (McLane); 3/2/10 PM Tr. 1068:17-19 (McLane).

99.    Every week, approximately 30 gallons of water mixed with ammonium perchlorate was washed out of Building 308, a grinding building.  Trial Ex. 281.

100.   Mixers were used to mix and heat the chemicals to make the propellant for the rocket motors.  Tigue Depo. 43:10-45:17.

101.   For each batch of 25 rocket motors, Bermite employees used 10 to 15 gallons of a VOC to rinse out remaining perchlorate to clean the mixer.  Tigue Depo. 47:24-48:23 and 138:25-140:22.

102.   The VOC used to clean the mixers was collected in drums.  The collected VOC was a mixture of solvent and perchlorate.  Tigue Depo. 148:5-19.

103.   Bermite employees used water to wash the perchlorate dust generated from the mixer out of the building and onto the ground.  Tigue Depo. 148:5-149:4.

104.   Mandrels were placed in the rocket motor tubes prior to casting to give form and shape to the propellant in the rocket motor tubes.  Tigue Depo. 82:19-25.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL TRIAL)

Doc. # DC-2317468 v.6

105.   Mandrels were removed from the rocket motor tube after cast and cure.  Tigue Depo. 83:1-4.

106.   The mandrels had a pound or two of propellant on the knob after it was extracted from the cast and cure assembly.  Tigue Depo. 83:5-14; 2/25/10 AM Tr. 507:5-17 (Zoch).

107.   Bermite employees used a VOC to clean and remove propellant from the mandrels.  Tigue Depo. 83:5-84:19, 85:1-3, 151:8-14.

108.   The waste propellant and VOC rags from the mandrels were placed in drums and burned.  Tigue Depo. 83:15-18; 2/25/10 AM Tr. 499:11-17, 528:25-529:24 (Zoch).

109.   The cast and cure assembly was configured to generate excess propellant.  Trial Ex. 1629.0257-58, 1629.0274; Tigue Depo. 84:20-22.

110.   The excess propellant from the cast and cure assembly accumulated near the casting spider and on the aft end of the rocket motor.  2/24/10 AM Tr. 285:18-287:13 (Calkins).

111.   After the casting process, the excess propellant was scooped off the top of the tube and placed in drums.  Tigue Depo. 50:2-19.

112.   After the propellant was removed from the cast and cure assemblies, the cast and cure assemblies were cleaned with TCE.  Tigue Depo. 84:9-22, and 85:23-24.

113.   The casting pot and chandelier were also cleaned with TCE.  Tigue Depo. 49:16-22.

114.   Compression molds generated excess propellant.  After the excess propellant was removed, the compression molds were cleaned with TCE.  Tigue Depo. 85:16-24; 2/25/10 AM Tr. 511:20-512:8 (Zoch).

115.   Perchlorate dust and waste was generated from sanding out the rocket motor tubes.  The dust and waste were placed in a drum for disposal.  Tigue Depo. 53:16-22.

18

FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL TRIAL)

Doc. # DC-2317468 v.6

116.   A pound or two of propellant remained on the jigs after their use in Building 317, the final assembly building, and was washed into the 317 impoundment.  2/25/10 AM Tr. 503:17-21, 508:5-510:6 (Zoch).

    **4.**    **There Is Contamination Around The Buildings Where GFE Was Used and Where Waste from GFE Was Burned**

117.   Perchlorate grinding occurred in Buildings 308, 313, and 314.  3/2/10 PM Tr. 1062:23-1063:5, 1071:18-1072:17 (McLane).

118.   Perchlorate stained the ground around the grinding buildings.  Tigue Depo. 158:2-159:10.

119.   Significant levels of perchlorate and VOC contamination exist around these buildings.  Trial Exs. 6539A and 3044 (McLane August 2009 Report) at 30.

120.   Drums filled with perchlorate waste and solvent waste were taken to Burn Valley and burned.  Tigue Depo. 30:15-31:13, 50:12-24, 83:10-18, and 84:23-25.

121.   Significant levels of perchlorate and VOC contamination exist in Burn Valley.  Trial Ex. 6539A; Trial Ex. 3044 (McLane August 2009 Report) at 13; Trial Ex. 3045 (McLane December 2009 Report) at 20.

122.   Casting and curing of rocket motors occurred in Buildings 306 and 307.  3/2/10 PM Tr. 1073:18-24 (McLane).

123.   Soils near Buildings 306 and 307 are heavily contaminated with perchlorate.  Trial Ex. 6539A; 3/2/10 PM Tr.1073:22-1074:9 (McLane).

    **H.**    **Contamination Resulted From the "Hogging Out" Procedures Used on Recycled and New Rockets**

    **1.**    **Bermite Hogged Out Rocket Motors Owned by the Government under the Recycling Contracts**

124.   Pursuant to Delivery Orders issued under the 1975 BOA for refurbishing and recycling rocket motors, the United States sent its rocket motors

FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL TRIAL)

that defendant's waste was the source of the release or that defendant's waste caused it to incur response costs."  *Carson Harbor Village Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1186 (C.D. Cal. 2003).  *See also Santa Clara Valley Water Dist. v. Olin Corp.*, 655 F. Supp. 2d 1048, 1057 (N.D. Cal. 2009) ("Cases within the Ninth Circuit support the conclusion that a CERCLA *prima facie* case requires a plaintiff to show that a release caused the incurrence of some response costs but it does not require that the release cause all of the recoverable response costs.").

## III.   CONCLUSION

301.   The United States is liable under 42 U.S.C. §9607(a)(2) as an owner of facilities at which disposal of hazardous substances took place and under 42 U.S.C. §9607(a)(3) as a person who arranged for disposal of hazardous substances.

302.   The questions of quantity of necessary response costs and allocation of damages among the parties are reserved for future proceedings.

### A.   Proviso

The Court recognizes that some of the above listed Findings of Fact may also be Conclusions of Law.  Similarly, some of the Conclusions of Law may also be Findings of Fact.

Dated:  June 30, 2010

_____
A. Howard Matz
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW (LIABILITY PHASE; POST-TRIAL TRIAL)

1   IGNACIA S. MORENO
    Assistant Attorney General
2   Environment & Natural Resources Division

3   MICHAEL C. AUGUSTINI (DC BAR NO. 452526)
    michael.augustini@usdoj.gov
4   MEREDITH WEINBERG (VA BAR NO. 47516)
    meredith.weinberg@usdoj.gov
5   MARTHA C. MANN (FL BAR NO. 155950)
    martha.mann@usdoj.gov
6   ADAM J. KATZ (DC BAR NO. 502776)
    adam.katz@usdoj.gov
7   Environmental Defense Section
    U.S. Department of Justice
8   P.O. Box 23986
    Washington, DC 20026-3986
9   (202) 616-6519
    FAX: (202) 514-8865
10
    Attorneys for Defendant United States of America
11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15

16  AMERICAN INTERNATIONAL
    SPECIALTY LINES INSURANCE          Case No. CV-09-1734 AHM (RZx)
17  COMPANY,

18              Plaintiff,             **DECLARATION OF CHARLES F.**
                                       **McLANE III IN LIEU OF DIRECT**
19        v.                           **TESTIMONY**

20  UNITED STATES OF AMERICA,

21              Defendant.

22

23

24  I, Charles F. McLane III, Ph.D., declare as follows:

25  1.    I am the founding Principal of McLane Environmental, LLC, an

26        environmental consulting firm located in Princeton, New Jersey.  I specialize

27        in ground water flow system analysis and in the fate and transport of chemical

                                    1

resulted from this disposal of contaminated soil on-site is the direct result of Whittaker-Bermite's actions (see Trial Ex. 3044 (McLane Report I), p. 54; Trial Ex. 3045 (McLane Report II), p. 50).

13. At times, Whittaker-Bermite conducted on-site burning to dispose of their production waste. The decision to conduct on-site burning was made by Whittaker-Bermite and the manner in which the burning operations were performed was controlled by Whittaker-Bermite. In addition, Jim Jisa, Whittaker-Bermite's former hazardous waste coordinator, testified that drums of solvents and other liquids were poured on top of the propellant waste prior to burning in the burn area (see Trial Ex. 3044 (McLane Report I), p. 44-47; Ex. 3045 (McLane Report II), p. 20-21, 56-57). The exposure of burn residues to precipitation resulted in deep migration of perchlorate and VOC contamination to soil, perched groundwater and the water table. Runoff carried perchlorate down Oakdale Canyon and into the drinking water aquifer of Santa Clarita.

14. Whittaker-Bermite's large-scale excavation and regrading activities in the Burn Area following the closure of the facility also spread waste material throughout that valley, causing the area of contaminated soil to increase (see Trial Ex. 3044 (McLane Report I), p. 44-46).

15. Whittaker-Bermite misled regulators with regard to their waste disposal practices at unpermitted dumps, the Building 317 impoundment, and the Burn Area. For example, Whittaker-Bermite did not disclose the unpermitted dump sites to state or federal regulators, which resulted in consideration of a criminal referral. In addition, Whittaker-Bermite implied to the California Department of Health Services that that there were no releases at the Building 317 impoundment when the evidence proved otherwise and failed to disclose

6

to regulators that solvents were disposed at the Burn Area (see Trial Ex. 3044 (McLane Report I), p. 30-46, 49-50; Trial Ex. 3045 (McLane Report II), p. 20-33).

16. There is no evidence that a release of hazardous substances occurred from U.S. Government-owned equipment at the Site. Ammonium perchlorate grinding machines were located and used inside of buildings that were owned and operated by Whittaker-Bermite. In his deposition, Edwin Tigue, a former Whittaker-Bermite propellant plant employee, described that the ammonium perchlorate dust generated by the grinding process was collected in the adjacent bag house, which Whittaker-Bermite owned, or was swept from the floor. He also testified that Whittaker-Bermite employees regularly released wash water containing perchlorate residues from Whittaker-Bermite buildings to the bare ground (see Trial Ex. 3044 (McLane Report I), p. 23-25). This company practice – and Whittaker-Bermite's failure to prevent water containing perchlorate from escaping the buildings and reaching the ground – continued up until 1986 (Pierson Depo. p. 183-188). This uncontrolled process likely caused or contributed to the contamination in the production areas where this occurred.

17. Documents related to the Building 314 fire (see Trial Ex. 18, ST012366) indicate that the only U.S. Government-owned equipment there at the time was a crusher, multi-swing hammer. Whittaker-Bermite owned two other grinders in the same building. Even if the crusher was used, which no Whittaker-Bermite employee who was deposed was able to confirm, there is no evidence of a release to the soil or groundwater from it.

18. Contracts also indicate that the U.S. Government owned mandrels at the Site. However, Mr. Tigue testified that the rags used to wipe very small amounts of

7

propellant from the Teflon-coated mandrels were containerized within the Whittaker-Bermite's casting building (see Tr. Ex. 3044 (McLane Report I), p. 23-25; Trial Ex. 3045 (McLane Report II), p. 13). Based on Mr. Tigue's description, there is insufficient basis to conclude that a release to soil or groundwater occurred from any mandrels.

19. Clearly, other items of government equipment were present at the Site. For example, I have reviewed Schedule J of the September 23, 1967 Whittaker-Bermite Agreement (WHIT23110 - WHIT23167), which was not produced until after I prepared my second report. I also have reviewed Schedule H of that Agreement (WHIT23035-WHIT23104), which indicates that Whittaker-Bermite owned propellant mixers, grinders, micro-pulverizers, degreasers and numerous other items of machinery and equipment at the Site. Without more information, these listings and the other similar documents I have reviewed do not establish to a reasonable degree of scientific certainty that a release occurred from any government equipment at the Site.

20. At trial, I will be prepared to explain further the basis of the opinions reflected in my two Rule 26 reports, and intend to do so.

Pursuant to 28 U.S.C. 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed February 5, 2010 at Princeton, New Jersey.

By: _Charles F. McLane III_
Charles F. McLane III

8

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

MICHAEL C. AUGUSTINI (DC BAR NO. 452526)
michael.augustini@usdoj.gov
MEREDITH WEINBERG (VA BAR NO. 47516)
meredith.weinberg@usdoj.gov
MARTHA C. MANN (FL BAR NO. 155950)
martha.mann@usdoj.gov
ADAM J. KATZ (DC BAR NO. 502776)
adam.katz@usdoj.gov
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
(202) 616-6519
FAX: (202) 514-8865

Attorneys for Defendant United States of America

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. CV-09-1734 AHM (RZx)<br><br>**DECLARATION OF DAVID L. BAUER IN LIEU OF DIRECT TESTIMONY** |

1.    My name is David L. Bauer.  I hold a Bachelor of Science degree in

Chemistry from John F. Kennedy University (1968), and am certified and/or

6.    The environmental setting was known to Whittaker at all times.  The slope and topography of the Site include significant differences in elevations at the facility and numerous canyons and ridges are present.  Precipitation from the Whittaker facility would flow down the canyons, eventually reaching the Santa Clara River only a short distance away.  During winter rains, most water would percolated into the soil, and chemicals or wastes exposed to rainfall would be dissolved or leached and subsequently reach the ground and enter the soil column.

7.    Whittaker failed to meet the appropriate standard of care at the Site.  Whittaker's land disposal, drum storage, and wastewater practices at the Site were in violation of permits issued to Whittaker, California's environmental statutes and regulations, Whitaker's own manuals and procedures, and even the basic guidance of the Department of Defense Contractor Safety Manual.

8.    For example, under the requirements of the 1949 Dickey Act, Whittaker was required to notify the California Water Pollution Control Board of the nature of its wastes and the manner in which it managed its wastes.  However, there is no evidence that Whittaker met its obligations under the Dickey Act or subsequent legislation and rules.  Whittaker did not disclose the nature of its wastes and the manner in which it managed its wastes to either the Regional Water Pollution Control Board or to the California Department of Toxic

4

Substances ("DTSC"). DTSC found Whittaker to be in violation of California environmental laws and regulations on multiple occasions, and similarly recommended criminal charges against Whittaker for failure to disclose disposal activities at the Site. In addition, while Whittaker did obtain permits for certain surface impoundments at the Site, it did not seek permits for other impoundments.

9. Whittaker also violated the Standard of Care to the extent the company willfully ignored known problems or potential problems relating to waste disposal activities at the Site. My review of the still-existing corporate documents and testimony of former employees reveals a history of poor housekeeping at the Site. Multiple corporate documents memorialize Whittaker's safety staff's opinions that the company was in violation of the Resource Conservation and Recovery Act and other laws and requirements as a result of indiscriminate dumping and improper storage of a variety of materials, including propellant (containing perchlorate) solvents. Several members of Whittaker's environmental safety staff have testified of the difficulties they experienced in maintaining environmental compliance at the Site. In addition, Whittaker plainly ignored their own consultant's advice over twenty years ago that a groundwater monitoring waiver would not be granted by the regulatory agencies and that there was a significant possibility that

5