IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

MICHAEL C. AUGUSTINI (DC BAR NO. 452526)
michael.augustini@usdoj.gov
MEREDITH WEINBERG (VA BAR NO. 47516)
meredith.weinberg@usdoj.gov
MARTHA C. MANN (FL BAR NO. 155950)
martha.mann@usdoj.gov
ADAM J. KATZ (DC BAR NO. 502776)
adam.katz@usdoj.gov
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
(202) 616-6519
FAX: (202) 514-8865

Attorneys for Defendant United States of America

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. CV-09-1734 AHM (RZx)<br><br>**DECLARATION OF MATTHEW LOW IN LIEU OF DIRECT TESTIMONY** |

1.  I am an attorney and an engineer, and, of relevance to this matter, I have used these disciplines for the past twenty-three years to address equitable cost allocation issues in numerous CERCLA cases as an arbitrator, mediator, settlement counselor, and expert witness.  I have appeared before courts and

1

court-appointed magistrates in my capacity as a neutral and have had my recommendations adopted.  I also have testified in court as an allocation expert.  My role in these cases is to analyze the evidence in the record, distill technical, scientific, and historical information, consider relevant allocation factors and recommend a fair allocation for the particular case.

2.  In 1983, I helped found TechLaw Inc., one of the first Superfund Support Contractors for the U.S. Environmental Protection Agency (EPA).  From 1983 through 1986, I directed TechLaw's support to EPA in approximately 100 cases which included evaluations of CERCLA liability and allocation. In September 1986, I established a subsidiary to allow me to assist private parties in CERCLA cases.  In my consulting capacity since 1986, as president of TLI System and TechLaw and more recently, vice president at Project Performance Corporation, I have served as an arbitrator, mediator, expert witness and settlement counselor to develop or recommend allocations for settlement or litigation.  My resume and a list of my CERCLA cost allocation cases, including cases in which I have testified by deposition or in court, is contained in Exhibit 1 to this Declaration (Attachment 1 to my August 24, 2009 report in this matter).  My experience includes at least 68 selected cases (many involving multiple sites).

3.  I have testified as an expert in CERCLA allocation cases and at settlement hearings.  Several of my allocation opinions have been accepted by courts. In addition, hundreds of parties have embraced my analysis and approach to allocation as a basis for mutual out-of-court settlements.  I also have served as an allocation consultant and settlement counselor in cases involving nine

2

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

ammunition, ordnance and/or explosive manufacturing plants, which have all concluded with settlements.

4.  In my August 24 Report, I outlined equitable factors, such as the Gore factors, that are often relied on in allocations under CERCLA (assuming liability is established).  Against that backdrop, the setting for this case is fairly typical of numerous situations where a private owner and operator of a facility actively performs work under both private commercial and government contracts, resulting in releases of contaminants.  The points that I believe are most important in deriving an allocation for the Whittaker-Bermite Site are:

    a.  Whittaker-Bermite actively sought and voluntarily entered into government prime contracts and subcontracts that were in the company's economic interests.

    b.  Whitaker-Bermite had exclusive control of operations at the Site, including decisions on waste handling and actually was responsible for disposing all waste generated at the Site.

    c.  Direct government involvement at the Site appears to have been focused on quality assurance – with on-site inspections primarily devoted to product performance.

    d.  Provisions in government contracts explicitly placed the responsibility for safety on the contractor.  For example, the DOD Contractors' Safety Manuals incorporated into government contracts required contractors to comply with all applicable federal, state, and local laws, and noted that contractors should take precautions to ensure that contaminated water would not pollute potable sources of water by percolation through the soil as the result of poor or inadequate treatment, and that explosive wastes should be collected in containers and ultimately burned at a location of the contractor's choosing.  At

3

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

times, waste-handling and dumping practices employed by Whittaker
Bermite were not consistent with these provisos.

e. Even if Bermite used TCE during World War II in connection with
government contracts, which the U.S. disputes, there is no evidence
establishing that Bermite's use (if any) during that time contributed to
significant Volatile Organic Compound ("VOC") contamination even
within the limited footprint of the facility at the time. The vast
majority of VOC contamination at the Site exists in then-undeveloped
areas where Bermite had no manufacturing or other operations during
World War II.

f. Most of the areas to be examined for buried unexploded ordnance
("UXO") or Munitions and Explosives of Concern ("MEC") were
Whittaker landfills or dump sites. Whittaker employees testified that
it was wrong to bury ammunition and explosives even in the 1950s,
and this also was prohibited by the DOD Contractors' Safety Manual.

g. The U.S. did not contract directly with Whittaker-Bermite for the
purchase of the 30 mm ammunition rounds that Whittaker assembled
with a depleted uranium ("DU") penetrator as a component.
Honeywell supplied the encapsulated DU penetrator, and Honeywell
was the party that contracted with Whittaker. The evidence also
indicates that Whittaker-Bermite had control over the program and
was responsible under its own safety plan to ensure that radioactive
materials were used, handled, stored, and transported in accordance
with state regulations. Under the safety plan, Whittaker-Bermite was
responsible for collecting any DU fragments remaining after a test
firing and removing them from the Site for disposal at a licensed
facility in Nevada. The contracts between Honeywell and Whittaker-
Bermite apparently have not been located. To the extent that the
contracts required test firing of projectiles with DU, the U.S. may
have had some limited involvement in the activities that led to
releases of DU at the Site. I am aware that there is a dispute regarding
whether the U.S. owned the barrel that Whittaker used for test firing.
Because my analysis assumes liability, as any allocation analysis
must, I already have taken these factors into account in offering my
allocation opinions.

4

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

h. The contamination – particularly for perchlorates, VOCs and UXO/MEC – at the Site is due in significant part to a lack of care by Whittaker-Bermite in its waste disposal practices. According to its own corporate officers in some instances, Whittaker-Bermite exhibited a number of violations of state and federal environmental regulations, and exacerbated the perchlorate and VOC and other contamination problems by failing to disclose the presence of numerous waste dumping grounds on the Site and by moving and grading contaminated soils throughout the Site.

i. Whittaker-Bermite received economic benefits from the government contracts.

5. In my experience, and in my opinion, the main thrust of any allocation effort in this case should be to first, apportion the contribution to contamination between commercial operations (in which there was no government involvement) and government contract operations, and second, for the portion of the contamination arising from Whittaker-Bermite's work on government contracts, to apportion the responsibility for that contamination between the Whittaker-Bermite and the government based on their respective degree of involvement.

6. In cases in which I serve as an allocation neutral or expert, I believe the way I can best aid the Court is to create an allocation framework that facilitates the analysis and incorporation of equitable factors and which can serve as a transparent basis for my analysis and opinions. Relying on the same methodology that I have successfully used in other cases, I have constructed a framework for the Whittaker-Bermite Site which includes the following:

a. A breakdown of the amount of contaminated soils in Areas of Concern divided into four areas of the Site – Northern Production

5

SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW

Area, Southern Production Area, Burn Valley, and Hula Bowl Area – as estimated by Whittaker-Bermite's environmental contractors in their remedial planning documents;

b. An estimate of the amount of government contract activity in each of the above four areas of the Site;

c. An analysis of six elements which, in my opinion, are most relevant to comparing the parties' respective degrees of involvement (See expanded discussion below)

d. Relatively small adjustments to take into account degree of care and degree of cooperation displayed by the parties.

7. While application of this framework and attendant calculations produces a specific number, it is intended more to serve as a guide than a formula for calculating a precise allocation percentage. As I noted in my reports, I am mindful that decisions on which allocation factors to apply and how to apply them are within the province of the Court. However, in reliance on the allocation framework and in consideration of the totality of the facts in the case, it is my opinion that the U.S. allocation percentage should be no more than 10% for each of the groups of contaminants that are driving the soils and groundwater remediation in this case.

8. The allocation framework is created as a series of spreadsheets for perchlorates, VOCs, UXO/MEC and DU as described in my August 24 (Exhibit 1 to this Declaration) and December 14 reports (Exhibit 2). Updated pdf versions of theses spreadsheets are attached to my January 26, 2010 Supplemental report (Exhibit 3).

9. To understand how the allocation spreadsheet tables provide a means to

6

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

quantify the above allocation framework, my sense is that it is most productive to pick them up and study them, instead of trying to follow a written description of how they work.  As an introduction, however, I include the following summary of the tables's structure, adapted from my August 24 report.

    a.  **Contaminant Contribution –** Calculations of the volume of perchlorate and VOC contaminated soils are taken from Whittaker's most recent Remedial Action Plan.  This allows us to apportion the percentage of contamination between the four areas of the Site.

    b.  **Contaminant Contribution –** Estimates of the percentage of contamination generated in connection with  Whittaker-Bermite's government (as opposed to commercial) work for each of the four main areas of the Site, are multiplied against the estimates of contaminated soils  to derive a percentage of contamination related to government work.  This percentage does not reflect the parties' role in causing the contamination or relative responsibility.

    c.  **Degree of Involvement calculations** – I have suggested weighting percentages for each element based on my experience in developing allocation frameworks in other, similar cases.  For each element, I have allocated a percentage to the U.S. and a percentage to Whittaker-Bermite based on an analysis of site operations and conditions as more fully set forth my August 24 and December 14 reports.  Because there is little information in the record that would allow an allocator to derive precise calculations, the numerical allocation percentages are intended to reflect a more qualitative evaluation of each element.  The allocation percentage for each element is multiplied by the weighting percentage for each element to produce a calculated a Degree of Involvement percentage.

    d.  **Adjustments to the Degree of Involvement calculations to take into account Cooperation and Care factors** – This analysis adjusts the Degree of Involvement percentage up or down by using adjustment factors.   Any adjustments result in a recalculated (Adjusted) Degree of Involvement percentage.

7

1

2          e. **Final allocation percentages for the U.S.**  – The resulting "U.S.

3             Allocation %" is calculated by multiplying the adjusted degree of

4             involvement percentage for each of four areas by each area's adjusted

               percentage of contaminated soils from government work.

5

6    I will further explain the rationale for the allocation analysis embodied by the

7    spreadsheet tables at trial in an effort to assist the Court's evaluation of this

8    issue.  I note that the calculations for contaminant contribution are not

9    necessary for DU (which is in a single isolated area at the Site), or UXO/MEC,

10   the costs for which entail a general survey over many areas of the Site.

11

12   10.  In my framework, I noted that the Northern Production Area was the

13       location of a significant amount of commercial fireworks and oil charge

14       production and, thus, I assume 50% of the contaminant releases may have

15       resulted from Whittaker-Bermite's non-governmental production in this

16       Area.  In the Southern Production Area, it appears that more of Whittaker-

17       Bermite's work was for the government.  I have assumed 90% as a fair

18       appraisal for the Southern Production Area.   For the Burn Area and Hula

19       Bowl Areas, I have assumed that Whittaker's disposal of waste generated

20       during government production could account for as much as 85% of the

21       contamination.  This assumption accounts for the likelihood that wastes from

22       the Northern Production Area were disposed in these locations and reflects

23       the fact that Whiitaker-Bermite took significant amounts of wastes from

24       government contract work to off-site facilities for disposal, including during

25       the periods of highest production of rocket motors.  These assumptions were

26       used for both perchlorates and TCE and PCE.  Again, these figures are

27       essentially the baseline and are not intended to reflect the parties' relative

8

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

responsibility or the reasons why the contamination exists in a particular area.

11.  Because apportionment of degree of involvement is the major factor in producing an allocation at this Site, I will summarize the discussion from my August 24 report of my rationale for inclusion and weighting of the elements.  These elements reflect my 23 years of experience in developing allocation analyses and my analysis is informed by my assessment of relevant case law in the CERCLA setting.

12.  With respect to the Degree of Involvement Element -- ***Ownership of property, buildings and equipment at which contamination occurred*** -- in my experience, 20% may be allocated for this factor, particularly where an owner is an active owner and operator.  Throughout the period of operations, Whittaker-Bermite owned all of the land, buildings, vehicles, and infrastructure (pipes, sewers, sumps, impoundments, etc.).  Evidence in the record indicates that government equipment was present and some items may have been used in rocket motor and other contracts.  But in comparison to the amount of equipment owned by Whittaker-Bermite, the percentage of government-owned equipment and types of equipment appear to have been less significant.  With regard to perchlorates, Whittaker-Bermite owned many grinders, mixers and an assortment of other equipment throughout the propellant plant.  With regard to solvent use, the company's equipment lists indicate that Whittaker-Bermite owned vapor degreasers, which may have been significant sources of TCE and PCE contamination, along with the impoundments, sumps, and tanks where solvents were stored and disposed at

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

the Site.  Given the above, in my opinion, the U.S. should be allocated a minimal percentage under this element, no more than 5%, to reflect the government equipment present at the Site.

13.  With respect to the Degree of Involvement Element -- ***Involvement in overall facility operations*** -- Evidence in the record establishes that Whittaker-Bermite had complete operational control of the facility.  The U.S. was not involved in overall facility operations, as confirmed by the Court's summary judgment decision.  In my experience, on the order of 15%-25% may be allocated for this element and I suggest 20% here.  In my opinion, the U.S. should be allocated a zero percentage for this element.

14.  With respect to the Degree of Involvement Element -- ***<u>Involvement in use and disposal or release of materials causing contamination</u>*** -- I have typically incorporated this element as a means of examining whether either of the parties played a more direct role in the specific activities giving rise to contamination.  I have weighted this element between 25% and 35% in previous matters and suggest 30% here.  In general, while it is true that contracts and specifications with the government or its prime contractors required the use of perchlorates, the decision to bid on these contracts was Whittaker-Bermite's alone.  The use of perchlorates was essential to those contracts involving perchlorate compounds. Contracts did require that the contractor implement safety provisions associated with explosives, including perchlorate, including the potential burning of explosive wastes in some fashion.  However, evidence indicates that Whittaker-Bermite had exclusive control over waste handling and disposal and that the government was not

10

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

involved in disposal decisions made at the Site, as the Court ruled on summary judgment.  Whittaker-Bermite could and did avail itself of off-site disposal options for much of the Site's operating history, including during the years in which peak rocket motor production occurred at the Site.  No information has emerged to indicate that any of the U.S. on-site representatives directed or supervised Whittaker-Bermite's disposal of process wastes.  Particularly in the production areas, evidence indicates that Whittaker-Bermite allowed areas to become contaminated through a number of inappropriate waste-handling and disposal methods.  Thus, for the production areas, in my opinion the U.S. share for this element should be minimal in the Northern Production Area and somewhat higher in the Southern Production Area —where rocket motor production and rocket motor refurbishment operations took place.  A slightly higher share should be allocated for the burn area in light of the fact that DOD guidance documents suggested burning as one means of disposal of explosives and propellants.  In these areas, a slightly larger share is recommended for perchlorates vs. VOCs to reflect the parties' varying degrees of involvement with respect to those substances.

15.  With respect to the Degree of Involvement Element -- ***Ownership of materials causing contamination*** – Whittaker-Bermite purchased perchlorate and solvents from commercial suppliers to meet its manufacturing needs, and the evidence does not indicate that the United States supplied those materials for use at the Site.  AISLIC suggested that the United States might have assumed ownership of some of the contaminants through a progress payment clause that apparently was

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

included in certain rocket motor contracts.  As noted in my December 14 report and during my deposition, that clause addresses title to parts, materials, inventories, non-capital tools, etc. acquired by Bermite and eventually allocable and chargeable to the contract before the contractor delivers the finished product.  My understanding is that the purpose of this provision was essentially to create a financing mechanism through progress payments and to provide a means for the government to protect its interests before receiving the final product, which is the object of the contract.  My understanding is that the progress payment provision has no applicability to waste, which had no value to the government and was never intended to be delivered as part of the final product.  The government's overriding interest is in ensuring that it receives the final deliverable for which it has paid progress payments.  In addition, the provision gave Whittaker title to any property not delivered to the United States upon completion of the contract. I am unaware of any witness who testified that the U.S. owned the wastes Whittaker generated from manufacturing pursuant to any contract term or otherwise.  Thus, in my opinion, the U.S. should receive a minimal, if any, percentage of this element.  To the extent that some contamination was caused by hogging out or repairing government-owned motors, (where the government did actually accept and pay for the motor and then return it later for refurbishing), it justifies a share to the U.S. for this element – which would be applicable mostly in the areas impacted by hog-out activities in the Southern Production Area.  Notably, Whittaker-Bermite had off-site disposal options during this time.  In my August 24 report, I noted that the percentage of perchlorate-contaminated soils in the areas affected by hog out operations is less than 19% of the total volume in the Southern Production Area, and

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

these areas were impacted as much or more by production activities and Whittaker-Bermite's later earthmoving and grading after the plant closed, as they were by any actual hog-out activities. Accordingly, I suggested that the U.S. receive a minimal percentage, no more than 10%, for this element for the Southern Production Area. I note that, under the revised volume estimates, the areas apparently impacted by the hog-out operations constitute less than 3 % of the volume of perchlorate contaminated soils. In my opinion, for VOC contamination, the U.S. should receive a minimal, if any, percentage of this element and the share should be less than the share recommended for perchlorates.

16. With respect to the Degree of Involvement Element ***Knowledge regarding potential for contamination from activities*** -- in my opinion, Whittaker-Bermite, as site operator, had superior knowledge concerning the likelihood of its disposal methods resulting in contamination at the Site, even if neither Whittaker-Bermite nor the U.S. was generally aware of the specific impacts of perchlorates. Whittaker's corporate management and individual employees were aware of the company's practices and procedures, had responsibility for enforcing them, and actually conducted all disposal activities at the Site. As such, in my opinion, Whittaker-Bermite should receive the greater percentage for this element. The U.S. was aware of the need for explosive burning and probably was aware that wastes would result from some aspects of the production at the Site under government contracts. Thus, the U.S. should receive a percentage for this element, as reflected in my analysis. I am not aware of evidence that the U.S. was aware of the facility's solvent disposal practices in specific locations at the Site. As such,

13

SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW

1    in my opinion, the U.S. should receive a minimal percentage for solvents for

2    this element, and less than the share recommended for perchlorates.

3

4    17.  With respect to the Degree of Involvement Element -- ***Economic Benefit*** --

5    In my opinion, this is a minor, but not inconsequential factor in comparing a

6    private corporation, whose motives are primarily economic, with

7    government organizations, whose objectives are largely meeting public

8    responsibilities.  Whittaker-Bermite's motive for engagement in government

9    contracts was economic.  Whittaker-Bermite received the economic benefits

10    under these contracts.  While the U.S. receipt of the product can be viewed

11    as a benefit, the U.S. did not receive any economic benefits from the

12    contracts.  Whittaker-Bermite or its insurers or the current owners may

13    receive some economic benefit in property appreciation that will result from

14    final remediation and commercial development of the Site, or, if a buyer is

15    found to assume responsibility for the remaining environmental issues as the

16    cleanup progresses.

17

18    18.  In my experience, in cases where there is a means to materially distinguish

19    parties based on respective degree of care, it becomes a relevant equitable

20    allocation factor.  Often, the lack of due care is reflected in greater volumes

21    of waste released by one of the parties – which may have a specific, direct

22    impact on the allocation. However, here, since only one of the parties was

23    responsible for disposal activities, it does become relevant to examine

24    whether contamination was made more widespread by either party's lack of

25    due care.  The actions of Whittaker-Bermite in its handling and disposal of

26    wastes manifested a lack of due care that exacerbated the contamination –

27

and likely increased the cost of the remediation.  In my opinion this would justify a minor increase in the degree of involvement share for Whittaker-Bermite.

19.  Whittaker-Bermite, primarily through its insurers, has funded investigations and remediation of the Site, but the record appears to suggest that Whittaker generally did not take responsibility for investigating or remediating the Site in a timely fashion and was not totally cooperative.  Up to this point, AISLIC has expended about $25 million on this Site under its insurance policies.  As noted in my reports, Whittaker resisted attempts to address groundwater contamination and had to be sued before it took action.  Whittaker also failed to properly disclose the scope of its unpermitted disposal locations to government authorities.  In my opinion, its actions do not merit a decrease in its allocation percentage.  The U.S. has cooperated by contributing $5.7 million to a groundwater study that has formed the basis for groundwater remedial planning at the Site.  The U.S. also reimbursed Steadfast $33.825 million for Site response costs under its settlement of Steadfast's CERCLA claim.   In my experience, the actions of the U.S. would not necessarily justify a cooperation reduction in its allocation percentage, nor do I believe that a cooperation increase is merited.

20.  In my August 24 and December 14 reports, I criticized the expert allocation opinions of Robert Zoch.  In general, I believe that his opinions reflect a predisposition to allocate 100% of contamination resulting from work on government contracts to the U.S.  In particular, his allusion to production during World War II and reference to a few World War II allocation cases is particularly inappropriate in light of the fact that there is no evidence that

perchlorates were used at the Site during World War II and it is clear that only a small portion of the Northern Production Area could have been impacted by World War II operations (if at all) – and, even in these areas, 40 years of post-World War II production logically had much more impact than the three years of the War.

21.  Mr. Zoch also relies heavily on government contract principles and the Aerojet contract settlement in particular as a "reference point" for allocation in this case.  As discussed further in my expert reports, in my opinion, government contract reimbursement principles have no relevance to the allocation in this case, which is a CERCLA cost recovery and/or contribution case brought by an insurance company.  Whittaker-Bermite apparently has no current government contracts or valid contract claims under which it could seek to recover environmental costs, and Whittaker itself could not recover the amounts AISLIC has incurred and is claiming in this case even if Whittaker did have such contract claims.

22.  As I have described in greater detail in my reports, none of Mr. Zoch's suggested allocation "reference points" reflect the facts that bear significantly on the parties' relative degree of involvement at the Whittaker-Bermite Site.  In my opinion, his analysis vastly overstates the role of the government by inappropriately disregarding what Whittaker-Bermite did to cause the contamination.  Whittaker-Bermite had overarching responsibility as the owner of all land, buildings, and waste disposal infrastructure at the Site and also controlled the day-to-day operation of the plant, which included responsibility for performing all waste disposal activities.  My

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

allocation framework takes these factors into account, as well as other salient factors that demonstrate that the United States played some role, but a relatively minor role as compared to Whittaker-Bermite.

23.  At trial, I will be prepared to comment further on the basis of the opinions reflected in my two Rule 26 reports, and intend to do so.


Pursuant to 28 U.S.C. 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed February 7, 2010 at Delray Beach, Florida.


By:   MATTHEW LOW

**SUMMARY OF DIRECT TESTIMONY OF MATTHEW LOW**

# August 2009

# Report

**EXPERT REPORT ON ALLOCATION WITH RESPECT TO THE
WHITTAKER-BERMITE SITE**

**MATTHEW A. LOW**

**Project Performance Corporation**

**August 24, 2009**

## INTRODUCTION

The matter involves a claim against the United States by American International Specialty Lines Insurance Company (AISLIC), as subrogee of Whittaker Corporation, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for recovery of response costs associated with perchlorate contamination at the Whittaker-Bermite Site (Site). On behalf of U.S. Department of Justice, I have been asked to provide my opinion in rebuttal to the Expert Report of Robert Zoch (Zoch report) on the issue of allocation. This report addresses equitable allocation of claimed perchlorate response costs between the U.S. and Whittaker-Bermite (the Site owner/operator).

Assuming, arguendo, that the Court finds the U.S. liable under CERCLA, allocation entails considering and applying different facts to relevant allocation factors. Ultimately, the Court will make findings of fact and equity in reaching its allocation decision. I am mindful that it is the province of the Court to decide which equitable factors are applicable and how they should be applied. In my view, allocation experts can be of optimum assistance to the Court by:

1. recommending the types of factors that they, in their experience, consider to be most applicable or useful to the Court in a particular case setting; and

2. outlining an allocation methodology and framework that allows the Court some flexibility in determining how to fairly apply the equitable factors to the facts of the case.

My intent with this report is to both critique the Zoch report and offer an opinion concerning an appropriate allocation framework for alleged perchlorate costs associated with this Site.[1] As I understand his report, Zoch's opinion is that the U.S. should be allocated between 79.8% and 100% of costs associated with perchlorate contamination at

---

[1] I am advised that the Court initially limited AISLIC's claim to perchlorate, but has since consolidated this action with AISLIC's second lawsuit regarding other contaminants allegedly at the Site. I also am aware that the Court has ordered additional discovery regarding non-perchlorate issues and set different dates for expert reports regarding those contaminants. Accordingly, this report does not address what allocation may be appropriate for those contaminants (assuming AISLIC establishes liability).

the Site.  In my opinion, Zoch has not provided a credible basis for his proposed allocation methodology or his opinion on allocation percentages.

## MY QUALIFICATIONS

I am an attorney and an engineer, and have used these disciplines for the past thirty-three years as a practitioner in the field of Environmental Law and Alternative Dispute Resolution.  For the past twenty-three years, I have addressed equitable cost allocation issues in numerous Superfund cases as an arbitrator, mediator, settlement counselor, and expert witness.  I have appeared before courts and court-appointed magistrates in my capacity as a neutral and have had my recommendations adopted.  I also have testified in court as an allocation expert and had my opinions accepted.  My role in these cases is to analyze the evidence in the record, distill technical, scientific, and historical information, consider relevant allocation factors and recommend an objective and fair allocation to the parties or to the court.  My resume and a list of my cost allocation cases, including cases in which I have testified by deposition or in court, are included in Attachment 1 to this report.

In 1983, I helped found TechLaw Inc., one of the first Superfund Support Contractors for the U.S. Environmental Protection Agency (EPA).  From 1983 through 1986, I served as Program Director for TechLaw's Technical Enforcement Support (TES) contracts with EPA.  Under these contracts, I directed TechLaw's support to EPA in approximately 100 cases.  My responsibilities included evaluations of PRP liability and allocation for EPA.   From September 1986 thru May 2003, I was president of TLI Systems, Inc., a wholly-owned subsidiary of TechLaw.  From May 2003 to March 2009, I served as president of TechLaw.[2]  Since March 2008, I have been a vice president of Project Performance Corporation.

In my consulting capacity since 1986, I have served as an arbitrator, mediator, expert witness and settlement counselor to develop or recommend allocations for settlement or litigation.  My resume and a list of my cost allocation cases, including cases in which I have testified by deposition or in court, are included in Attachment 1 to this report.  My resume specifically lists 68 selected cases (many involving multiple sites) in which I served as an arbitrator, mediator, settlement counselor, or expert to develop allocations, comprising:

- 29 cases as an arbitrator or mediator, seven of which were court-sponsored assignments and one of which was an EPA Pilot Allocation Project;
- 39 cases as an allocation expert, consultant or settlement counselor for private parties and the government – many of the cases involve multiple sites;

---

[2] In 2006, we reorganized TechLaw, Inc. into a holdings company and three separate subsidiaries, TechLaw Inc., TLI Solutions, Inc. and TechLaw Solutions.  I currently serve a president of TLI Holdings, Inc. and oversee operations of the holdings company and the three subsidiaries.  My consulting work is run through TLI Solutions. The TLI Holdings Group has about 350 employees.

I have testified as an expert in CERCLA allocation cases three times[3] and have testified in court for settlement hearings or other matters six times.[4]  I also have had several allocation opinions accepted by courts,[5] as well has having numerous allocation recommendations embraced by hundreds of parties as a basis for settlement.[6]  I have served as an allocation consultant and settlement counselor on cases involving nine ammunition, ordnance and/or explosive manufacturing plants.[7]  Claims against the United States for nine of these plants have been settled and one currently is in settlement discussions.  Finally, I have written three publications regarding CERCLA allocation or arbitration and one EPA manual regarding investigating potentially responsible parties at hazardous waste sites.

In cases in which I serve as an allocation neutral or expert I rely on equitable factors as a basis for my analysis and opinions.  In this case, the contamination at issue primarily stems from collection, discharges, releases and movement of wastes associated with various production processes and ancillary materials and waste handling operations.  AISLIC has claimed costs for past and future investigation and remediation of contamination at various areas of the Site.  In this type of a case, neutral allocators and courts typically consider, as the primary equitable factors, the relative magnitudes and types of releases from different activities and the parties' respective degree of involvement in activities that caused the contamination.

---

[3] Junker Landfill, Roebling Steel Superfund Site, Metcoa Superfund Site.

[4] Testified regarding allocation assumptions for Arrowhead Refinery Superfund Site; presented allocation framework to special master for Warwick Landfill Superfund Site; testified in East Bethel Landfill settlement hearing; testified in Berks Associated Superfund Site matter as a neutral to outline allocation process that was adopted by Court; testified in District Court on hazardous substances and CERCLA liability in W.R. Grace v. Zotos International; testified regarding database in Abex.

[5] Recommendation accepted for Fields Brook Superfund Site;  allocation assumptions presented to court and endorsed by magistrate for Arrowhead Refinery Superfund Site; allocation process recommendations adopted by judge in case management order for Berks Associated Superfund Site, which is also known as the Douglassville case; presented allocation framework to magistrate and requested by magistrate to draft allocation recommendation for all parties in Warwick Landfill Superfund Site;  testimony accepted as basis for allocation by court in Metcoa Superfund Site.  For the opinion accepting settlement recommendation for the Fields Brook Site, *see United States v. GenCorp, Inc.*, 935 F. Supp. 928 (N.D. Ohio 1996).  For the opinion accepting allocation database for the Metcoa Superfund site, *see United States v. Pesses*, 120 F. Supp.2d 503 (W.D. Penn. 2000).

[6] Fields Brook Superfund Site, Ludlow Landfill, Arrowhead Refinery Superfund Site, Caldwell Trucking Superfund Site, Berks Associated Superfund Site, Metcoa Superfund Site, Bofors Nobel Superfund Site, Hylebos Superfund Site, GEMS Landfill Superfund Site, Stickney/Tyler Landfills Superfund Sites, Jones Industrial Services Landfill, Shaffer Landfill Superfund Site, Norfolk Southern Site, Tucson International Airport, Ramapo Landfill, Croton Point Landfill, and Chemical Resource Recovery Solvent Reclamation.

[7] Crane, Tamaqua (Riverdale and Woodlawn Plants), Atlantic Research, DuPont Plants (Remington – 3 plants, Pompton Lakes, Chambers Works), National Fireworks.

Attachment 2 is a list of documents that my staff and I have considered.  I have been provided with access to all of the depositions and document productions in the case. I also have relied on the expert reports of Dr. Charles McLane, Dr. Jay Brigham, and David Bauer for certain facts and opinions that I believe are relevant to allocation.

I am being compensated at a rate of $275 per hour for work on this case.

## ALLOCATION UNDER CERCLA

### A.    *Equitable Factors*

Under the CERCLA, parties who have expended cleanup costs at hazardous waste sites may seek contribution or cost recovery from other responsible parties.  The use of equitable allocation factors is the primary basis for apportioning liability in contribution actions under CERCLA, as amended by the Superfund Amendments and Reauthorization Act (SARA) of 1986.  The legislative history of CERCLA and certain of its provisions support the use of equitable factors to apportion liability in contribution actions.  "[T]he court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  CERCLA Section 113(f)(1); 42 U.S.C. 9613(f)(1).  In a contribution action under Section 113, contribution defendants are liable for their fair share, provided that contribution plaintiffs can demonstrate that the costs they have incurred are greater than their fair share.  Courts throughout the nation, and potentially responsible parties, during the course of consensual settlement negotiations, have relied on equitable factors to serve as a guide for allocation at CERCLA Sites.  See ***U.S. v. R.W. Meyer, Inc.***, 932 F.2d 568, 572 (6th Cir. 1991).  I have relied on equitable factors in my work as an arbitrator, mediator and expert witness in cases where allocation is at issue. Typically, allocators rely on an allocation methodology that fairly takes into account relevant equitable factors.

### B.    *Gore Factors*

There are six factors set forth in the 1980 amendment to CERCLA offered by then-Representative Al Gore.  Although this amendment was never enacted into law, numerous courts have held that these factors (often referred to as the "Gore factors") provide a logical starting point for allocation in cost recovery and contribution cases. The Gore factors are:

i.    The amount of the hazardous substances involved;

ii.    The degree of the toxicity of the hazardous substances involved;

iii.    The ability of the party to demonstrate that its contribution to a discharge, release or disposal of a hazardous substance can be distinguished;

4

iv.    The degree of involvement by the party in the generation, transportation, treatment, storage, or disposal of the hazardous substance;

v.    The degree of care exercised by the party with respect to the hazardous substance concerned, taking into account the characteristics of such hazardous substance; and

vi.    The degree of cooperation by the party with federal, state, or local officials to prevent any harm to the public health or the environment.

See, e.g., ***United States v. A&F Materials Co., Inc.***, 578 F.Supp. 1249, 1256-1257 (S.D. Ill. 1984).

In addition to the Gore factors, Courts recognize that other factors may be relevant in different cases. Each case is treated individually, and no preset allocation methodology or formula, or set of allocation factors, is used in every case. "No exhaustive list of criteria need or should be formulated." ***U.S. v. R.W. Meyer, Inc.***, 932 F.2d at 572. Additional factors that have been relied on include economic benefit and degree of knowledge.

While there are various ways of assessing the impact of different contaminants and relative amounts released by specific parties, the essence of this factor is to allocate response costs to those parties that have been involved in the release of contaminants of concern on some reasonably fair basis.[8] Where portions of a site can be geographically divided, only parties responsible for contributing contaminants to a particular location are attributed a share for remediation of that location.[9]

To the extent that the degree of knowledge about the impacts of various activities, the degree of care in performing various activities, or the degree of cooperation in addressing the impacts of contamination provide a basis for materially distinguishing any parties, these factors also are relevant. The difference in benefits accruing to the respective allocation parties from historical and future use of the site or facility in question also is a relevant consideration. Generally, these factors are difficult to quantify. They are considered in a qualitative sense, and, in my experience, are considered in determining the parties' respective degree of involvement in the activities causing the contamination.

---

[8] See e.g., _Hatco Corporation v. W.R. Grace & Co._, 836 F. Supp. 1049, 1059 (D. NJ 1993) vacated and remanded on other grounds, 59 F.3d 400 ("The causation inquiry begins with an attempt to identify the party who introduced contamination to the Site."); _Boeing Company v. Cascade Corporation_, 920 F. Supp. 1121, 1136 (D. Ore 1996) ("…the respective harm to the environment is best reflected by the mass of contaminants each contributed to the TSA plume").

[9] See, _**Hatco**_, supra.

**OPINIONS AND DISCUSSION REGARDING MR. ZOCH'S REPORT**

The setting for this case is fairly typical of numerous situations where a private owner and operator of a facility actively seeks to contract with the U.S. and enters into one or more contracts for the delivery of various types of goods or services.  The Whittaker-Bermite companies also were involved in contracts with private entities.  In this case, like many others, the government contracts involved the production and delivery of various ammunition and weapons components, and the contracts included requirements that Whittaker-Bermite meet both product specifications and safety guidelines associated with handling explosives.  Due to contaminant releases during or after production, both under private and government contracts, various areas of the Site became contaminated.  Additional contamination also resulted from Whittaker- Bermite's earthmoving and grading activities after all manufacturing ceased at the Site.  Thus, in my experience, and in my opinion, the main thrust of any allocation effort in this case should be to:

1.  Estimate the respective contaminant contribution (which, in the context of the Gore factors, relates to the amount of hazardous substances released) from various activities at the Site over different time periods, and

2.  In the case of contamination resulting from government contract operations, compare the U.S. degree of involvement in the activities causing the releases with the degree of involvement of the site owner/operator or other liable parties.

Additional Gore factors (such as degree of care and degree cooperation) and other factors (economic benefit, degree of knowledge) also may be relevant, although, in my experience, they, more often than not, are of somewhat lesser significance as discrete factors since they often are incorporated into an evaluation of the parties' respective degrees of involvement.

As I understand Zoch's approach, he is attempting, as he puts it, "to identify factual information applicable to the Site under consideration that can assist the Court in selecting and applying appropriate equitable factors for development of a tailored allocation metric."  However, in addition to identifying factual information that he deems applicable, Zoch has proposed an allocation "metric," and then combined his suggested allocation metric with four other possible allocation reference points, or markers, which, when taken together, result in his opinion that the U.S. share "could" fall between 79.8% and 100%.   Zoch's analysis appears to be outcome-determinative and appears to proceed generally from his view that the U.S. should be allocated 100%, or close to it, of the costs associated with contamination related in any way to government contract work, regardless of Bermite's or Whittaker's role in causing the contamination.

In my opinion:

1.  Zoch's allocation "metric" is built around:
    a.   selective and inappropriate assumptions;

6

      b.   an incomplete and mostly one-sided set of facts and, in some cases, an erroneous interpretation of certain facts; and

      c.   a misapplication of equitable factors.

2.   The four other possible reference points proposed by Zoch as a basis for his allocation are not applicable to this case setting since they include:

      a.   one relying on a single allocation factor, which, in my opinion, would not be appropriate;

      b.   two settlements that, in my opinion, Zoch has misinterpreted and misapplied; and

      c.   two decided World War II-related cases which, in my opinion, are not applicable.

### *Zoch's suggested allocation metric*

As I have done in this report Zoch also sets forth a list of possible equitable allocation factors, including the Gore factors. The listing of factors in this part of his report is consistent with the manner in which many judicial decisions are approached and framed, but Zoch fails to follow through and apply these factors in a reasoned way in his report.

Zoch states that "an allocation metric could start with a degree of involvement analysis to establish a 'base allocation,' which could then be adjusted through consideration of other factors." He then states that owner, operator and arranger categories are assigned percentages based upon the relative harm posed by potential actions under each category. And then, within each of these categories, he suggests that each category percentage be further allocated between the U.S. and Whittaker-Bermite. While he does not seem to take a definitive position or recommend any particular percentage for any of the categories, he does offer an analysis for illustrative purposes.

In my opinion, Zoch's recommended framework inappropriately intermingles questions of liability under section 107 of CERCLA and equitable allocation – specifically, the degree of involvement factor. The categories of owner, operator and arranger are categories of liability. Many cases, such as landfills or reclamation facilities, involve a large group of generators or arrangers – who generate waste and arrange for its disposal or reclamation – and one or more owner/operators, who run the disposal or reclamation sites. In those cases, it is not unusual to develop an allocation around these categories. However, this case involves a single site owner/operator of a manufacturing facility (Whittaker-Bermite) which contracted with both private and government entities for the production of materials.

By couching the U.S. degree of involvement as both co-operator and "arranger," and by further recommending a separate and sizeable "arranger" share, Zoch's analysis is designed to guarantee that the U.S. would be allocated a sizeable share. Zoch does not outline how he would determine "the relative harm posed by potential actions under each category," an omission which I believe undermines his reliance on liability categories as

a basis for an equitable allocation determination. In addition, he does not address the point that Whittaker-Bermite can also be considered an arranger, inasmuch as it generated waste and arranged for its disposal waste in various sections of the large amount of property that it owned and controlled. My point here is not to parse words, but to emphasize that while I agree that degree of involvement is a critical allocation factor in this case, I do not believe that Zoch's methodology of allocating by liability category is an appropriate or helpful way to differentiate the parties' respective degrees of involvement.

Furthermore, in analyzing the allocation under different categories, Zoch appears to leap to certain conclusions without supporting analysis. With respect to "ownership," he states that "when there are differences in the ownership of land, buildings and equipment, much of the owner share is reasonably attributed to owners of equipment which resulted in contaminant releases. It is not clear whether this is Zoch's opinion or whether he is stating this as fact – however he provides no basis for this statement either in his own experience, or other allocation precedent. In my twenty-three years of experience, I have never encountered a case where a party was allocated a substantial degree of involvement share based on ownership of a minor percentage of equipment at a site, even where that equipment may have processed chemicals or components with chemicals that require remediation at a site. Ownership of the property and the facility, including production, maintenance and storage buildings, waste impoundments and waste disposal areas, and sewers and piping conveying waste to those areas, are important aspects of a party's degree of involvement. My understanding is that evidence shows that the Whittaker-Bermite owned all of the land, buildings, infrastructure, and disposal facilities on the Site.[10] Even if the U.S. may have owned some items of grinding and casting equipment used for rocket motor production, Whittaker-Bermite ran its own machine shop and owned most of the production equipment at the Site. Thus, Zoch's conclusion that the U.S. and Whittaker were "joint" owners of the Bermite plant and that the U.S. could be allocated 40% of an "owner" share is, in my opinion, not consistent with any reasonable interpretation of the facts in this case.[11]

With respect to Zoch's suggested "operator" allocation – by suggesting in his "illustration" that the U.S. should receive two-thirds of the operator share, Zoch is, first of all, assuming that the U.S. is liable as an operator.[12] But even if the U.S. is assumed to

---

[10]  I am advised the Court has determined that Whittaker is liable under CERCLA as an "owner."

[11]  While I am aware of certain documents listing certain government-owned equipment on rocket motor contracts, I am not aware of any documents providing a complete list of equipment owned by Whittaker-Bermite and used on perchlorate-related government work. But, given the extensive grinding and casting operations at the Site, it would appear that the small number of government-owned grinding machines and other equipment that AISLIC alleges was present at the Site would not have constituted a significant percentage of equipment used. In addition, while use of grinding and casting machines may have generated dust or particles inside buildings, it appears to be well document that Site contamination was caused by the disposal practices instituted by Whittaker-Bermite.

[12]  I understand that the U.S. has submitted a Motion for Summary Judgment seeking a ruling that the U.S. is not liable as an "operator" in this case. I note that if the U.S. is not held liable as an operator, a sizeable portion of Zoch's suggested allocation (16.75% in his "illustration") would be eliminated. Similarly, if the

have liability as an operator, Zoch once again leaps to a result without any supporting analysis or justification. In my opinion, he has overlooked the basic facts of the case, including much of the deposition testimony, which shows that Whittaker-Bermite operated the Site on a day-to-day basis,[13] made all the decisions concerning what products to manufacture, and made all decisions concerning operations and waste disposal at the Site, and controlled and conducted all operations that resulted in releases of contaminants. Whittaker-Bermite volunteered to contract with the U.S. to manufacture certain products involving perchlorate compounds.[14] Conditions of these contracts included reference to government product specifications and safety guidelines – from which Whittaker produced its own operational procedures.[15] Whittaker produced its own manual for environmental protection and waste disposal, and was responsible for executing it.[16]

Even if the Court ultimately concludes that these contract provisions and the presence of U.S. on-site quality assurance inspectors create some modicum of control over disposal sufficient to create operator liability, it would not, in my opinion, make the U.S. a co-operator of the Site with Whittaker, and would not support an allocation to the U.S. of two thirds of an "operator" share based on that alleged "level of control."[17] Moreover, to the extent that Zoch's "operator" opinion is based on alleged government control over operations during World War II, it would be misplaced, since there is no evidence that perchlorate was used in any products manufactured under World War II contracts at the Site. In any event, Zoch places undue importance on the World War II years not only because he provides no information that any perchlorate contamination occurred during that time but also because they represent a very small portion of the Site's more than 40-year operational history.

As I noted above, carving out a separate "arranger" share, weighting it in his illustration at 50% of the total allocation, and then assigning the U.S. 95% of that share based on his production estimates, guarantees a substantial allocation percentage to the U.S. In my opinion, Zoch has not presented a credible basis for this portion of his

---

Court ultimately finds that AISLIC has not established that U.S. is liable under CERCLA as an "owner" or "arranger," the "owner" or "arranger" portions of Zoch's allocation would be eliminated.

[13] See, e.g., Deposition of James Card, p. 45; Deposition of Douglas Moore, pp 18-19.

[14] See, e.g., Deposition of James Card, p. 27. Deposition of Douglas Moore, pp 19, 37.

[15] See, e.g., Deposition of James Card, p. 57.

[16] See, e.g., Deposition of James Card, p. 59. Exhibit 62. Deposition of Max Calkins, p 61. Deposition of Douglas Moore, pp. 23, WE0288569.

[17] Notwithstanding the presence of government quality assurance inspectors Whittaker-Bermite had the responsibility for quality and safety and had the responsibility for shutting down productions lines if something was amiss. See, e.g., Deposition of James Card, p. 90. See Deposition of Wallace Pflug, pp. 113-114 (DCAS did not have the power to interfere with Bermite's production lines unless a contractual issue arose).

framework and there is no precedent for such a significant allocation for "arranger" liability in a case involving a manufacturing facility that was privately owned and operated. When considering the respective degrees of involvement of site owner/operators and entities with which they contract, it is more appropriate to consider the totality of their course of dealing, without any category labels. By contrast, Zoch appears to have ignored the totality of circumstances, including Whittaker-Bermite's total control of the Site and the extent to which contamination at the Site was the result of Whittaker-Bermite's waste handling practices.

Zoch also adds 15% to the U.S. allocation – in his illustration, 5% each for care, cooperation and benefits. I agree with Zoch that these may be relevant allocation factors and they generally are subjective. However, Zoch's method of incorporating them and his justification is based on an incomplete and one-sided view of the facts.

His reference to and reliance on World War II cases on the question of benefits is inappropriate inasmuch as there is no evidence that perchlorate was used in any products manufactured under World War II contracts at the Site. Perchlorate was used in both private and government contracts, and Whittaker-Bermite gained revenue and profits from its work under these contracts. In presenting a one-sided view of the facts, Zoch inexplicably ignores any economic benefits realized by Whittaker.[18]

With respect to cooperation, Zoch again presents a one-sided view – overlooking the fact that the U.S. provided $7 million in funding for groundwater studies at the Site to examine the extent of perchlorate contamination.[19] He also overlooks the fact that the U.S. acted to settle the matter with Steadfast for $33.85 million, while AISLIC declined to enter into a settlement. Zoch also fails to note the extent to which Whittaker-Bermite resisted California regulatory authorities' efforts to have Whittaker-Bermite address groundwater issues at the Site until ordered or sued by local water purveyors.[20] California regulators also believed that Whittaker-Bermite failed to disclose the full extent of the landfills and dumps present on the Site.[21] The California Department of Toxic Substances Control was prompted to recommend that the California Attorney General pursue action against Whittaker for violations of California's Health and Safety Code.[22] These were all Site-specific actions that, in my opinion should bear on an assessment of the parties' relative degrees of cooperation.[23]

---

[18] For example, Whittaker-Bermite's contracts with the government for rocket motors involved revenue of over $50 million. See Expert Report of Jay Brigham and citations therein.

[19] See, e.g., Deposition of Karen Anderson, pp 58-61, 71-72.

[20] See Complaint, ST 46507.

[21] Deposition of Alan Sorsher, pp. 20-28, 43-49.

[22] ST030774.

[23] Although Zoch takes issue with the Department of Defense's general views and actions on perchlorate issues, those issues are less relevant to what the parties have done to address contamination at the Site. Moreover, Zoch does not note that Whittaker has actively advocated similar positions on regulatory issues,

With respect to care, Zoch essentially overlooks the extent to which Whittaker-Bermite violated various regulatory and contractual provisions and the contribution of that lack of care to the contamination at the Site.[24]  A number of violations resulted in contamination of areas requiring cleanup.[25] As noted in the expert report of Dr. Charles McLane, Whittaker-Bermite's waste disposal practices, included use of unlined impoundments and faulty sumps, burying drums and waste in unauthorized dumping areas, allowing wastewaters from building wash-down to be released directly onto the ground, and failing to properly manage the burn and hog-out areas.

### *Reliance on production volume as an allocation reference point*

Zoch suggests that a volume-based allocation might be appropriate – which according to him, would result in an allocation to the U.S. of 95%.  This is based on Zoch's calculation that government production accounted for 95% of production[26]  at the Site and the assumption that the U.S. should be allocated 100% of any contamination arising out of the government contracts.  But this approach completely ignores the role and contribution by Whittaker-Bermite to the contamination at the Site.  And even if AISLIC proves that 95% of Whittaker-Bermite's total sales were directed to the U.S., Zoch's assumption that all government work involved use of perchlorate is not supported

---

for example, opposing a bill that would have allowed more stringent regulation of perchlorate in California in 2006, see AISLIC0313350, which the Governor ultimately vetoed at Whittaker's urging. AISLIC031335.  Thus, it is not meaningful to compare whether the Department of Defense was less cooperative than Whittaker when it comes to the potential regulation of perchlorate generally as an emerging contaminant.  See also AISLIC0311906 (Bill for $160,000 for lobbying efforts related to the maximum contaminant level for perchlorate.

[24] In the Lyondale case cited by Zoch, the court recognized that, for some parties, degree of care, or lack thereof, can be balanced against degree of cooperation, or lack thereof, and cancel one another out – specifically in the case of Exxon, whose apparent lack of cooperation with government authorities was balanced by its apparent exercise of greater care in managing its waste.  See *Lyondale Chemical Company v. Albermarle Corporation, et al*, Civil Action No. 1:01- CV-890 Findings of Fact and Conclusion of Law, October 5, 2007, paragraphs 416 and 417.  The court also declined to penalize non-settling parties for lack of cooperation –finding that they did not act sufficiently egregiously to merit an increase for such conduct. See paragraph 416.

[25] Exhibits 22, 23, 90; Deposition of James Card, pp. 129, 130 (RCRA violations and deteriorating drums, contamination of the Hog-out area), p. 130 (waste propellant washing down a hill in copious amounts, contaminating Oro Fino Canyon stream),  p. 132 (propellant dumped on the ground in the hog-out location and Jato mix area, near building 317.  See also Deposition of  James Jisa, pp. 255-256 (personally witnessed contamination in the hog-out area); Deposition of Edwin Tigue, pp. 26, 30-32 (Wastewater from production building went out of the building and directly to the ground).

[26] The amount of perchlorate used by Whittaker-Bermite in government vs. private contracts is relevant, but Zoch does not attempt to make such a comparison.   But even if such a comparison could be made, it would still be inappropriate to allocate 100% of the contamination contribution by Whittaker-Bermite's work under government contracts.

by the record.[27]   To the extent that this calculation includes production that did not involve use or release of perchlorate, including World War II production, it is inappropriate.

I am mindful that, absent documentary evidence that would serve as a basis for this calculation, Zoch has relied on the declarations and/or testimony of former Whittaker-Bermite employees.  However, in at least one case, the declarant seemed to have been relying on what he was told by counsel.[28]   In any event, regardless of what the actual percentage of perchlorate use and/or releases were under government contracts, Zoch's assumption that the U.S. should be allocated 100% of any contamination caused by work on government contracts is not based on any particular analysis and seems to be inconsistent with his own allocation metric.

### _Reliance on the Steadfast Settlement as an allocation reference point_

In my opinion, Zoch's use of the Steadfast Settlement to support an allocation to the U.S. of 79.8% reflects his propensity to unduly stretch the meaning or significance of something or to offer an incomplete or inaccurate presentation of facts in support of his conclusions.  To begin with, my understanding is that the terms of the Steadfast settlement provide that it is not intended to have any evidentiary or precedential effect in this or any other matter involving claims asserted against the U.S.  I further understand that it is the position of the U.S. that because the Court approved the proposed settlement terms, it is inappropriate for Zoch to rely on the Steadfast settlement as precedent for an allocation of AISLIC's alleged costs.

However, assuming that the Court does not preclude Zoch from relying on the Steadfast settlement, on the face of it, the U.S. did not agree to pay anything close to the percentage that Zoch suggests.  In this regard, the errors in Zoch's analysis include:

---

[27] For example, Zoch states in his report that post-WWII production of igniters for some flares and the Mark 125 igniter (used in the folding fin-aircraft rocket) contained small amounts of potassium perchlorate. (Zoch page 12-13).  He cites the deposition testimony of Max Calkins and the Draft RI Report as evidence that potassium perchlorate was used in the production of military ammunition, flare, and igniter production. In his 2002 deposition in the Castaic Lake Water Agency litigation, Mr. Calkins testified that perchlorates were not used in the production of GAUSA ammunition, AAHA ammunition, 30mm ammunition, and flares.  He speculated that there may have been a "very small, very very small" amount of potassium perchlorate in the GAUSA fuse or high-explosive incendiary rounds . (ST022374).  In his 2009 deposition, Calkins testified that the following products did not contain perchlorates: ammunition rounds, detonators, fuses, flares, signal cartridges, glow plugs, tracer pellets, and igniters. (DEP0032357-363).   Calkins testified in 2009 that the BKN03 pellet contained potassium perchlorate (DEP0032358).  However, following additional questioning regarding use of perchlorates, Calkins indicated that he was "getting my chemicals mixed up" and stated that the BKN03 pellets contained potassium nitrate and did not contain perchlorates.(DEP0032363)  Perchlorates were not included in the list of components found in an Ammunition Data Card for the Ignition Booster Pellet, BP-1(W-S004793) and the 1983 Material Specification for Ignitor Mix (W-S006536-552).

[28] Deposition of James Card, p. 148.

1.  He assumes that the claim against which the $33.825 million should be measured was the $91 million in the complaint, when my understanding is that Steadfast presented claims for additional costs subsequent to the filing of the claim – raising the claim to more than $100 million.  Even if, as Zoch asserts, the subrogation claim should be reduced by approximately $13.25 million to exclude non-CERCLA response costs, the amount of the response claim is still far greater than the calculation used by Zoch.

2.  He fails to note that the $33.825 million payment by the U.S. also could reflect the possibility that Steadfast might have been able to recover pre-judgment interest (assuming that it established government liability), which would run into the millions of dollars given the size of Steadfast's claim, which also would significantly lower the value and allocation percentage of the actual dollars being reimbursed.

3.  He overlooks the fact that the $33.825 million payment by the U.S. is for all contaminants, not just perchlorate – thus his "reduction" of RFI Parties' "CERCLA" costs from $16 million to $2.4 in part to exclude what he assumes are non-perchlorate costs, is not warranted, and his reduction of the $75 million (as adjusted) Whittaker claimed subrogation costs by 11.7% also is unwarranted.

4.  He arbitrarily, and without any analysis, concludes that only 15% of the RFI parties' costs would be considered as non-perchlorate, recoverable response costs as a means of reducing Steadfast's CERCLA costs.

5.  He arbitrarily and without any analysis or support concludes that the "value" of the U.S. $33.825 million payment should be increased to $45,406,250 by adding a $2.5 million cost of litigation and 20% litigation factor.  These assumptions are without any basis.

6.  He ignores the fact that AISLIC and the U.S. made substantial document productions, conducted over 20 fact depositions, and exchanged Rule 26 expert reports subsequent to the Steadfast settlement, significantly altering the mix of information available to consider for purposes of determining what would be a fair and equitable allocation in the context of AISLIC's claims.

Thus, Zoch's calculation of a presumed U.S. payment (arbitrarily increased to $45,406,250) divided by a presumed Steadfast CERCLA recoverable cost (arbitrarily reduced to $56,925,250), which results in a percentage of 79.8%, is inappropriate.

### *Reliance on Aerojet Settlement as an allocation reference point*

Zoch also relies on a settlement agreement resolving a contract dispute between Aerojet and the U.S. pursuant to which the U.S. recognized "as allowable for government contract cost purposes up to 88% of environmental expenses at [Aerojet's] Sacramento and former Azusa sites." As noted in published reports by GenCorp. (Aerojet's

13

successor), these costs could be recovered to the extent that Aeorjet sustained its business under U.S. contracts.  Zoch notes this point and also notes that Whittaker-Bermite no longer has contracts with the U.S. since it went out of business in 1987.   Nevertheless, Zoch cites this agreement as a reference point for an allocation under CERCLA to the U.S. in the present case of 88%.  As I understand that settlement, it involved a contract proceeding and the amount of environmental costs that could be placed into Aerojet's overhead pool in support of its pricing under government contracts.

Indirect overhead costs are by their nature those that may be necessary for the overall operation of the business but are not specifically identified with particular final projects or contracts performed for customers.  The government Cost Accounting Standards imposes some general rules regarding the characteristics of costs that would be permissible to include in general overhead pools, and specific rules for certain kinds of costs.  There is no special rule for environmental remediation costs as distinct from other corporate-wide liabilities.  Therefore, the general rules are applied – i.e., the costs must be shown to be reasonable, allocable, consistently treated and not specifically excluded by any government regulation. Allowable environmental costs may include litigation expenses, liability insurance premiums, or rent, mortgage, and other costs of occupancy that are typically not considered recoverable CERCLA response costs.  Given that no details concerning the sites in question or the terms of agreement are provided, in my opinion, it would not be appropriate to simply use this settlement as a reference point for a CERCLA allocation in this case or in any other CERLA case.

The Aerojet settlement was not a matter brought under CERCLA and, thus, the referenced settlement could not reflect an agreement by the U.S. to accept an equitable allocation under CERCLA of 88%.  The U.S. merely agreed to allow Aeorjet to include 88% of its environmental costs as reasonable and allowable indirect costs in its government contracts.  In my opinion, this in no way substitutes for a thorough analysis of CERCLA's equitable factors in allocating AISLIC's alleged costs incurred at the Whittaker-Bermite Site.

### *Reliance on selective "War Plant" cases as an allocation reference point*

I have served as a settlement counselor or neutral in numerous cases in which a private party seeking response cost reimbursement alleges that the U.S. was involved as an operator or arranger.  Regardless of the case setting, the period of time in question, or the types of contracts involved, almost every claim includes a reference to the <u>Cadillac Fairview</u> case for the proposition that the U.S. should be allocated 100% for response costs associated with release of contaminants during production under government contracts.  But, as has been borne out in the many cases that I have helped to resolve through settlement, that case has little applicability to most cases, and, in my opinion, should have no applicability to this case.  First, the period of U.S. involvement in <u>Cadillac Fairview</u> was exclusively during World War II.   As Zoch notes in the quotes that he references on page 51 of his report, that apparently was an important element of the decision.  The level of government control during World War II was markedly

different than relevant period here.  Secondly, the <u>Cadillac Fairview</u> case centered on interpretation of an indemnification provision in the contract between the site owner/operator and the U.S.  While the court lacked jurisdiction to decide the legal consequences of that provision, it did decide that it was appropriate to consider it as an equitable factor for purposes of equitable allocation.  No such indemnification provision in favor of Whittaker is in issue in this case.

Similarly, the recent Court of Claims case cited by Zoch on page 54 of his report, also is not applicable to this case.  That case involved a legal interpretation of a contract provision, not equitable allocation under CERCLA.  In any event, there is no provision in this case comparable to the "taxes" clause interpreted in that case.  Furthermore, that case also involved World War II contracts and a number of facts that were unique to that case and not present in the case at hand.[29]

## OPINIONS AND DISCUSSION ON RECOMMENDED ALLOCATION FRAMEWORK

### Overview

Whittaker-Bermite owned the property and designed, built and owned facilities at the Site.  Whittaker used perchlorate in fireworks and other commercial products, perhaps beginning in about 1946 and lasting until 1987.  From 1959-1987 Whittaker-Bermite used perchlorate for the production of rocket motors under prime contracts with various government agencies and under subcontracts with commercial firms who held prime contracts with government agencies.  Whittaker-Bermite also entered into contracts with commercial firms that did not involve the government.  In the course of carrying out these contracts, Whittaker-Bermite released perchlorate into the environment, contaminating soils and groundwater at the Site to a level requiring remediation.

### AISLIC's Assertion:

As I understand AISLIC's argument, it is based on the following:

1) Government contracts, which allegedly accounted for about 95% of the products manufactured at the Site, contained various provisions which, along with government actions under these contracts, manifest a significant degree of involvement in activities that resulted in contamination, including:

      i)   Product specifications.

---

[29] Among other things, both of the cases cited by Zoch deal with allocation for response costs that arose from work exclusively under government contracts during World War II.  Since releases of perchlorate at the Whittaker-Bermite Site resulted from work under private contracts, and the level of U.S. involvement was considerably different, these cases could not be a basis for assigning the U.S. 100% of all response costs associated with perchlorate.

ii) Safety manuals relating to handling of explosive compounds, including perchlorate.

iii) Use of government-owned equipment in the processes, including equipment involved in the generation of perchlorate compounds (mainly in the form of dust from grinding machines and casting molds that were ultimately released at the Site;

iv) Government supply and ownership of perchlorate compounds used in the contracts by Whittaker-Bermite.

v) The right of the government or prime contractors to conduct inspections for quality control purposes and the presence of on-site government inspectors.

2) Other equitable factors should be taken into account to increase the U.S. allocation percentage, including:

i) The U.S. has not cooperated in the investigation and cleanup of the Site.

ii) The U.S. exhibited a lack of care in addressing the evolving perchlorate contamination problem.

iii) The U.S. received the primary benefit from the products provided by Whittaker-Bermite under government contracts.

AISLIC suggests that these provisions, along with the fact that Whittaker-Bermite's products and services were in furtherance of important U.S. interests in the "Cold War," should result in a substantial share being "equitably" allocated to the U.S.

**Opinion**

In my opinion, the points most relevant to this allocation are:

1. Whittaker-Bermite actively sought and voluntarily entered into government prime contracts and subcontracts that were in the company's economic interests.

2. Whitaker-Bermite had exclusive control of operations at the Site, including decisions on waste handling and disposal.

3. Provisions in government contracts explicitly placed the responsibility for safety on the contractor. The DOD Contractors' Safety Manuals incorporated into government contracts noted that contractors should take precautions to ensure that contaminated water would not enter or pollute potable sources of water by percolation through the soil as the result of poor or inadequate treatment and that explosive wastes should be collected in containers, filled with fuel and ultimately

16

burned.  Waste-handling and dumping practices employed by Whittaker Bermite were not consistent with these provisos.

4. Direct government involvement at the Site appears to have been focused on quality assurance – with on-site inspections primarily devoted to product performance.

5. Perchlorate compounds were not used in World War II contracts and, therefore, AISLIC's assertions about alleged U.S. degree of involvement during World War II are not relevant to allocation for perchlorate response costs. The contracting environment during the period of perchlorate use at the Site was quite unlike the prevailing conditions under which World War II contracts were issued and implemented.

6. The government has cooperated by performing a perchlorate groundwater study at the Site and by engaging in good-faith settlement negotiations, which resulted in a Court-approved settlement agreement with Steadfast.  Among other things, Whittaker-Bermite failed to disclose to state and federal authorities the presence of numerous waste-dumping grounds on the Site and it also resisted efforts of California water agencies to address groundwater contamination.

7. The contamination problem at the Site is due in significant part to a lack of care by Whittaker-Bermite in its waste disposal practices.  According to its own corporate officers in some instances, Whittaker-Bermite exhibited a number of violations of state and federal environmental regulations, and exacerbated the contamination problem by failing to disclose the presence of numerous waste dumping grounds on the Site and by land farming contaminated soils throughout the Site.

8. Whittaker-Bermite received economic benefits from the government contracts.


**ALLOCATION FRAMEWORK**

      **A.**    <u>**Primary Allocation Factors**</u>

At manufacturing sites, such as the one at issue here, the primary equitable factors are:

- the respective magnitude of contamination for which each party may be responsible; and

- each party's respective degree of involvement in activities causing the contamination.

If one assumes government liability for the purpose of an allocation analysis, then the Court must evaluate how to weigh relevant equitable allocation factors. We have a general understanding of the types of operations that occurred in different buildings and different areas of the Site. We also have a general understanding of the types of operations that may have involved use and disposal/release of perchlorate compounds.

The case does not involve multiple plant owners and operators over time. The Whittaker-Bermite companies are the only companies to have owned and operated the facility during the years that perchlorate was used on the Site. Thus, the need to compare the relative magnitude of releases over time by different operators at different locations at the Site is not present here. However, since Whittaker-Bermite produced products containing perchlorate for private commercial interests, and the locations of production of such commercial products can be identified, it is necessary to take into account the fact that perchlorate releases from commercial operations may have had more significant impacts on some areas of the Site than others.

With respect to contamination that did occur under government contracts, the case involves the actions of two parties -- Whittaker-Bermite, on the one hand and the U.S., by virtue of the contracts that it entered into, on the other hand. The key allocation issue becomes how to sort out the relative degree of involvement of these parties.

However, it also is appropriate to take into account the fact that much of contamination occurred in the course of Whittaker-Bermite implementing subcontracts with various government prime contractors. To the extent that Whittaker's theory of U.S. liability is based, in part, on quality assurance oversight or contracting out work for which waste disposal is inherent, these prime contractors also would appear to have liability and should be allocated an equitable share. The U.S. hired the prime contractors to perform the work and the prime contractors subcontracted the work out to Whittaker-Bermite, with the prime contractors gaining an economic benefit from the subcontract relationship.

In a number of cases similar to this one in which I have served as a settlement counselor, I have proposed the use of an allocation methodology that ultimately has been relied on by the parties, and, where appropriate, a mediator, to fashion a settlement. The recommend framework entails:

1. Analyzing the history and use of different areas of the Site where perchlorate contamination is present;
2. Assessing the magnitude of contaminant contribution from commercial and government activities;
3. For government contracts, suggesting the various elements relevant to "degree of involvement" factor with respect to the contamination in question – in this case, perchlorate;
4. Developing weighting multipliers for these elements of the degree of involvement factor;

18

5. Comparing the involvement of the respective parties for each element to derive a degree of involvement percentage; and

6. Making any adjustments to take into account other equitable factors (e.g. care, cooperation, contractual indemnities, etc.).

At this Site, there are dozens of Areas of Concern. Determining the source of contamination for each of them at a "micro level" would be unduly complex and, in any event, not necessary to arrive at an allocation that fairly reflects the parties' relative responsibility with respect to the overall Site. To reduce this complexity, I have broken down the Site into major areas of concern, tracking the way in which they have been broken down in the expert report of Dr. Charles McLane:

- Northern Production Area (OU-5, OU-1Dn)
- Southern Production Area (OU-1A, B, C, Ds, E and OU-2)
- Burn Valley and Burn Area (OU-3)
- Hula Bowl Landfills Area and Unpermitted Landfills (OU-4)

In my view, the elements most relevant to the parties' respective degrees of involvement include the following:

- Ownership of property and buildings and equipment that were contaminated or generated contamination;
- Involvement in overall facility operations;
- Involvement in use, disposal and release of materials causing contamination;
- Ownership of materials causing contamination;
- Knowledge regarding potential for contamination from activities; and
- Economic Benefit

In light of the fact that Mr. Zoch has raised degree of care and degree of cooperation as additional factors, I have incorporated them into the allocation analysis as adjustments to the parties' degree of involvement percentage.

**ALLOCATION ANALYSIS**

### A.    <u>Contaminant Contribution</u>

By evaluating the estimated volumes of perchlorate-contaminated soils in different area of the Site, it is possible to estimate the percentage contribution of each of these four areas to the cleanup. The most heavily contaminated areas are the Southern and Northern Production Areas.

As set forth in the expert report of Dr. McLane:

**Northern Production Area --**

This area was used for commercial production of fireworks and production and testing Baker Oil Charges, both products known to contain perchlorate. The production for Baker Oil apparently went on for 30 years[30] and generated waste perchlorate. Waste perchlorate from this production was allowed to spill onto the ground. Seven dumps sites in this area were contaminated with perchlorate. Numerous sumps in this area were found to have deficiencies. Thus, a significant amount of contaminant contribution in this area resulted from commercial operations

**Southern Production Area**

This area also was used for commercial production of Baker Oil Charges. This area also was impacted by Whittaker's practice of land farming, spreading contaminated soil along previously uncontaminated areas. JATO rocket motors were produced in this area under government contracts beginning in 1959 and ceased in 1965. Rocket motors for the Sidewinder and Chaparral were produced in this area and led to an expansion of the number of buildings. Wastes from these operations were dumped onto the ground in violation of internal company guidelines and RCRA. Soil contamination in proximity to production buildings is indicative of inappropriate waste disposal from these buildings. A significant amount of contamination is found in landfills and haphazard waste dumps around the Site. Numerous sumps in this area were found to have deficiencies. A measurable amount of contamination in this area resulted from commercial operations. The extensive amount of contamination resulting from operations under government contracts stemmed from improper waste handling and disposal practices. The "hog-out" area also was located in the Southern Production Area.

**Burn Area**

Wastes from commercial production probably were burned here as well as wastes from government production. The majority of wastes in this area likely stemmed from government contracts. However, as I understand it, Whittaker-Bermite did not maintain the burn pits by removing residue and ash after each burn – a practice that was included in guidance documents and would have reduced the mass of perchlorate in the soils. In addition, some soil excavations in the Burn Area apparently spread contaminated soil throughout additional portions of the valley.

---

[30] Letter from Bermite Division to Baker Service Tools, July 30, 1981. W-S081268

**Hula Bowl Landfills**

This was an organized landfill operation that was never permitted under RCRA. There is evidence that Whittaker-Bermite buried perchlorate waste in this area. If any of the perchorate waste buried here was from government contracts, it was in violation of the provisions of government contracts which prohibited the burial of explosive wastes.

**B.    Degree of Involvement Factor -- Elements**

*Ownership of property, buildings and equipment  at which contamination occurred*

Judicial and consensual allocation experience suggests that a substantial equitable share is usually allocated to owners of land and buildings during activities producing the contamination and to current owners of the land, particularly when the owner is an active owner. In my experience, 20% may be allocated for this factor. Throughout the period of operations, Whittaker-Bermite owned all of the land, buildings, and infrastructure (pipes, sewers, sumps, impoundments, etc.). Evidence in the record does indicate government ownership of some equipment, including a few pieces of grinding and casting equipment that may have been used in rocket motor and other contracts. But in comparison to the amount of equipment owned by Whittaker-Bermite, the percentage of government-owned equipment appears to have been quite limited. Given the above, in my opinion, the U.S. should be allocated a minimal percentage under this element, no more than 5% (or 1.0% of the total Site allocation if this factor is weighted 20%).

*Involvement in overall facility operations*

Evidence in the record suggests that Whittaker-Bermite had complete operational control of the facility. It decided what projects to work on, how to price the projects, who to hire to run the projects, who to purchase supplies from, how to handle materials, and where and how to dispose of wastes. The U.S. was not involved in overall facility operations at all. In my experience, on the order of 15%-25% may be allocated for this element and I suggest 20% here. In my opinion, the U.S. should be allocated a zero percentage.

*Involvement in use and disposal or release of materials causing contamination*

I have incorporated this element as a means of examining any more direct involvement in the specific activities giving rise to contamination. I have weighted this element between 25% and 35% in previous matters and suggest 30% here. In general, while it is true that contracts and specifications with the government or its prime contractors required the use of pechlorates, the decision to bid on these contracts was Whittaker-Bermite's alone. The use of perchlorates was essential to those contracts involving perchlorate compounds. Contract specifications did require that the contractor implement safety provisions associated with explosives, including perchlorate, including

burning of explosive wastes.  However, evidence indicates that Whittaker-Bermite had exclusive control over waste handling and disposal and that the government was not involved in disposal decisions made at the Site.  Whittaker-Bermite could and did avail itself of off-site disposal options.  No information has been found to indicate that any of the U.S. on-site representatives directed or supervised Whittaker-Bermite's disposal of process wastes.  Particularly in the productions areas, evidence indicates that Whittaker-Bermite allowed areas to become contaminated through a number of inappropriate waste-handling and disposal methods.  Thus, for the production areas, in my opinion the U.S. share for this element should be minimal.  In my opinion, that government contracts specified burning of propellants would justify a higher share for the government for this element than others, which I have incorporated into my analysis.

### *Ownership of materials causing contamination*

I have incorporated this element in my allocation analyses in the past. This element is particularly relevant if a customer supplied materials causing contamination and continued to own them through the work in progress.  Zoch has asserted that some perchlorate compounds used by Whittaker-Bermite were supplied by the U.S.  However, the only direct evidence of which I am aware indicates that Whittiker-Bermite purchased perchlorate from commercial suppliers.[31]  I also am not aware of any provisions in rocket motor contracts indicating that the U.S. owned the work in progress.  Thus, in my opinion, the U.S. should receive a minimal, if any, percentage of this element.  To the extent that some contamination was caused by hogging out or repairing government-owned motors, it would justify a share to the U.S. for this element – which would be applicable mostly in the areas impacted by hog-out activities in the Southern Production Area.  The percentage of perchlorate-contaminated soils in the areas affected by hog out operations is less than 19% of the total volume in the Southern Production Area and these areas were impacted as much or more by production activities as they were by hog-out activities.  Moreover, Whittaker-Bermite also hogged out defective motors that the U.S. apparently did not own in this area.  Accordingly, I would suggest that the U.S. receive a minimal percentage, no more than 10%, for this element for the Southern Production Area.

### *Knowledge regarding potential for contamination from activities*

In my opinion, Whittaker-Bermite, as site operator, had superior knowledge concerning the likelihood of its disposal methods resulting in contamination at the Site, even if neither Whittaker-Bermite nor the U.S. was generally aware of the specific impacts of perchlorates.  As such, in my opinion, Whittaker-Bermite should receive the greater percentage for this element.  The U.S. was aware of the need for explosive burning and probably was aware that wastes would result from some aspects of the production at the Site under government contracts.  Thus, the U.S. should receive a percentage for this element, as reflected in my analysis.

---

[31] See Expert Report of Jay Brigham.

### *Economic Benefit*

In my opinion, Whittaker-Bermite's motive for engagement in government contracts was economic. Whittaker-Bermite received the economic benefits under these contracts. While the U.S. receipt of the product can be viewed as a benefit, the U.S. did not receive any economic benefits from the contracts. Whittaker-Bermite or its insurers or the current owners may receive some economic benefit in property appreciation that will result from final remediation and commercial development of the Site.

## D.     Other Factors

### *Care*

In my experience, in cases where there is a means to materially distinguish parties based on respective degree of care, it becomes a relevant equitable allocation factor. Often, the lack of due care is reflected in greater volumes of waste released by one of the parties – which may have a specific, direct impact on the allocation. However, here, since only one of the parties was responsible for disposal activities, it does become relevant to examine whether contamination was made more widespread by either party's lack of due care.

As noted above and in the report of Dr. McLane, the actions of Whittaker-Bermite in its handling and disposal of wastes manifested a lack of due care that exacerbated the contamination – and likely increased the cost of the remediation. In my opinion this would justify a minor increase in the degree of involvement share for Whittaker-Bermite.

### *Cooperation*

Whittaker-Bermite, primarily through its insurers, has funded investigations and remediation of the Site, but the record appears to suggest that Whittaker generally did not take responsibility for investigating or remediating the Site in a timely fashion and was not totally cooperative. Up to this point, AISLIC has expended about $17 million on this Site under its insurance policies. As noted above, Whittaker resisted attempts to address groundwater contamination and had to be sued before it took action. Whittaker also failed to properly disclose the scope of its unpermitted disposal locations to government authorities. Thus, as I indicated above, in my opinion, its actions do not merit a decrease in its allocation percentage. The U.S. has cooperated by contributing $7 million to a groundwater study that will form the basis for groundwater remedial planning at the Site. The U.S. also reimbursed Steadfast $33.825 million under its settlement of Steadfast's CERCLA claim. In my experience, the actions of the U.S. would not necessarily justify a cooperation reduction in its allocation percentage, nor do I believe that a cooperation increase is merited.

E.    **Allocation Summary**

Attachment 3 provides a means to quantify the above allocation framework and analysis.  It is a spreadsheet table representing the above allocation analysis.  This table shows:

1. **Calculations of estimated volumes of perchlorate contaminated soil in each of four areas (Columns, 2 and 3)** – Estimates are taken from Site Feasibility Studies.  This volume estimates show that the Southern Production Area has the largest volume, by far, of contaminated soils;

2. **Estimates of the percentage of contamination caused by government (as opposed to commercial) work (Columns 4 and 5) –** Based on the operating history of the Site, it appears that the Northern Production Area was the location of a significant amount of commercial fireworks and oil charge production and, therefore, up to 50% of the contaminant releases may have resulted from non-governmental production.  In the Southern Production Area, it appears that the vast majority of the perchlorate use and disposal was related to Whittaker-Bermite's government contract work.  While site deposition testimony appears to estimate government production to be in the range of 92% to 95%, I have suggested that 90% as a fair appraisal for the Southern Production Area.   For the Burn Area and Hula Bowl Areas, I have suggested 85% to account for the likelihood that wastes from the Northern Production Area were disposed in these locations.

3. **Degree of Involvement calculations (Columns 5—13)** – I have suggested weighting percentages for each element based on my experience in developing allocation frameworks in other, similar cases.  For each element, I have allocated a percentage to the U.S. and a percentage to Whittaker-Bermite and its prime contractors based on the analysis set forth above.  Because there is little information in the record that would allow an allocator to derive precise calculations, the numerical allocation percentages are intended to reflect a more qualitative evaluation of each element.  The allocation percentage for each element is multiplied by the weighting percentage for each element to produce a calculated a Degree of Involvement Percentage in Column 13.

4. **Adjustments to the Degree of Involvement calculations to take into account Cooperation and Care factors (Columns 14-17)** – This analysis adjusts the Degree of Involvement percentage from Column 13 up or down by using adjustment factors.  Thus, a number of 1.1 in columns 14 or 15 would signify a 10% increase in the Degree of Involvement percentage while a 0.9 number would signify a 10% reduction.   These adjustments result in a recalculated Degree of Involvement percentage in column 16, which produces an Adjusted Degree of Involvement share in column 17.

5. **Final allocation percentages for the U.S. (Column 18)** – The percentages in column 18 are calculated by multiplying the final adjusted degree of involvement percentage for each of four areas by each area's adjusted percentage of contaminated soils from government work.

**F.    Conclusion**

Attachment 3 includes inputs that are qualitative and which reflect both my experience in applying equitable factors and my professional judgment in evaluating the facts of this case.  While application of this framework and attendant calculations produces a precise percentage, it is intended more to serve as a guide than to produce a precise allocation percentage.  As I noted above, I am mindful that decisions on which allocation factors to apply and how to apply them are within the province of the Court.  However, in reliance on the above framework and in consideration of the totality of the facts in the case, it is my opinion that the U.S. allocation percentage should be no more than 10%.


_____

Matthew Low

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

---

**Project Performance Corporation**

---

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

**EDUCATION**

J.D., Washington College of Law, American University, 1973
B.S., Engineering, State University of New York at Stony Brook, 1969

**PROFESSIONAL EXPERIENCE**

Over 30 years of experience in environmental compliance, management and enforcement, risk assessment, arbitration, mediation, dispute resolution, and policy analysis. Experienced in development of environmental management systems and conduct of due diligence investigations. Expert on Superfund liability, allocation, cost recovery analysis, and NCP compliance having worked on over 100 cases. Extensive experience in case arbitration and mediation of enforcement cases, contractual claims, including indemnities, releases and successor-in-interest issues. Serve as a mediator and facilitator in a variety of environmental areas, including enforcement, claims for recovery of property damage and remediation, allocation negotiations, acid rain legislative development, high-level nuclear waste disposal siting and licensing, asbestos in public and commercial buildings, used oil regulation, hazardous waste capacity assurance planning, and solid waste legislation. Experience in environmental enforcement and policy as a litigation attorney and branch chief at EPA's Office of Enforcement and Policy, and as the Policy Director for the National Commission on Air Quality.

*Vice President, Energy, Environmental & Climate Solutions, Project Performance Corporation (Started March 24, 2008)*

Direct Energy, Environmental and Climate Change Programs at PPC. Manage a staff of 25 consultants and analysts – with focus on regulatory and compliance analysis, Superfund expert consulting and settlement advisory services and climate and sustainability consulting and program development.

*President, TLI Holdings, Inc/TechLaw, Inc (May 2003-March 1, 2008); TLI Systems, Inc. (subsidiary of TechLaw, 1986 - 2003)*

[TLI Holdings became the parent company of TechLaw, Inc. in 2006.] Arbitrator, mediator, settlement counselor, and expert witness in hazardous waste site cases. Assist parties in contribution and cost recovery actions by designing settlement processes, developing settlement frameworks, mediating negotiations, acting as an arbitrator, and providing expert testimony. Serve as mediator and arbitrator in cases between the government and private parties. Conduct due diligence and transactional risk assessments. Provide consulting services on environmental policy issues and serve as facilitator and

1

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

mediator of negotiations and policy dialogues involving a variety of environmental issues.  Responsible for corporate operations such as strategic planning and marketing.

Performed due diligence of environmental risks for major railroad merger.  Assisted Georgia Environmental Protection Division in drafting amendments to Hazardous Site Response Act regulations. Drafted Solid Waste and Landfill legislation for the Governor of Kentucky and assisted Governor's office in gaining enactment of bill through discussions with General Assembly and diverse interest groups.  Served as co-mediator in successful Nuclear Regulatory Commission negotiated rulemaking involving licensing support system for siting of high level nuclear waste repository.  Developed legal analysis of issues involving interstate transport and disposal of hazardous waste and mediated successful negotiations on interstate agreements for the National Governors' Association.

### *Shutler and Low*. *(1981 -1991)*

Represent commercial clients in regulatory proceedings and enforcement (civil penalty and recall) cases before EPA on Clean Air Act issues and DOT on safety issues.  Presented arguments in two successful U.S. Court of Appeal cases challenging EPA regulations.  Practice includes diverse matters such as trademark applications, FCC satellite transponder litigation, management of product liability litigation, risk management programs for a major racing association, and licensing agreements.

### *Senior Project Manager and General Counsel*, *TechLaw, Inc. (1983 - 1986)*

Program director on multimillion dollar CERCLA and RCRA enforcement support contract with EPA.  This new contract was designed to assist EPA in site case analysis and cost recovery actions. Managed PRP searches and liability analyses at over 90 Superfund sites.  As General Counsel, oversaw legal aspects of the corporation.

### *Policy Director*, *National Commission on Air Quality (1979 - 1981)*

Directed the Policy Analysis Division (10 million dollar budget) for the legislative commission established to evaluate the Clean Air Act and make recommendations to Congress.  Conducted studies in five regions of the country on implementation of the Clean Air Act, with emphasis on state programs and state/federal interrelationships.  Responsible for managing the studies, overseeing regional hearings, and drafting Commission recommendations, which were presented to Congress in 1981.

2

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

### Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

***Branch Chief***, *EPA, Office of Enforcement (1973 - 1979)*

Responsible for implementation of enforcement programs, primarily for compliance with auto emission and fuels requirements. Supervised three enforcement sections (with 50 attorneys and engineers), managed preparation of regulations and development of enforcement programs and cases. Served as lead counsel in the first formal administrative trial involving a challenge by an auto manufacturer to an ordered recall. The case involved application of a precedent-setting legal theory and EPA prevailed at the hearing and in the Court of Appeals.

***Engineer***, *Department of the Navy (1969 - 1973)*

Project engineer supervising integration of ordnance systems in two major shipbuilding programs, evaluated compliance with technical contract specifications and assessed justification for multi-million dollar engineering change proposals.

## PROFESSIONAL MEMBERSHIPS

Member of the District of Columbia and Virginia Bars
Member of the U.S. Court of Appeals, D.C. Bar
Member of the U.S. District Court, D.C. Bar

## PUBLICATIONS

Superfund Allocations: How do Allocation Consultants Address the Complex Issues as Presented in Multi-Party Allocation Disputes:  Co-author -- For October 1997 5th Section Fall Meeting of American Bar Association Section of Natural Resources, Energy and Environmental Law

Allocation in a Contaminated Sediments Case, 1996 (For Contaminated Sediments Continuing Legal Education Course), 2008 (for Best Practices Conference)

Fields Brook Arbitration: ADR in a Complex Superfund Case, 1997 (Chem. Waste Lit. Rep.)

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

Co-author of chapter on automobile emissions control in Environmental Law Treatise (Law of Environmental Protection, Environmental Law Institute)

Enforcement and Inspection Guidance for Enforcement of Toxics Release Reporting Requirements, 1987 (For Environmental Protection Agency)

Manual for Investigation of Potentially Responsible Parties at Hazardous Waste Sites, 1984 (For Environmental Protection Agency Pursuant to Technical Enforcement Support Contract)

Clean Air Act Investigation and Inspection Manual for Mobile Source Enforcement, 1975 (For Environmental Protection Agency)

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

## SELECTED ALLOCATION AND COST RECOVERY ARBITRATION, MEDIATION, SETLEMENT COUNSELING AND EXPERT ASSIGNMENTS

### *ARBITRATION AND MEDIATION ASSIGNMENTS SUPPORTING COURT-SPONSORED SETTLEMENT EFFORTS*

### Fields Brook Superfund Site, Ashtabula, Ohio

Designated arbitrator in Case Management Order to conduct fact-finding and recommend allocation regarding 5.4 square mile watershed in highly industrialized area.  Contaminated sediment in stream running through area requires remediation.  Allocation of costs for 20 million dollar remedial investigation, source control identification and remedial design.  Conducted extensive fact-finding, including taking of 60 depositions and 20 plant inspections.  Conducted two week arbitration hearing.  Case included two World War II Facilities.  Final Recommendation accepted unanimously.

### Ludlow Landfill, New York

Designated allocator pursuant to Case Management Order.  Issued allocation recommendation for 400 fourth-party defendants for purposes of settlement.  Over 98% of parties settled based on our recommendation.

### Arrowhead Refinery Superfund Site, Duluth, Minnesota

Pursuant to Case Management Order, issued non-binding allocation recommendation for 200 parties involved in litigation over cleanup of oil rerefining site.  Presented allocation assumptions to Court and they were endorsed by magistrate.  Issues involved treatment of owner/operators, treatment of largest party whose used oil contribution was well documented, petroleum exclusion, analysis of the way different waste oils were processed on the site for incorporation in the allocation, water content, and toxicity.  Allocation recommendation was the basis of settlement.

5

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

---

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

---

## Caldwell Trucking Superfund Site, New Jersey

Designated allocator under Case Management order in case involving groundwater contamination stemming from operations of septic waste treatment facility and adjacent manufacturing operations. Engaged in arbitration and mediation of 12 separate contractual indemnification, release or successor-in-interest disputes. Chair of deposition committee for the fact-finding component under the CMO. Technical issues include assessment of expert opinions of four groundwater experts, and resolution of successor-in-interest disputes for a number of parties. Under CMO, authorized to resolve all procedural disputes. Case involves allocation for over 120 parties. Final allocation report issued in September, 1998, and has served as basis for settlement of EPA past cost and contribution claims. Case has settled with the exception one successor-in-interest issue.

## Berks Associates Superfund Site, Pennsylvania

Allocation consultant for group of 200 parties in oil reclamation site. Developed allocation process adopted by Judge in Case Management Order. Primary issue involved establishing waste volume hauled by 20 waste haulers through extensive interviews. Developed dispute resolution process pursuant to which parties could present challenges to me for consideration and recommendations. Issues involved analysis and resolution of disputes concerning petroleum exclusion, used and useful product distinctions, treatment of different wastes during different time frames, geographical differences in site use. Allocation analysis was basis for settlement.

## Warwick Landfill Superfund Site, New York

Allocation expert for group of contribution plaintiffs involved in litigation over landfill allocation. Presented preliminary allocation framework to Special Magistrate, Honorable Harold Tyler, designated by Court to address discovery and settlement. Requested by Judge Tyler to draft allocation recommendation for all parties, including defendants. Served with Judge Tyler as co-mediator, successfully bringing parties to a settlement.

## Metcoa Superfund Site, Pennsylvania

Allocation consultant for a group of 200 plus parties involved in cost recovery litigation over remediation of metals recycling facility. Performed technical and legal analysis and developed settlement process framework. Pursuant to court embraced settlement process, developed dispute resolution process for parties to present challenges to me for consideration and recommendations.

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

Helped manage six days of challenge deliberations by Allocation Committee, addressing approximately 100 disputes.  Served as mediator to address 7 contractual indemnification and release disputes as part of comprehensive multi-party settlement negotiations.  Allocation analysis dispute resolution process and mediation were basis for settlement.  Serve as allocation expert to group in contribution action against recalcitrant parties.

## *ALLOCATION ASSIGNMENTS UNDER EPA ALLOCATION PILOT PROGRAM*

### Peerless Industrial Paint Coating Superfund Site, Missouri

Allocator and mediator in EPA Allocation Pilot Project for Industrial Paint Coatings Site.  Case involved nomination of additional parties, fact-finding interviews with site operator, assessment of legal issues relating to used and useful products, mediation and issuance of allocation recommendation.  Successfully mediated resolution of the case.

## *SELECTED ADDITIONAL ARBITRATION OR MEDIATION ASSIGNMENTS*

### Bofors Nobel Superfund Site, Michigan

Served as neutral allocator for group of ten parties linked as owner/operators or alleged tolling customers of a manufacturing complex consisting of  dye, surfactant, herbicide and pesticide, and specialty chemical plants.  Reviewed over 1,000 boxes of documents, conducted inspections 4 operating plants, and conducted six depositions in fact-finding effort.  Allocation involved analysis of contractual relationships and arranger liability and factual analysis of chemicals released during various time periods in different processes.  Two operable units on the plant site subject to a ROD for groundwater contamination.  Allocation recommendation served as basis for settlement.

### Hylebos Waterway Superfund Site, Tacoma, Washington

Neutral allocator on behalf of a PRP Group to conduct fact-gathering and issue non-binding allocation for about 100 parties operating manufacturing, logging, chemical treating, petroleum storage and other facilities along the Hylebos Waterway into Commencement Bay.  Recommendations included opinion on recoverable Superfund costs.  Conducted inspections of approximately 20 facilities and took over 30 depositions as part of fact-finding effort for allocation and cost recovery issues.  Case includes two

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

World War II facilities, including a major ship yard. Sediment in waterway requires remediation. Final Allocatoin Report issued May, 2000. Issued settlement recommendations for 30 of 33 allocation process participants that have been accepted by the parties and EPA.

**Chemical Recovery Services Site, Ohio**

Serve as allocator and mediator for group of 40+ parties linked to a solvent reclamation facility. Developed allocation process, analyzed evidence and party submissions and provided recommendations. Conducted two-day mediation that led to preliminary agreement on performing party allocation and cash-out offers to various parties.

**USX/BFI Mediation**

Successfully mediated dispute over legal impact of contractual release and indemnity provisions previously written into a prior settlement agreement.

**Sartomer, West Chester, Pennsylvania**

Developed allocation for four successive owner/operators of solvent chemical plant over 25 years. Conducted plant inspection and interviewed plant managers and operating personnel. Allocation involved determining areas of releases during different operating periods and linking releases to groundwater contamination that is being remedied. Parties settled.

**Consolidated Iron and Steel, New York**

Served as a allocation mediator for a group of five parties subject to a special notice letter from EPA in regard to a metals recycling site. Evaluated legal, technical and equitable arguments and mediated an agreement between the parties while at the same time negotiating with EPA on behalf of the parties to gain further concessions from EPA on the settlement.

**High Point Landfill, New Jersey**

Conducted extensive document review and issued preliminary allocation decisions regarding waste types and estimated volume. Requested by parties to serve as mediator between high volume and medium-to-low volume groups of parties, and also to help mediate within the medium-to-low volume group. Mediation resulted in comprehensive settlement involving all parties and NJDEP.

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

**Project Performance Corporation**

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

**GEMS Landfill Superfund Site, New Jersey**

Issued allocation recommendation for landfill remediation involving about 200 parties.  Extensive information gathering and analysis.  Issues involving transshipment by three major transporters.  Development of assumptions for computing waste to site from transshippers.  Analysis of degree of hazardousness of different waste types for incorporation into allocation scheme.  Allocation adopted by the Generator Group.

**Stickney/Tyler Landfills Superfund Sites, Ohio**

Issued allocation recommendation for landfill remediation for a group of about 20 parties.  Conducted site inspection of two landfills and engaged in extensive information gathering and analysis.  Little documentation.  Issues involved allocation for adjacent sites, owner/operator issues and disputes over effects of contractual indemnities, waivers and successor liability.  Allocation was basis for settlement among group members, which was also joined by the primary site operator (which was not a participant in the allocation process).  Additional parties (also non-participants) have settled based on recommendations.

**Jones Industrial Services Landfill, New Jersey**

Issued allocation recommendation for about 15 parties involved in mixed waste landfill.  Issues involved interpretation of deposition evidence and records, analysis of site operations, analysis of different waste types, development of assumptions to fill in data gaps to compute waste volumes.  Recommendation used by parties as a basis for allocation.

**Shaffer Landfill Superfund Site, Massachusetts**

Issued allocation recommendation for about 30 parties involved in mixed waste landfill.  Issues involved interpretation of records to derive volumes and waste types.  Conducted interviews of site owner/operators.  Extensive dispute resolution process.  Allocation used as a basis of negotiations that resulted in a settlement offer to EPA.

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

---

**Project Performance Corporation**

1760 OLD MEADOW ROAD   ♦   1st FLOOR   ♦   MCLEAN, VIRGINIA   ♦   22102   ♦   (703) 748-7293

---

**Norfolk Southern, Virginia**

Mediator for two parties involved in cleanup of property leased by a metals reclamation company from a railroad.  Settlement issues included effect of contractual lease provisions on liability.  Clean up costs of $6 million dollars in issue.  Over 4 days of mediation, parties reached agreement on cost allocation, releases, indemnification, certifications, and other issues that resulted in settlement.

**South Andover Superfund Site, Minnesota**

Mediator between 15 parties involved in mixed waste site involving transformer disposal and reclamation, metals reclamation, industrial waste disposal.  Issues involved linkage of certain parties to different waste contaminants, analysis of 4 operable units and use by different operators.  Mediation was successful and was basis for good faith offer to the Government.

**Jadco-Hughes, South Carolina**

Mediator between a group of generators and owner/operator of a chemical processing site.  Issues involved analysis of respective operations of multiple owner/operators, impacts of partial site remediation.  Parties reached settlement.

**Global  Landfill, New Jersey**

Conducted extensive document review to identify PRPs, created waste-in database, and issued interim allocation recommendation for PRP Group that was basis of compliance with a state directive.

**Port Refinery, Connecticut**

Served as allocation consultant and successfully mediated settlement among various PRPs involved in mercury transactions with mercury processing facility.

**Seaboard Chemical, North Carolina**

Served as allocation consultant.  Created database of incoming shipments and assisted PRP Group in resolving substantive disputes.  Efforts resulted in site-wide settlement.

10

ATTACHMENT 1

MATTHEW A. LOW, ESQ
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

**Galaxy Chemical, Maryland**

Served as allocation consultant. Created database of incoming shipments. Managed cash-out process for Phase 1 pursuant to which over 400 parties cashed out. Assisted PRP Group in resolving substantive disputes.

**Fisher Calo, Indiana**

Served as allocation consultant. Created database of incoming shipments. Assisted PRP Group in resolving substantive issues. Conducted site inspection and multiple interviews with site operator as part of allocation process to address issues related to use of different facilities. Efforts resulted in site-wide settlement. Provided fact-witness deposition testimony in contribution action brought by settling PRPs.

**Croton Point Landfill, New York**

Served as a neutral allocator to assist parties in a reallocation of settlement proceeds for a Landfill in New York. Analyzed a significant body of relevant information and developed a proposed allocation that was accepted by the parties.

**Ramapo Landfill, New York**

Served as a neutral allocator to assist parties in allocating liability for a Landfill in New York and negotiating with the NY AG's office. Analyzed a significant body of relevant information, developed a proposed allocation and mediated negotiations between and among group member. Also served as a negotiator on behalf of the group with the NY AG's office. Achieved a settlement among the parties and between the parties and NY.

11

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

**Project Performance Corporation**

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

## *SETTLEMENT COUNSELING ASSIGNMENTS AND EXPERT WITNESS ASSIGNMENTS*

### Dow Chemical Multiple Sites

Serve as a settlement counselor to the Department of Justice to assist the parties in resolving government liabilities and allocation shares for a number of Dow facilities that were in operation during World War II.  Conducted site inspections and analysis of two of Dow's largest chemical plants.  Case involves analysis of contracts between Dow and the U.S. as well as technical assessment of sources of contamination.  Also involves opinion on NCP consistency, of Dow's investigation and remediation efforts and recoverability of past and future costs.  Presented allocation framework in mediation that was basis for settlement.of claims with respect to Dow's Freeport chemical plant.  Claims with respect to other plants are pending.

### GM Multiple WWII Sites

Serve as a settlement counselor to the Department of Justice to assist the parties in resolving government liabilities and allocation shares for a number of GM operated facilities that were in operation during World War II.  Involves analysis of contracts between GM and the U.S. as well as technical assessment of sources of contamination.  Also involved analysis of NCP consistency of GM's investigation and remediation efforts and recoverability of past and future costs.  Presented allocation framework in mediation that was basis for settlement.

### Li Tungsten Superfund Site

Served as expert for the U.S. Attorney's Office in New York in mini-trial before a mediator.  Case involved tungsten manufacturing plant and associated waste processing areas.  Presentation before mediator  included  allocation analysis and analysis of NCP consistency of costs incurred.  Case settled.

### Alcoa/Reynolds Multiple Sites

Served as a settlement counselor for the U.S Department of Justice in contribution action brought by Alcoa/Reynolds with respect to six aluminum manufacturing plants.  Included allocation analysis and assessment of NCP consistency of claimed costs.  Presented allocation framework in mediation that was basis for settlement.

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

**Crane Corporation – Phoenix Airport Site**

Served as settlement counselor for the U.S Department of Justice in contribution action brought by Crane Corporation with respect to an explosives manufacturing plant. Included allocation analysis and assessment of NCP consistency of claimed costs. Presented allocation framework in mediation that was basis for settlement.

**Westinghouse – Blairsville Plant**

Served as settlement counselor for the U.S Department of Justice in contribution action brought by Westinghouse with respect to a nuclear material processing plant. Included allocation analysis and assessment of NCP consistency of claimed costs. Presented allocation framework in mediation that was basis for settlement.

**Cheswick Nuclear Processing Facility, Pennsylvania**

Serve as a settlement counselor in litigation involving U.S. involvement in nuclear material licensing and processing at the Cheswick Facility. Prepared allocation framework that led to settlement of case.

**ZRZ Realty Site**

Serve as an allocation consultant and settlement counselor for the Department of Justice, Navy and Maritime Commission in contribution case involving groundwater, sediment and soil contamination stemming from World War II shipbuilding operations and post-war ship dismantling, barge building and metals scrapping operations. Conducted site inspection. Provided recommendations to parties in mediation on allocation, and recoverable costs that were the basis of settlement negotiations. Presented allocation framework in mediation that was basis for settlement.

**Tucson International Airport, Arizona**

Served as allocation consultant and settlement counselor for the Department of Justice and Air Force in contribution case involving groundwater contamination caused by chlorinated solvents (TCE, PCE, TCA) and soil contamination stemming from World War II, Korean War and post-war operations. Conducted site inspection. Provided allocation and framework and recommendations to DOJ that was the basis of settlement in negotiations between the parties.

13

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

### DuPont Multiple Sites

Served as settlement counselor for Department of Justice in contribution case brought by DuPont with respect to 13 major chemical, ordnance and manufacturing plants. Concerns liability of government for contamination caused by World War II operations at numerous facilities. Involves analysis of contracts between DuPont and the U.S. as well as technical assessment of sources of contamination. Also involves opinion on NCP consistency of DuPont's investigation and remediation efforts and recoverability of past and future costs. Collaborated with DuPont's expert and conducted joint inspections and analyses of six of the largest ordnance and chemical manufacturing facilities. Case settled.

### Bethlehem Shipyard, Maryland

Served as settlement counselor to the Department of Justice in case involving liability of the United States for lead contamination stemming from shipyard activities during World War II. Issues include assessing impact of provisions in property sale contract specifying buyer assumption of site restoration responsibilities. Also included analysis of NCP consistency and recoverability of past costs incurred in site remediation. Provided recommendations to the parties that were the basis of settlement.

### Stibnite Mining Site, Idaho

Served as settlement counselor for the United States in a contribution case involving liability of the United States Forest Service and other agencies for activities related to mining activities during and post-World War II. Issues in case included disputed terms in contracts, leases and permits. Participated in settlement negotiations. Presented allocation framework in negotiations that was basis for settlement.

### Krekji Dump, Ohio

Served as settlement counselor to the National Park Service in a contribution case including assessment of recoverability of response costs. Case settled.

### Southern California Gas Aliso Gas Works Site, California

Served as settlement counselor in contribution action by Southern California Gas Company against the United State. Case involves analysis of operations of the largest MGP in the world, a Butadiene plant, crude

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

oil processing and storage facilities and manufacturing plants. Collaborated with experts from SoCal Gas and prepared allocation framework for mediation that led to settlement of case.

**ExxonMobil Baytown Refinery, Texas**

Currently serving as a settlement counselor in assessing claim against the United States asserted by Exxon. Collaborated with experts for Exxon and prepared allocation analysis for negotiations.

**Myers Landfill, California**

Currently serving as a settlement counselor in multi-party litigation involving U.S. Forest Service involvement in a landfill on United States lands. Prepared allocation analysis for negotiations.

**Cheswick Nuclear Processing Facility, Pennsylvania**

Served as a settlement counselor in litigation involving U.S. involvement in nuclear material licensing and processing at the Cheswick Facility. Prepared allocation framework that led to settlement of case.

**Tar Creek Superfund Site, Oklahoma**

Currently serving as a settlement counselor in multi-party negotiations involving U.S. Department of Interior involvement in lead and zinc mining leases and operations on Native American lands in the northeast section of Oklahoma. Prepared preliminary allocation analysis for negotiations.

**Fox River, Wisconsin**

Currently serve as settlement counselor in mult-party negotiations involving Corps of Engineers responsibility for dredging contaminated sediments. Prepared settlement framework for discussions.

**National Fireworks, Massachusetts**

Currently serve as settlement counselor in multi-party negotiations involving U.S. involvement in munitions manufacturing. Prepared settlement framework for discussions.

15

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD   ◆   1st FLOOR   ◆   MCLEAN, VIRGINIA   ◆   22102   ◆   (703) 748-7293

### Verizon, New York

Currently serve as settlement counselor involving former nuclear processing site.  Prepared settlement framework for discussions.

### Westinghouse, Missouri

Currently serve as settlement counselor involving former nuclear processing site.  Prepared settlement framework for discussions.

### Dietzman Superfund Site, New Jersey

Prepared expert report and provided expert deposition testimony in bankruptcy estimation proceeding. Issues included liability of successor owner of land originally used as an asbestos dump and degree of involvement in causing continuing or increased contamination of wetland.  Case settled before trial.

### Roebling Steel Superfund Site, New Jersey

Prepared expert report and testified at trial in bankruptcy estimation proceeding in U.S. District Court in Salt Lake City.  Issues included analysis of successive operators of a steel and wire manufacturing facility.  Case settled after trial.

### SIAC v. Halliburton Litigation – Multiple Sites

Serve as expert witness for defendant in federal CERCLA contribution and state indemnity claim cases relating to claim for recovery of environmental response costs and environmental damages.  Prepared expert reports on reasonableness of costs, allocation and NCP Compliance.  Case settled.

### Cherry Farm, New York

Assisted parties in developing an allocation that was used for settlement negotiations.  Conducted site inspection and analysis.  Site adjacent to foundry and chemical manufacturing plants used for disposal of wastes from manufacturing operations.  Major issues involved assessing source of PCBs in materials dumped at the site.  Case settled.

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ◆    1st FLOOR    ◆    MCLEAN, VIRGINIA    ◆    22102    ◆    (703) 748-7293

### Oeser Wood Manufacturing Site, Washington

Served as settlement counselor to Oeser, Inc. on NCP consistency issues relating to removal, investigation and cleanup costs sought by the United States at a wood manufacturing site. Provided anlaysis that was used in a mediation that led to settlement.

### Ott/Cordova, Michigan

Served as settlement counselor to Unilever on NCP consistency issues relating to removal, investigation and cleanup costs sought by the United States and Michigan at a chemical manufacturing facility. Prepared expert report that was submitted to the United States during negotiations. Case ultimately dismissed on liability grounds.

### ILCO Lead Battery Site, Alabama

Serve as expert witness and settlement counselor for defendants in cost recovery case involving lead processing facility and seven satellite sites at which slag was disposed. Prepared expert report on consistency with the NCP and provided expert deposition testimony. Case settled.

### Cabot/Koppers Superfund Site, Florida

Served as expert witness in a contribution case involving groundwater contamination caused by wood treatment facility, pine tar product facility, and petroleum-related facilities. Prepared expert allocation report and provided expert deposition testimony. Case settled before trial.

### East Bethel Landfill, Minnesota

Provided analysis and presented it at settlement hearing on behalf of group of generators of waste. Primary issue involved analysis of operations of site operator and degree of involvement, cooperation, knowledge of operators and generators. Case settled after hearing.

### Davis Liquid Superfund Site, Rhode Island

On behalf of contribution defendants, prepared allocation analysis relating to allocation among approximately 50 parties involved in disposal of chemical wastes at a chemical waste site.

17

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

### Charles George Landfill Superfund Site, Massachusetts

Prepared allocation recommendation for intra-party and inter-group allocation. Issues include analysis of waste types, analysis of records and data gaps, statutory defenses. Case settled.

### Junker Landfill, Wisconsin

Served as allocation consultant and expert witness for group of PRPs involved in a landfill site.

### Harbor Point Superfund Site, New York

Serve as expert allocation witness for the New York State Canal Corporation in contribution action relating to contaminated sediments in Utica Harbor. Prepared expert report and expert rebuttal report. Testified at deposition. Case settled.

### Metcoa Superfund Site, Pennsylvania

Served as expert allocation witness for contribution plaintiffs. Prepared expert report and testified in deposition and at trial in U.S. District Court in Pittsburgh. Court accepted testimony as basis for allocation.

### Tutu Wellfields Superfund Site, U.S. Virgin Islands

Served as expert allocation witness in case involving groundwater contamination and insurance coverage. Prepared expert report and testified at deposition. Case settled prior to trial.

### Brewer Road Site, New York

Served as expert allocation witness in case involving industrial landfill used by two affiliated companies. Prepared expert report and testified at deposition on allocation and consistency with the NCP. Testified in liability phase of the trial regarding use of hazardous substances by defendant. Trial of allocation and NCP issues pending decision on liability.

ATTACHMENT 1

**MATTHEW A. LOW, ESQ**
**VICE PRESIDENT, ENERGY, ENVIRONMENTAL & CLIMATE PROGRAMS**

---

## Project Performance Corporation

1760 OLD MEADOW ROAD    ♦    1st FLOOR    ♦    MCLEAN, VIRGINIA    ♦    22102    ♦    (703) 748-7293

**Laskin Poplar Oil Site, Ohio**

Serve as settlement counselor and expert allocation witness in case involving oil reclamation and multiple generators of waste oils.  Expert report filed April 1, 2000.  Testified at deposition.

Attachment 2

EXPERT REPORT OF MATTHEW LOW -- DOCUMENTS CONSIDERED

August 24, 2009

AISLIC0007225-377, CDM, Site-Wide Feasibility Study, Operable Units 2 through 6, October 12, 2007.

AISLIC0079826 – 27, letter from  Max Calkins to US Army Missile Command.

AISLIC0079828 – 865, contract issued by US Army Missile Command to Whittaker Corporation.

AISLIC0087088, Contractor's Release for recycling/refurbishment contract, Contract No. DAAH01-76-A-0009.

AISLIC0108137 – 149, Honeywell purchase order.

AISLIC0131663, letter from John J. Peloquin to Gordon J. Louttit, May 18, 1987.

AISLIC0136392-456, Pollution Legal Liability Select/Cleanup Cost Cap policy.

AISLIC0311906-07, AISLIC0311898, memorandum from Paul D. Smolinsky to Eric Lardiere, et al., July 2, 2007.

AISLIC381932-950, Bermite overview.

AISLIC382058, memorandum from Larry Bohanan to Dan Hofmann, November 20, 1986.

AISLIC382059-72, memorandum from L.N. Bohanan to George Meehleis and Bob Stephens, November 17, 1986.

AISLIC385689-802, Coverage and Claims Settlement Agreement, November 15, 2005.

CALKINS000181 – 208, Exhibit 509, Bermite Powder Company document.

ST002140-41, Exhibit 203, letter from Zoyd Luce to Naval Air Systems Command, October 11, 1982.

ST012415-18, Exhibit 199, letter from James Card to Naval Air System Command, October 12, 1982.

ST020564-840, deposition of Zoyd R. Luce, March 28, 2002.

ST020957 – 8, signed instructions and compliance for propellant plant waste disposal.

ST020988-1207, deposition of James Patrick Jisa, April 9, 2002.

ST022312 – 447, deposition of Max Calkins, April 4, 2002.

ST025264, Exhibit 278, memorandum from Zoyd R. Luce to J. Wooten, September 30, 1980.

1

ST025515-17, Exhibit 275, memorandum from Zoyd R. Luce to D. Moore, October 9, 1980.

ST029595-96, Exhibit 22, memorandum from Zoyd R. Luce to Ray Sabin, October 15, 1980.

ST029954, Exhibit 313, memorandum from Jim Jisa to Zoyd Luce, April 6, 1982.

ST030304-06, Exhibit 204, letter from Department of the Navy to James Card, August 12, 1983.

ST030795 – 803, memorandum of Landfill Investigation Report.

ST030826 – 35, letter from Nancy J. Long (Department of Toxic Substances Control) to Theodora Berger, November 29, 1995.

ST030939 – 58, telecopy transmittal form of Office of Legal counsel and Criminal Investigations for Department of Toxic Substances Control.

ST034919-35095, deposition of Hassan Amini, March 28, 2003.

ST038888-93, Exhibit 195, Declaration of James Card.

ST066083-260, DOD Contractors' Safety Manual for Ammunition, Explosives and Related Dangerous Material, October 1968.

ST082763-67, Exhibit 205, letter from James V. Card to Ms. Hutton of Naval Air System Command.

US089325 – 399, ammonium perchlorate customer sales for 1982-85, 1988, and 1991 and weekly status reports from 1956-1959.

US089428 – 434, letter from D.C. Cable to B.J. Campbell, June 27, 1967.

US089445 – 448, perchlorate sales by year and state destination.

W14804 – 840, letter from Department of Toxic Substances Control.

WE0228182, Remedial Investigation Report – Volume I, January 1997.

WE0234352 – 376, procedures for disposal of hazardous material.

WE0251057, Remedial Investigation Report – Volume II, January 1997.

WE0251624, Remedial Investigation Report – Volume III, January 1997.

WE0280572 – 3, letter to Jim Jisa from James L. Stahler, P.E.

WE0286430, Exhibit 515, Barbara Bishop on April 23, 1982.

WE0286588, letter from Jim Jisa to all Supervisors and Foremen.

2

WE0287028, Exhibit 516, memorandum from Jim Jisa to Paul Kirkegaard, November 23, 1982.

WE0287083, letter from Zoyd R. Luce to Distribution, December 21, 1982.

WE0287601 – 02, letter to Z. Luce from Jim Jisa.

WE0287867 – 70, China Lake Indemnification, September 8, 1983.

WE0288569, memorandum from Zoyd R. Luce to Distribution, March 12, 1984.

WE0291273, Exhibit 19, shipping receipt for explosives dated May 29, 1986.

WE0291622, Route for Explosives, August 28, 1986.

WE0316279 – 80,Exhibit 511, permit for industrial wastewater discharge by the Sanitation Districts of Los Angeles County.

WE0316295 – 297, Exhibit 510, Industrial Waste Disposal Permit given by the County of Los Angeles  to Bermite Powder Company.

WE0316328 – 31, Department of Army License No. DACA09-3-74-167 for disposal of waste at Fort Irwin for the period March, 1974 to February, 1977.

WE0316507 – 10, Department of Army License No. DACA09-3-77-337 for disposal of waste at Fort Irwin for the period March, 1977 to February, 1980.

WE0321121 – 22, letter from William M. Junga to Commander of Naval Air systems Command.

WE0321448, Exhibit 512, notice from the County of Los Angeles Department of county Engineer Project Planning and Pollution Control Division.

WE0322998, route for explosives for Truck 173.

WE0328262-270, disposal and demil operations.

WE0349341, Exhibit 513,memorandum to issue Douglas B. Moore the authority to receive explosives.

WE0350670-71, memorandum from George Meehleis to Distribution, October 27, 1986.

WE0351537 – 540, special instructions for drivers.

WE0351841 – 61, Environmental Protection Handbook , January 1979.

WE0351980, letter from Jim Jisa to G.L. McMurray

WE0356584 – 87, letter from John D. Freitag to Fred Bourland.

W-S004793 – 94, Ammunition Data card.

3

W-S005020 – 029, letter from James V. Card to Charles Finck of Honeywell.

W-S006531 – 552, purchase order.

W-S036097-98, Exhibit 201, letter from James Card to TRW, Inc., February 28, 1983.

W-S041669, DAR 7-104.79 – Safety Precautions for Ammunition and Explosions.

W-S078503-04, Exhibit 200, letter from James Card to Naval Air Systems Command, November 15, 1982.

W-S079228 – 29, letter from Max Calkins to J.W. Carlise of Baker Service Tools.

W-S080139-383, contract documents, contract DAAH01 76 A 0009.

W-S080916-19, Bermite purchase order.

W-S080920-24, Bermite requisition order.

W-S080926, master receiving inspection record.

W-S081249 – 355, shipping and pricing, department budget/proposal summaries.

W-S081325-26, data configuration list.

W-S100242 – 424, facilities contracts.

W-S100413 – 14, letter to M.E. Tryon from Max Calkins.

W-S-17933 – 39, letter from Timothy J. Brooks to Ford Aerospace & Communications Corporation.

C. Ott Deposition, Exhibit 1, list of Navy, Army, and DCMA Contracts with Bermite Powder Company in California from 1942- 1987.

Defendant United States of America's Memorandum in Support of its Motion for Partial Summary Judgment, June 17, 2009.

Defendant United States of America's Separate Statement of Uncontroverted Facts in Support of its Motion for Partial Summary Judgment, June 17, 2009.

Deposition of Alan Sorcher, February 28, 2003.

Deposition of Douglas B. Moore, March 6, 2009.

Deposition of Edwin Tigue, June 5, 2009.

Deposition of Gene Swearengin, May 28, 2009.

4

Deposition of James P. Jisa, April 25, 2009.

Deposition of Max Calkins, May 20, 2009.

Deposition of Richard Yuss, May 19, 2009.

Deposition of Wallace Roy Pflug, May 21, 2009.

Deposition of Zoyd R. Luce, Jr., May 12, 2009.

Deposition Testimony of James Card, May 14, 2009.

Deposition Testimony of M. Christine Ott, May 27, 2009.

Exhibit 202, Supplemental Declaration of James Card.

Expert Report of Robert M. Zoch, Jr., P.E., June 8, 2009.

GENCORP Form 10-K, January 25, 2008.

GENCORP Form 10-K405, February 18, 2000.

GENCORP Form 10-Q, July 13, 1994.

Lizza, Hugo. "I Shoot the Works." Popular Mechanics Magazine,  July 1957: page 97.

Lyondell Chemical Company et al., versus Albemarle Corporation, et al., Civil Action No. 1:01-CV-890, Order.

Lyondell Chemical Company et al., versus Albemarle Corporation, et al., Civil Action No. 1:01-CV-890, Findings of Fact and Conclusions of Law.

San Gabriel Valley Superfund Site, Amended Agreement and Covenant Not to Sue Northrop Grumman Systems Corporation.

Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco, Inc. versus United States, U.S. Court of Federal Claims, Case No. 06-141C.

# December 2009

# Report

**SUPPLEMENTAL EXPERT REPORT ON ALLOCATION WITH RESPECT TO THE WHITTAKER-BERMITE SITE**

**MATTHEW A. LOW**

**Project Performance Corporation**

**December 14, 2009**

## INTRODUCTION

This report supplements my report dated August 24, 2009 in the matter involving a claim against the United States by American International Specialty Lines Insurance Company (AISLIC), as subrogee of Whittaker Corporation, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for alleged response costs at the Whittaker-Bermite Site (Site). My previous report addressed recovery of response costs associated with perchlorate contamination. This report addresses non-perchlorate contaminants. On behalf of U.S. Department of Justice, I have been asked to provide my opinion in rebuttal to the Supplemental Expert Report of Robert Zoch (Zoch Supplemental report) and also address equitable allocation of claimed non-perchlorate response costs between the U.S. and Whittaker-Bermite (the Site owner/operator).

***In my opinion, the allocation framework that I outlined in my previous report also provides a reasonable basis for allocating the costs to remediate soils contaminated with non-perchlorate contaminants impacting the Site: VOCs, Unexploded Ordnance (UXO) and Depleted Uranium.***

As I noted in my previous report, ultimately, the Court will make findings of fact and equity in reaching its allocation decision. I remain mindful that it is the province of the Court to decide which equitable factors are applicable and how they should be applied.

In his supplemental report, Mr. Zoch did not address any aspect of my critique of his earlier report, nor did he comment on any of my other opinions. Thus, this report will address Zoch's apparent extension of his perchlorate allocation metric to non-perchlorate compounds and his expanded discussion of forward contract pricing in the Aerojet matter. Attachment 1 lists documents I have considered in preparing this report.

1

**ZOCH'S SUPPLEMENTAL REPORT**

***In my opinion, Zoch's extension of his perchlorate-based allocation metric to VOCs and other non-perchlorate contaminants is unsupported and not credible.***

While his supplemental report contains some additional discussion concerning use of non-perchlorate chemicals at the facility, as I understand the report, Zoch appears to still be relying on the same allocation "metric" that he offered in his initial report on perchlorate compounds. At least with respect to VOC contamination, there is no discussion in his report concerning whether there is any difference in the way the Site became contaminated with non-perchlorate compounds and the extent to which there are differences in the U.S. and Whittaker-Bermite's respective degrees of involvement in the contamination.[1] In particular, his opinion apparently continues to be that the U.S. should be allocated 100% of any contamination arising out of the government contracts despite the Court's ruling that the U.S. is not liable as an operator.[2]

As I stated in my previous report and for the reasons therein, Zoch has not provided a credible basis for his proposed allocation metric or his opinion on allocation percentages. Zoch's approach continues to completely ignore the role and contribution by Whittaker-Bermite to the contamination at the Site. VOC- contaminated soils constitute by far the largest of volume of soils slated for remediation and, in my opinion, Whittaker-Bermite was primarily responsible for the releases that resulted in the contamination. I see no support for extending his earlier perchlorate-based opinion to VOCs or any other non-perchlorate chemicals.

***In my opinion, the Aerojet settlements do not constitute an appropriate allocation metric in a CERCLA matter.***

Zoch expands on his opinion that settlement agreements resolving a contract dispute between Aerojet and the U.S. pursuant to which the U.S. recognized certain Aerojet cleanup costs as allowable costs "could be perceived as an equitable allocation factor to be considered by the Court." As I understand the Aerojet settlements with the U.S., one agreement pertained to incurred remediation costs that were deemed allowable overhead charges on Aerojet's historical contracts and the second agreement pertained to the allowance of current and future compliance costs as an overhead component in Aerojet's forward pricing.

Zoch's opinion may be summarized as; 1) Site environmental costs are recoverable under government contracts, 2) Whittaker-Bermite was a government

---

[1] His initial opinion was that the U.S. should be allocated between 79.8% and 100% of costs associated with perchlorate contamination at the Site. He has adjusted that range in light of the Court's opinion that the U.S. is not liable as an operator. His new proffered range is 72.5% to 100%.

[2] See page 10 of Zoch's report suggesting that the cost actions related to UXO, MEC, and DU could equitably be assigned to the U.S. prior to consideration of the remaining costs.

contractor when the site environmental harm occurred, 3) the company exercised due care in its operations,  4) but for the closing of Whittaker-Bermite's plant in 1987 – the site environmental costs would be reimbursable to the company under federal contracting principles, and 5) the responsibility of the Government as an "Operator" under CERCLA is irrelevant to the analysis.

As I noted in my previous report, the Aerojet settlement was a contract matter and, thus, the referenced settlement did not reflect an agreement by the U.S. to accept an equitable allocation under CERCLA of 88% for that site or any other.  The U.S. merely agreed to allow Aerojet to include 88% of its environmental costs as reasonable and allowable indirect costs in its government contracts.  In my opinion, this contract settlement in no way substitutes for a thorough analysis of CERCLA's equitable factors in allocating AISLIC's alleged costs incurred at the Whittaker-Bermite Site.  From the limited portions of the Aerojet settlement documents that AISLIC has produced to date, they cannot be considered surrogates for CERCLA allocation.

In her 1993 testimony before the Legislation and National Security Subcommittee of the Committee on Government Operations, Dr. Suzanne Phinney, Vice President, Environmental Aerojet General Corporation, acknowledged that Aerojet's rights against the Government under CERCLA are independent of its contractual rights.  In Aerojet's contracting claims, the issue under consideration was the company's ability to include costs in its contract pricing.  Aerojet still bore the risk that, due to an uncertain government contracting base, it may not recover the full amount of environmental costs included in its forward contract pricing. Under CERCLA, "the issue to be negotiated or for a court to decide would be the Government's share of funding responsibility, based upon its role and activities at the site during the years in which pollutions occurred." [3]

Zoch has failed to adequately support his conclusions through appropriate analysis and evidence.  It appears that Zoch has developed his opinion from a limited review of the Federal Acquisition Regulations (FAR), Defense Contract Audit Agency (DCAA) guidance documents, agreements related to the settlement of contract pricing disputes between Aerojet and the Department of Defense (DoD), and the November 16, 2009 Rebuttal Addendum of Dr. Hugh Thompson.  Zoch has oversimplified the complexities of government contracting principles and guidance, conducted a narrow and selective document review, has ignored many distinguishing factors between the Bermite and Aerojet operations, and has broadly misinterpreted or overstated facts that are favorable to his opinion.

---

[3] Statement by Dr. Suzanne Phinney, Vice President, Environmental, Aerojet General Corporation to the Legislation and National Security Subcommittee of the Committee on Government Operations, May 20, 1993, page 63.

***In my opinion, even if government cost reimbursement principles or decisions could be
considered an equitable allocation factor, there are significant differences between the
Aerojet situation and the Whittaker-Bermite situation that make the use of the Aerojet
settlements inappropriate as the basis for an equitable allocation metric in this case.***

As I understand the facts in the Aerojet contract matter, it initially involved a
determination of non-allowance of environmental costs by an administrative contracting
office that ultimately led to the Aerojet settlements with the U.S. and the current
allowance of environmental compliance and response costs as part of Aerojet's contract
pricing. There are a number of factors that distinguish the Aerojet situation and its
settlements with the U.S. from the Whittaker-Bermite operations and Zoch's proposed
allocation metric.

1. Since the discovery of contamination at Aerojet's Sacramento site, and continuing
   to the present, Aerojet has been a government contractor. As a current
   government contractor, Aerojet was afforded the government full cost accounting
   principles as vehicle to distribute a portion of its overhead costs to its government
   contract pricing. Whittaker-Bermite's position as a government contractor ceased
   in 1987 with the closing of the Site. As such, the company no longer has a
   government contracting base that can absorb a portion of its overhead costs.
   Inclusion of costs from discontinued operations in current contract pricing is
   generally not allowed.[4] Zoch's analysis continues to ignore the fundamental
   undisputed fact that while Aerojet had contracts through which it could recover
   environmental costs, Whittaker apparently has no such contract rights.

2. Zoch's analogy to the FAR is flawed because it ignores the FAR's provisions
   requiring that the contractor's insurance and other recoveries be taken into
   account in assessing this type of contract claim. Aerojet's settlement, for
   example, provides for a credit to the U.S. for any funds Aerojet recovers from its
   insurers.[5] Evidence produced in this matter indicates that from at least 1956
   through 1986 Whittaker-Bermite maintained commercial general liability
   insurance coverage with a number of insurance carriers.[6] In addition, it is
   important to recognize that this CERCLA action is being brought by AISLIC, an
   insurer, for costs that it – not Whittaker -- is incurring under the policy. Because
   the costs that AISLIC is seeking in this lawsuit would not be recoverable by

---

[4] According to the 1992 DCAA Audit Guidance memorandum, *"if costs arise from a site the contractor
previously occupied, the costs for clean up would usually be allocated to the segment's site where the work
was transferred. However, if the segment is closed with none of its former work remaining within the
company, the cost would generally not be directly allocable to other segments of the business."*
ASLICEXPERT000259-264.

[5] According to GenCorp, Inc.'s (parent of Aerojet) 1993 10-K filing, under a 1990 settlement, "the U.S. will
receive a credit equal to 50% of any insurance recovery that Aerojet may receive in respect of costs
covered by the settlement." Notes to Consolidated Financial Statements, GenCorp, Inc. 10-K, February
12, 1994.

[6] AISLIC0131275-341.

4

Whittaker under FAR principles, Zoch's reference to the FAR is particularly inappropriate. Zoch also has ignored any credits due to the U.S. for insurance recoveries received by Whittaker, such as in settlements with Steadfast Insurance or others.

3. The contract settlements and advance agreements negotiated between the U.S. and Aerojet reflect a unique set of circumstances that are not duplicated in this matter. See, for example, the 2003 advance agreement between Aerojet and the U.S. addressing the allowability of environmental cleanup costs associated with ARC's Camden, Arkansas site as part of Aerojet's acquisition of the propulsion business unit of Atlantic Research Corporation (ARC).[7] The U.S. involvement with the ownership and operation of the Aerojet site was vastly different than the relationship between purchaser and contractor found at the Whittaker-Bermite site. Unlike the Aerojet site, Whittaker-Bermite owned all of the land, buildings, infrastructure, and disposal facilities on the Site.[8]

4. Even if the response costs in this case were paid by Whittaker and Whittaker was still a contractor for the U.S., it is speculative for Zoch to conclude that response costs at the Whittaker-Bermite Site would be recoverable under forward contracts.[9] Given the actions of Whittaker-Bermite in causing the contamination, it is not at all clear that they would be found to be reasonable under FAR principles. An extensive factual analysis would be required of the specific circumstances pertaining to the Whittaker-Bermite Site. Moreover, contractors with current open contracts (which apparently Whittaker does not have) cannot base their recovery on their percentage of past government contracts, as Zoch seems to suggest.

---

[7] The parties acknowledged that the "Agreement is executed on the basis that the circumstances associated with it are unique and special, and that is not precedent setting nor does it bias the Parties in their rights or obligations regarding any other future issues not associated with this Agreement." Advance Agreement Regarding Environmental Costs Following Aerojet's Acquisition of the Atlantic Research Corporation Propulsion Business, page 5.

[8] Dr. Phinney stated that the U.S. Navy claimed a leasehold in about 3,500 off the 8,500 acres comprising the Aerojet site. The Navy and Air Force also owned nearly 300 buildings at the site, or nearly 55% of all buildings associated with suspected pollution sources. Statement by Dr. Suzanne Phinney, Vice President, Environmental, Aerojet General Corporation to the Legislation and National Security Subcommittee of the Committtee on Government Operations, May 20, 1993, page 55, 56.

[9] *A cost is allowable only when the cost complies with **all** of the following requirements: reasonableness; allocability; standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances; terms of the contract; and any limitations set forth in this subpart.* [9] [emphasis added] FAR, Subpart 31.2

**OPINIONS AND DISCUSSION ON RECOMMENDED ALLOCATION FRAMEWORK FOR VOCS**

**Discussion -- VOCs**

Various witnesses have testified that Whittaker used TCE, PCE, and TCA as degreasing solvents for equipment and components at the site.  Documents in the record also indicate that Whittaker released solvents to the environment in a number of ways in numerous areas of the site, often haphazardly or indiscriminately, during at least the 1970s and 1980s.[10]  There is little evidence (if any) on TCE use and nothing I have seen to establish that significant TCE releases occurred during World War II and the period immediately following.

In my previous report, I noted that it is my understanding that evidence shows that Whittaker-Bermite owned all of the land, buildings, infrastructure, and disposal facilities on the Site and that the U.S. may have owned some equipment.  In addition, I noted that there was no evidence that the U.S. supplied perchlorate to Whittaker-Bermite or owned any work in progress that included perchlorate.  Once again, I am aware of no evidence that the U.S. owned or supplied VOCs to Whittaker-Bermite or otherwise owned any work in progress that contained VOCs.[11]  Whittaker purchased the solvents that it required and determined how to use them in its manufacturing operations.[12]

In addressing TCE or PCE in his supplemental report, Mr. Zoch cites the testimony of Jack Arnold that TCE was used during World War II assembly of 20 mm ammunition to degrease components of the ammunition.[13]  Whether Bermite used TCE

---

[10] See Expert Report of Charles McLane.

[11] I am mindful that Zoch has cited a portion of a 1969 contract provision indicating that  title to all parts, materials, inventories, non-capital tools, etc. acquired by Bermite and eventually chargeable to the contract, immediately vest with the Government.  See Zoch Report at footnote 35.  US094939.  However, it is not clear whether this portion of a document is from a contract or from a bid document, and if it is from a contract, how the cited contract provision was implemented.  Moreover, Mr. Zoch ignores the remainder of this contract provision that gave Whittaker title to anything not delivered to the United States upon completion of the contract: "Upon completion of performance of all the obligations of the contractor under this contract, including liquidation of all progress payments hereunder, title to all property (or the proceeds thereof) which had not been delivered to, and accepted by, the Government under this contract or which had not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the government under this clause shall vest in the contractor."  This clause does not appear to have any applicability to wastes generated at the Site, and I am unaware of any witness who testified that the U.S. owned or controlled the wastes Whittaker generated from manufacturing.  Whittaker employees testified that it was the company's responsibility to properly dispose of its waste.  See Richard Yuss, James Card.

[12]   *See, e.g.*, deposition testimony of Martha Davis, Whittaker's purchasing director, and Richard Yuss, Whittaker's chief chemist.

[13] I am aware that there may be some evidence that the U.S. owned and furnished 20 mm ammunition components which Bermite Powder loaded and assembled during World War II.  AISLIC0750113.

during World War II is a factual issue that I understand is in dispute. It is my understanding that it is the opinion of Jay Brigham, an expert for the U.S., that TCE was likely not used at this plant during World War II.[14] Except for the deposition of Mr. Arnold, I am unaware of any other evidence indicating that TCE might have been used during World War II. But even if Bermite used TCE for a two or three year period during World War II, as Zoch asserts, that use alone would not significantly impact my allocation opinion for a variety of reasons.

For example, I am aware of no evidence that the U.S. supplied or owned any TCE or any degreasing equipment at the Site during World War II. Similarly, I am aware of no evidence that the U.S. required the use of TCE by Bermite. To my knowledge there are no documented releases of TCE at the Site during World War II, and I note that Mr. Zoch has not identified any release locations that trace back to this timeframe. The absence of information regarding World War II contrasts sharply with the substantial evidence that Whittaker released VOCs throughout the facility, often indiscriminately, during the 1960s, 1970s and 1980s.

Moreover, Mr. Zoch offers little information about which buildings Bermite used for 20 mm ammunition assembly. My review leads me to conclude, consistent with the analysis performed by the United States' other experts, Dr. McLane and Ms. Sitton, that all of the operational activity at the facility during World War II occurred in the Northern Production Area (as described in my previous report) and specifically OU-5. Based on the latest Remedial Action Plan, the areas impacted by VOC contamination within the Northern Production Area that may have been active during World War II and the predicted excavation volumes for VOCs are as follows:

| 18 | Near Former Building 73 | 36,660 | Baker Oil production, lab and warehouse |
|----|----|----|----|
| 31/45 | Near Former Buildings 36 and 42; Building 37 | 322,016 | Storage -- Building 37 indicated as assembly process building |
| 33 | Near Former Buildings 46 (48, 49, 50, 52, 53, 58, 61, 63, 64)) | 70,326 | Baker Oil production; Dump Site; Support (Lab) |

Although there is VOC contamination associated with Areas 48 and 49, the machine shop buildings (#99 and #101) in those Areas were not constructed nor in use prior to 1965 and could not have been a source of TCE releases during World War II. Similarly, aerial photographs indicate that Bermite did not begin using the area below Water Tank No. 2 (designated as Area 2) as a dump during the 1940s, and, thus, I see no

---

[14] Mr. Zoch also assumed that perchlorates were used during World War II in his previous report. As noted in my previous report, there does not appear to be any evidence in support of this assumption. Because Mr. Zoch offered no new evidence on this issue in his November 16 report, I still have no reason to believe that perchlorates were used in Bermite's World War II 20 mm ammunition production.

basis to conclude that this area could have been a source of TCE releases during World War II.

Accordingly, there are only a few areas of VOC contamination that were known to be in use during the two or three year period during World War II in which Bermite assembled 20 mm ammunition. Operations continued in those same areas for both commercial and government work for the next 40 years, when active manufacturing ceased in 1987. Mr. Zoch does not explain why he believes that the VOC contamination in these soils is attributable to World War II, as opposed to Whittaker's ongoing operations, and I see no credible basis for his conclusion if that is indeed his opinion.

Otherwise, the basic facts of the case remain the same as I summarized them in my previous report -- Whittaker-Bermite operated the Site on a day-to-day basis, made all the decisions concerning what products to manufacture, and made all decisions concerning operations and waste disposal at the Site, and controlled and conducted all operations that resulted in releases of contaminants. Whittaker-Bermite produced its own operational procedures, produced its own manual for environmental protection and waste disposal, and was responsible for executing it, and had the responsibility for quality and safety. There is no evidence that the U.S. supplied or owned any of the TCE or other solvents used by Whittaker-Bermite – in fact all of the evidence shows that Whittaker purchased those materials from private entities.

I assume that Zoch continues to add 15% to the U.S. allocation – in his illustration, 5% each for care, cooperation and benefits. Since some of his justification for these added percentages was based specifically on U.S. actions with respect to perchlorate-related production and contamination, it is unclear why he would extend these additions to VOCs. In any event, as I noted in my previous report, Zoch has overlooked a number of facts that call into question his opinions on application of these factors. In particular, Whittaker-Bermite's waste disposal practices, including indiscriminate dumping and releases from production buildings and storage areas point to a lack of care by Whittaker-Bermite.[15]

**Opinion -- VOCs**

In my opinion, the points most relevant to allocation of VOCs are:

1. Whittaker-Bermite actively sought and voluntarily entered into government prime contracts and subcontracts that were in the company's economic interests.

2. Whitaker-Bermite had exclusive control of operations at the Site, including decisions on waste handling and disposal.

---

[15] See discussion of indiscriminate dumping and disposal by Whittaker-Bermite in expert report of Charles McLane.

3.  Direct government involvement at the Site appears to have been focused on quality assurance – with on-site inspections primarily devoted to product performance.

4.  Even if Bermite may have used TCE in World War II contracts, which the U.S. disputes, there is no evidence indicating that Bermite's use during that time contributed to significant VOC contamination at the Site.

5.  The contamination problem at the Site is due in significant part to a lack of care by Whittaker-Bermite in its waste disposal practices.  According to its own corporate officers in some instances, Whittaker-Bermite exhibited a number of violations of state and federal environmental regulations, and exacerbated the contamination problem by failing to disclose the presence of numerous waste dumping grounds on the Site and by land farming contaminated soils throughout the Site.

6.  Whittaker-Bermite received economic benefits from the government contracts.

**Allocation Framework -- VOCs**

I have applied the same framework for allocation of VOCs as I did for perchlorates, breaking down the Site into the same major areas of concern:

- Northern Production Area (OU-5, OU-1Dn)
- Southern Production Area (OU-1A, B, C, Ds, E and OU-2)
- Burn Valley and Burn Area (OU-3)
- Hula Bowl Landfills Area and Unpermitted Landfills (OU-4)

I have incorporated the same elements most relevant to the parties' respective degrees of involvement:

- Ownership of property and buildings and equipment that were contaminated or generated contamination;
- Involvement in overall facility operations;
- Involvement in use, disposal and release of materials causing contamination;
- Ownership of materials causing contamination;
- Knowledge regarding potential for contamination from activities; and
- Economic Benefit

In light of the fact that Mr. Zoch raised degree of care and degree of cooperation as additional factors in his previous report, I have continued to incorporate them into the allocation analysis as adjustments to the parties' degree of involvement percentage.

9

**Allocation Analysis -- VOCs**

    **A.**    **Contaminant Contribution**

By evaluating the estimated volumes of VOC-contaminated soils in different areas of the Site, it is possible to estimate the percentage contribution of each of these four areas to the cleanup. For VOCs, the most heavily contaminated areas are the Southern Production Area and the Burn Valley Area.

In the Southern Production Area, the two primary areas of contamination are impoundments or dumps utilized by Whittaker-Bermite for waste disposal:

- Area 1, the Former Building 317 Impoundment and the Ravine South of Building 317. – 1,160,838 cubic yards. As noted in the report of Charles McLane, this area was used as a catchment area for liquid wastes. The impoundment was in use from the 1960s to 1983 and apparently was unlined until approximately 1980.

- Area 4, Building 339 Area Ravine -- 1,884,404 cubic yards. As noted in the reports of Charles McLane and Mary Sitton, multiple drums and containers were observed in this Area in 1969 and 1982 aerial photographs – which is indicative of this area being used as a storage area or a dump.

In Burn Valley, the volume is 2,066,390 cubic yards.

**Northern Production Area --**

As noted in my previous report, this area was used for commercial production of fireworks and production and testing of Baker Oil Charges. The production for Baker Oil apparently went on for 30 years.[16] It is not clear from the evidence whether and, if so, how much, VOC-related compounds were used in this commercial production, but solvents seemingly were ubiquitous at the site and Bermite and Whittaker routinely used them for purposes of cleaning machines. As noted above, during World War II, 20 mm ammunition production also likely occurred in the Northern Production Area, since that was the main footprint of the facility during that period. However, much of the soil contamination had to occur subsequent to World War II, including the dump site near Water Tower 2 and the area around the machine shop, which are heavily contaminated and require significant volumes of soils to be excavated.

**Southern Production Area**

As noted in my previous report, this area also was used for commercial production of Baker Oil Charges. This area also was impacted by Whittaker's practice of land farming, spreading contaminated soil along previously uncontaminated areas. JATO rocket motors were produced in this area under

---

[16] Letter from Bermite Division to Baker Service Tools, July 30, 1981. W-S081268

government contracts beginning in 1959 and ceased in 1965.  Rocket motors for the Sidewinder and Chaparral were produced in this area. Testimony indicates that VOCs were used in these government contracts and wastes from these operations were dumped onto the ground in violation of internal company guidelines and RCRA.  Soil contamination in proximity to production buildings is indicative of inappropriate waste disposal from these buildings.  A significant amount of contamination is found in landfills and haphazard waste dumps around the Site and the impoundments that Whittaker owned and operated, particularly in Areas 1 and 4, mentioned above.  As noted in the report of Charles McLane, numerous sumps in this area were found to have deficiencies.   The extensive amount of contamination resulting from Whittaker's operations stemmed from improper waste handling and disposal practices.  The "hog-out" area also was located in the Southern Production Area.

**Burn Area**

As noted in the report of Charles McLane, Whittaker took solvents to the Burn Area for disposal and dumped them there at least one day before a burn was to take place.  This would have provided a mechanism for release and migration in soils.  Wastes from commercial production probably were burned here as well as wastes from government production.  Although the majority of wastes in this area likely stemmed from government contracts, I am not aware that the government required Whittaker-Bermite to dispose of wastes there, and there is also information suggesting that several areas of contamination within Burn Valley do not correspond to Whittaker's designated burn location.

**Hula Bowl Landfills**

This was an organized landfill operation that was never permitted under RCRA.  There is evidence that Whittaker-Bermite buried VOC-related waste in this area.  However, recent information suggests that the Hula Bowl has a smaller amount of contaminated soil volume than Whittaker's environmental consultants originally estimated.

**B.    Degree of Involvement Factor -- Elements**

***Ownership of property, buildings and equipment at which contamination occurred***

With regard to this factor, there is no new evidence requiring changes from my previous report.  Throughout the period of operations, Whittaker-Bermite owned all of the land, buildings, and infrastructure (pipes, sewers, sumps, impoundments, etc.).  Evidence in the record does indicate government ownership of some equipment, possibly including a few items that may have been used in rocket motor and other contracts.  But in comparison to the amount of equipment owned by Whittaker-Bermite, the percentage

11

of government-owned equipment appears to have been quite limited.[17]   Given the above,
in my opinion, the U.S. should be allocated a minimal percentage under this element, no
more than 5% (or 1.0% of the total Site allocation if this factor is weighted 20%).

### *Involvement in overall facility operations*

Evidence in the record suggests that Whittaker-Bermite had complete operational
control of the facility.  It decided what projects to work on, how to price the projects, who
to hire to run the projects, who to purchase supplies from, how to handle materials, and
where and how to dispose of wastes.  The U.S. was not involved in overall facility
operations at all.  The Court's November 2009 order finding that the U.S. was not liable
as an operator of the facility is consistent with and reinforces my analysis of this factor.
In my experience, on the order of 15%-25% may be allocated for this element and I
suggest 20% here.  In my opinion, the U.S. should be allocated a zero percentage.

### *Involvement in use and disposal or release of materials causing contamination*

There is evidence that the U.S. may have owned and supplied components of 20
mm ammunition assembled by Whittaker-Bermite in the Northern Production Area for
two or three years during World War II.  However, there is no indication that the U.S.
owned or supplied any solvents or equipment used to degrease the components.  In my
opinion, the U.S. appears to have had less involvement in the use and disposal of solvents
than with perchlorate.  In general, while it may be true that contracts with the government
or its prime contractors and related product specifications may have outlined the need for
degreasing, Zoch has not identified such evidence in his report.  Moreover, Whittaker-
Bermite had exclusive control over the purchase, use, handling and disposal of solvents
and  the government was not involved in disposal decisions made at the Site with respect
to solvents.  No information has been found to indicate that any of the U.S. on-site
representatives directed or supervised Whittaker-Bermite's disposal of solvent wastes,
which was recognized by the Court in its summary judgment decision in favor of the
United States on the operator issue.  Particularly in the productions areas, evidence
indicates that Whittaker-Bermite allowed areas to become contaminated through a
number of inappropriate waste-handling and disposal methods.  In my opinion, the U.S.
share for this element should be minimal and be less than the share recommended for
perchlorates.

### *Ownership of materials causing contamination*

All the evidence points to the fact that Whittiker-Bermite purchased solvents from
private sources and owned the solvents.  As noted above, Zoch cites a portion of a single
document for the proposition that the U.S. may have owned the work in process for
products produced under government contracts generally.  But even if that were the case,
the VOC contamination stems from wastes stored or dumped by Whittaker-Bermite, not

---

[17] David Bye, a Whittaker mechanic who worked at the site for twenty years and was familiar with all of
the production lines, testified that he could not recall any U.S. equipment in use at the site.  By contrast, he
was aware of and routinely worked on machinery designed and owned by Whittaker.

from any process steps. To the extent that some VOC contamination was caused by solvent use in hogging out or repairing government-owned motors, which AISLIC alleges and the United States denies, it would justify only a small share to the U.S. for this element based on the activities in the Southern production Area.[18] In my opinion, the U.S. should receive a minimal, if any, percentage of this element and the share should be less than the share recommended for perchlorates.

### Knowledge regarding potential for contamination from activities

As I noted in my previous report, in my opinion, Whittaker-Bermite, as site operator, had superior knowledge concerning the likelihood of its disposal methods resulting in contamination at the Site. This is particularly true with respect to solvent disposal, which appears to have been indiscriminate at the Site. As such, in my opinion, Whittaker-Bermite should receive the greater percentage for this element. I am not aware of evidence that the U.S. was aware of the facility's solvent disposal practices. As such, in my opinion, the U.S. should receive a minimal percentage, for this element, and less than the share recommended for perchlorates.

### Economic Benefit

As noted in my previous report, in my opinion, Whittaker-Bermite's motive for engagement in government contracts was economic. Whittaker-Bermite received the economic benefits under these contracts. While the U.S. receipt of the product can be viewed as a benefit, the U.S. did not receive any economic benefits from the contracts. Whittaker-Bermite or its insurers or the current owners may receive some economic benefit in property appreciation that will result from final remediation and commercial development of the Site.

### D.    Other Factors

### Care

As noted in my previous report, the actions of Whittaker-Bermite in its handling and disposal of wastes manifested a lack of due care that exacerbated the contamination – and likely increased the cost of the remediation. In my opinion, this would justify a minor increase in the degree of involvement share for Whittaker-Bermite.

---

[18] The Whittaker employees who performed the hog out operation, such as Edwin Tigue and Timothy Ferrett, did not testify that they worked on government-owned motors. Nor did Whittaker apparently use TCE or PCE as part of the hog out process. The employees mentioned that they used a different solvent called Oakite. Degreasing of the rocket motor tubes was a separate process performed inside Building 317.

_**Cooperation**_

I see no difference from my previous report with respect to degree of cooperation as it relates to VOCs.  I have not recommended any adjustments upward or downward for Whittaker-Bermite or the U.S.

E. **Allocation Summary**

Attachment 2 provides a means to quantify the above allocation framework and analysis.  It is a spreadsheet table representing the above allocation analysis.  This table shows:

1. **Calculations of estimated volumes of VOC-contaminated soil in each of four areas (Columns, 2 and 3)** – Estimates are taken from the latest Remedial Action Plan.  This volume estimates show that the Southern Production Area has the largest volume, by far, of contaminated soils;

2. **Estimates of the percentage of VOC-contamination caused by government (as opposed to commercial) work (Columns 4 and 5) –** Based on the operating history of the Site, it appears that the Northern Production Area was the location of a significant amount of commercial fireworks and oil charge production.  Given the paucity of information on the use and release of VOC contaminants in this Area, I see no basis other than to assume up to 50% of the contaminant releases may have resulted from non-governmental production.  In the Southern Production Area, it appears that the vast majority of the VOC use and disposal was related to Whittaker-Bermite's government contract work.  While deposition testimony appears to estimate government production to be in the range of 92% to 95%, I have continued to rely on a 90% figure, as a fair appraisal for the Southern Production Area.  For the Burn Area and Hula Bowl Areas, I have suggested 85% to account for the likelihood that wastes from the Northern Production Area were disposed in these locations.

3. **Degree of Involvement calculations (Columns 5—13)** – I have suggested weighting percentages for each element based on my experience in developing allocation frameworks in other, similar cases.  For each element, I have allocated a percentage to the U.S. and a percentage to Whittaker-Bermite and its prime contractors based on the analysis set forth above.  Because there is little information in the record that would allow an allocator to derive precise calculations, the numerical allocation percentages are intended to reflect a more qualitative evaluation of each element.  The allocation percentage for each element is multiplied by the weighting percentage for each element to produce a calculated a Degree of Involvement Percentage in Column 13.

4. **Adjustments to the Degree of Involvement calculations to take into account Cooperation and Care factors (Columns 14-17)** – This analysis adjusts the Degree of Involvement percentage from Column 13 up or down by using

adjustment factors.  Thus, a number of 1.1 in columns 14 or 15 would signify a 10% increase in the Degree of Involvement percentage while a 0.9 number would signify a 10% reduction.   These adjustments result in a recalculated Degree of Involvement percentage in column 16, which produces an Adjusted Degree of Involvement share in column 17.

5. **Final allocation percentages for the U.S. (Column 18)** – The percentages in column 18 are calculated by multiplying the final adjusted degree of involvement percentage for each of four areas by each area's adjusted percentage of contaminated soils from government work.

### F.    Conclusion -- VOCs

As I noted in my previous report, Attachment 2 includes inputs that are qualitative and which reflect both my experience in applying equitable factors and my professional judgment in evaluating the facts of this case.  While application of this framework and attendant calculations produces a precise percentage, it is intended more to serve as a guide than to produce a precise allocation percentage.  As I noted above, I am mindful that decisions on which allocation factors to apply and how to apply them are within the province of the Court.  The calculations for VOCs produce an allocation percentage for the U.S. that is lower than the share I calculated for perchlorates. However, in reliance on the above framework and in consideration of the totality of the facts in the case, it is my opinion that the U.S. allocation percentage for VOCs should be no more than 10%.

## OPINIONS AND DISCUSSION ON RECOMMENDED ALLOCATION FRAMEWORK FOR UXO/MEC AND DEPLETED URANIUM (DU) CONTAMINATION

Response costs relating to UXO/MEC and DU are somewhat distinct from those relating to perchlorates and VOCs – more limited in nature and implicating different activities.  With respect to UXO/MEC, a number of areas will need to be further surveyed, but no wholesale soil excavation is anticipated for remedial purposes.  In the case of DU, only one Area of the Site is impacted.  Given this, and the fact that it is likely that UXO/MEC and DU are related to government contracts in a general sense, I have selected a more simplified allocation framework considering the parties' respective degrees of involvement.

## UXO/MEC Contamination

### A.  Discussion

In a general sense, the UXO and MEC issue is likely associated with government contracts, but that does not explain why California regulators are requiring that Whittaker screen various locations at the Site for these items.  For example, there is evidence that

15

Whittaker uncovered a live Baker Oil power charge during an early investigation of the Burn Valley and there have been long-standing rumors that fireworks – presumably from the time that Golden State Fireworks operated at the site – were buried in the Hula Bowl and possibly other areas.[19]  Whittaker also made munitions for foreign customers.[20]  In addition, during DTSC's criminal investigation, several Whittaker employees told DTSC that explosive waste had been buried at the Site, and in the Hula Bowl area in particular.[21] At his deposition in this case, Whittaker's hazardous waste coordinator, James Jisa, confirmed that he personally participated in the burial of two large loads of ammonium perchlorate waste in the Hula Bowl and JATO areas.[22]

Against this backdrop, I cannot agree with Zoch's opinion that the U.S. should be allocated 100% of any costs for investigating and remediating UXO or MEC releases.  As documented in the expert report of Charles McLane, most of the areas to be examined for buried UXO or MEC were landfills, dump sites, demolition areas, or ravines.  As he also points out, burial of ammunition and explosives was prohibited by the DOD Contractors' Safety Manual.  Whittaker employees readily confirmed that the burial of ordnance and explosive wastes was not an acceptable method of disposal at the site, and yet it apparently occurred in some areas.[23]

**B. Degree of Involvement Factor -- Elements**

### Ownership of property, buildings and equipment  at which contamination occurred

The U.S. did not own any land, infrastructure or equipment related to burial of UXO or MEC.

### Involvement in overall facility operations

The U.S. was not involved in overall facility operations.

---

[19] See IT Report, WE0157888 (Baker Oil) & WE0009105 (fireworks); see also J. Jisa Deposition (Oct. 2009), at 35-42 (discussing rumors regarding disposal of UXO).

[20] See, e.g., Deposition Exhbit 32 (fuze contract with Singapore); D. Moore Deposition (2009), at 34-35 (20 mm fuzes for South Korea).

[21] See Deposition Exhibit 111 (enclosing DTSC investigative report), W00867-869 (Jisa discussing burial of various materials and his concerns about future real estate development).

[22] Jisa Deposition (Oct. 2009).   See also G. Abdun-Nur, Deposition (2002) at 77-79 (discussing burial of perchlorate drums near Building 313); see also Deposition Ex. 11 (Kanowsky Letter to DTSC).

[23] See R. Yuss Deposition (Oct. 2009), at 24-26; W. Burrow Deposition (2008), at 89-90 (burying any waste was "unethical" even in the 1950s).

### *Involvement in use and disposal or release of materials causing contamination*

Through contracts entered into with Whittaker-Bermite, the U.S. was involved as a customer with respect ammunition and ordnance produced by Whittaker-Bermite. However, there is no evidence that the U.S. had any involvement in Whittaker-Bermite's burying or dumping of UXO or MEC at the Site.  I am aware of no UXO or MEC contamination that is directly attributable to government production or quality specifications.  To the extent that UXO or MEC was buried, or that DTSC has concerns that it was buried, Whittaker was responsible for those disposal activities.

### *Ownership of materials causing contamination*

The U.S. may have owned components of ammunition or ordnance assembled by Whittaker-Bermite in some of its ammunition or ordnance contracts, but Mr. Zoch has cited no specific evidence of any U.S. ownership of UXO or MEC found in the various areas of the Site.  By definition, Whittaker did not deliver the UXO and MEC waste to the U.S. as part of a finished product.  There is no evidence that Whittaker accounted for or reported to the U.S. about what it was burying at the site.

### *Knowledge regarding potential for contamination from activities*

There is no evidence that the U.S. was aware of any UXO/MEC dumping by Whittaker-Bermite.  It is unclear to what extent Whittaker-Bermite's corporate management knew that the burial of these wastes was occurring, but the practice appears widespread and there are numerous reports of uncontrolled storage or dumping of wastes in the landfills that are subject to UXO and MEC investigation, such as the Hula Bowl canyons and the Point.  Whittaker-Bermite employees had superior knowledge about the nature and extent of these disposal activities.

### *Economic Benefit*

Whittaker-Bermite sought and received the economic benefits from the contracts with the government.

## C. Other Factors

### *Care*

As noted above, much of the UXO/MEC has been found in areas used by Whittaker-Bermite as landfills and dumps – demonstrating a lack of care by Whittaker-Bermite in its handling and disposal of potentially explosive wastes or off-spec ammunition or ordnance.  In my opinion this would justify a minor increase in the degree of involvement share for Whittaker-Bermite.

### *Cooperation*

I see no difference from my previous report with respect to degree of cooperation as it relates to UXO/MEC. I have not recommended any adjustments upward or downward for Whittaker-Bermite or the U.S.

### D. Allocation Summary and Conclusion

In considering the respective degrees of involvement relating to UXO/MEC contamination, in my opinion, only a minimal share should be allocated to the U.S. relating to its limited involvement as a customer. The calculation using this framework produces a share of less than 10% for the U.S. (See Attachment 3). Accordingly, it is my opinion that the U.S. should not be allocated more than a 10% share for UXO/MEC response costs.

## Depleted Uranium Contamination

### A. Discussion

Zoch asserts that the DU was "to be furnished by the Government in the form of aluminum clad, incendiary projectiles for assembly into 30 mm Armor Piercing Incendiary ("API") military ammunition." Zoch's cited document is a summary of Whittaker's procedures for depleted uranium storage and processing at the facility. The cited document does not indicate that the government is or will be the supplier of DU.[24] The source outlines the program/material description, stating that DU material "will be received as solid configured parts, completely enclosed in the Armor Piercing Incendiary (API) projectile. The Bermite program will include assembly of the projectile into a cartridge case, packaging into ammunition boxes, and shipment to designated agencies. Approximately 0.5% of the assembled rounds will be expended on-site as part of a required quality assurance program." The document further states "No milling, machining, grinding, chemical, or direct mechanical procedures will be performed on the DU.[25]"

One aspect of Whittaker's program contemplated test round firing presumably for quality assurance purposes, which was accomplished in a test facility comprised of a gun (Gun House -- Building 107) firing into one of three target areas – the primary one being a bullet catch (Building 102) comprised of sand. Whittaker was solely responsible for collecting all of the fired rounds and any bullet fragments, and properly disposing of them at an off-site location in Nevada. Upon completing of the API program after

---

[24] I am aware that Jay Brigham has reviewed data cards and come to the conclusion that the U.S. did not furnish DU or the enclosed projectile. I am aware that Charles McLane is also addressing this issue.

[25] Zoch also cites a Specification for Ignitor Mix, IB-52, apparently for the proposition that the U.S. furnished the test fixture and gun to Whittaker-Bermite. However, this is a Honeywell specification and it is unclear how this applies to the DU rounds. Nor is Whittaker-Bermite mentioned anywhere in the Honeywell specification.

approximately two years in 1979 or 1980, Whittaker endeavored to remove all DU from the site under the guidance of its private consultant and Whittaker's Safety staff.  In 1983, the test area was sampled and determined to be free of radiation.  However, additional DU contamination has been uncovered in areas west and down slope from the bullet catch and in an area extending 1,000 feet west of the test area.

The radioactive material license issued to Whittaker-Bermite allowed the facility to possess up to 80,000 pounds of DU.  I am unaware of any evidence that the U.S. was involved as a party to or had any rights under Whittaker-Bermite's  license.

I am aware that there is a dispute concerning whether the U.S. furnished the gun barrel for test firing.  Jay Brigham and a U.S. Air Force witness are of the view that the U.S. would not have furnished the gun.

### B.  Degree of Involvement Factor -- Elements

#### *Ownership of property, buildings and equipment  at which contamination occurred*

The U.S. did not own any land or buildings, related to use or release of DU. There is a dispute over whether the U.S. owned and supplied the barrel used for test firing of projectiles.  I have seen no contract documentation indicating that the U.S. supplied the barrel to Whittaker-Bermite, as opposed to Honeywell or some other entity.  I have taken the possible provision of the test barrel by the United States into account in my analysis.  .

#### *Involvement in overall facility operations*

The U.S. was not involved in overall facility operations.

#### *Involvement in use and disposal or release of materials causing contamination*

Through contracts entered into with Whittaker-Bermite, the U.S. was involved as a customer for the purchase of projectiles assembled by Whittaker-Bermite that contained DU.  However, the evidence indicates that Whittaker-Bermite had control over the program and was responsible under its own safety plan to ensure that radioactive materials were used, handled, stored, and transported in accordance with state regulations.  I am aware of no evidence showing any direct communications between Whittaker and the U.S. about any aspect of the DU/API program, and there is apparently no such documentation suggesting that any disposal of DU would occur at the site. Under the safety plan, any DU remaining after a test firing was to be removed by Whittaker-Bermite and a Whittaker executive, Zoyd Luce, confirmed that there was no intent for any DU to remain.  To the extent that the contracts required test firing of projectiles with DU, the U.S. may have had some limited involvement in the activities that led to releases of DU at the Site.  However, I am not aware that any contracts for this product have been produced.  In any event, Whittaker ultimately was responsible for

19

collecting the DU and paying for the off-site disposal costs associated with the shipments to Nevada.

### *Ownership of materials causing contamination*

I am unaware of any evidence that the U.S. owned the DU.  According to Data Cards form the Site, the Projectile in which the DU was encapsulated was furnished by Honeywell.[26]

### *Knowledge regarding potential for contamination from activities*

I assume that both the U.S. and Whittaker Bermite were aware that DU is mildly radioactive and fact that DU would be released as part of the test firing requirement of the contract.

### *Economic Benefit*

Whittaker-Bermite sought and received the economic benefits from the contracts with the government.

## C. <u>Other Factors</u>

### *Care*

As noted above, Whittaker-Bermite's own safety plan required any residual DU to be removed after each test firing. That DU was found in areas almost 1,000 feet from the test firing area indicates some lack of care on the part of Whittaker-Bermite.  In my opinion this would justify a minor increase in the degree of involvement share for Whittaker-Bermite.

### *Cooperation*

I see no difference from my previous report with respect to degree of cooperation as it relates to DU.  I have not recommended any adjustments upward or downward for Whittaker-Bermite or the U.S.

---

[26] W-S005788.

### D.  Allocation Summary and Conclusion

In considering the respective degrees of involvement relating DU contamination, in my opinion, the U.S. may have a slightly higher degree of involvement due to the generally heightened concern about radioactive elements, generally, and the provision in the contracts that apparently required testing of projectile rounds containing DU.   The calculation using this framework produces a share of less than 10% for the U.S. (See Attachment 3).   Accordingly, it is my opinion that the U.S. should not be allocated more than a 10% share for DU response costs.


_____

Matthew Low

**Attachment 1**

**EXPERT REPORT OF MATTHEW LOW -- DOCUMENTS CONSIDERED**

**December 14, 2009**

AISLIC0004388, CDM Remedial Action Plan, Operable Unit 1, Table 5, February 3, 2005.

AISLIC0126682-686, Letter from Carl J. Kanowsky to Ms. Penny Nakashima- Department of Toxic Substances Control regarding Bermite/Whittaker, November 11, 1996.

AISLIC0131275-341, Letter from J. Richmond to B. Guibord, February 3, 1998.

AISLIC40661, Check Request form to be paid to Whittaker Corporation, February 24, 2009.

AISLIC410149-310, Former Whittaker-Bermite Facility Remedial Action Plan Operable Units 2 through 6, Table 7-3. January 30, 2009.

AISLIC0720814822, CDM 2008.

AISLIC0750113, Application for a Necessity Certificate, October 15, 1942.

ASLICEXPERT000259-264, DCAA Audit Guidance memorandum, 1992.

AISLICEXPERT030037-047, Settlement Agreement between the United States of America and Aerojet-General Corporation, November 29, 1992.

AISLICEXPERT030048-053, Advance Agreement Regarding Environmental Costs Following Aerojet's Acquisition of the Atlantic Research Corporation Propulsion Business.

ST021399-478, Deposition testimony of Glen Abdun-Nur, March 25, 2002.

ST034919-35055, Deposition testimony of Hassan Amini, March 28, 2003.

ST084763-79, Material Specification for Igniter Mix, IB-52, February 10, 1977.

US089497-8, Kerr-McGee Chemical Corporation Ammonium Perchlorate Buyback Disbursement, August 4, 1986.

USEXPT006690-838, Draft Remedial Action Plan, Operable Units 2 through 6, August 14, 2009.

W00738-809, Deposition testimony of Rodney A. Fong, October 6, 2006.

W00849, Letter from Mary Lock, Chief Investigator of the Criminal Investigations Branch to Mr. Gil Garcetti, Los Angeles County District Attorney, March 24, 1993.

W00850-855, Department of Toxic Substances Control, Statement of Facts in the Investigation of Whittaker Corporation.

W00856-858, Memorandum From the Criminal Investigations Branch to Rodney A. Fong regarding the Whittaker Bermite, July 1, 1992.

W00859-885, Memorandum From the Criminal Investigations Branch to Rodney A. Fong regarding the Whittaker Bermite Search Warrant, July 1, 1992.

W00867-869, James Jisa Deposition Exhibit 111.

W02125-2257, Deposition testimony of Jeffrey B. Hicks, December 6, 2006.

W02263-2264 , Expert report of Jeffrey Hicks regarding Material and Waste-Handling Practices of Perchlorate at the Whittaker-Bermite Facility in Saugus, California.

W15076-98, Deposition of Department of Toxic Substances Control, Nancy Jane long, September 25, 2006.

W-S005788, Department of Defense, Ammunition Data Card for 30mm PGU-14A/B API Cartridges manufactured by Bermite, Division of Whittaker Corporation, June 22, 1984.

W-S081268, Letter from Bermite Division to Baker Service Tools, July 30, 1981.

WE0009105, Fireworks IT Report.

WE0157888-890, Field Activity Daily Log, Bermite Whittaker, Burn Pit Area, May 30, 1990.

WE0309425-6, Bermite Discrepancy Report, December 11, 1980.

WE0322197, Bermite Discrepancy Report, June 8, 1981.

WE0346395-520, Bermite Division Shipping Invoices.

WE0348042-058, Bermite MSDS Program Chemicals and Quantities on Hand, February 24, 1986.

Advance Agreement Regarding Environmental Costs Following Aerojet's Acquisition of the Atlantic Research Corporation Propulsion Business, page 5.

Aerial Photography of Bermite Site, August 16, 1947.

Aerial Photography of Bermite Site, July 25, 1969.

Aerial Photography of Bermite Site, March 14, 1973.

CDM Feasibility Study, Table 7-1, 2007.

Deposition testimony of D. Moore, Exhibit 32, pg. 34-35, 2009.

Deposition testimony of David Bye, Whittaker mechanic.

Deposition testimony of Gene Swearengin, May 28, 2009.

Deposition testimony of Glen Abdun-Nur, February 25, 2009.

Deposition testimony of James Jisa, April 25, 2009.

Deposition testimony of James Jisa, October 3, 2009.

Deposition testimony of James Card, Whittaker employee. May 14, 2009.

Deposition testimony of Marikay Fish, May 11, 2009.

Deposition testimony of Martha Davis, Whittaker's purchasing director. October 15, 2009.

Deposition testimony of Richard Yuss, Whittaker's chief chemist. October 8, 2009.

Deposition testimony of Timothy Ferrett, October 20, 2009.

Deposition testimony of William Burrow, pg. 89-90, 2008.

Deposition testimony of William Burrow, May 29, 2009.

Deposition testimony of Zoyd Luce, September 28, 2009.

Deposition testimony of Zoyd Luce, September 29, 2009.

Former Whittaker-Bermite Facility Draft Remedial Action Plan Operable Units 2 through 6, August 14, 2009.

EPA Hazardous Waste Codes for Wastes Commonly Generated by Small Quantity Generators.

Exhibits to Zoyd Luce's September 28, 2009 deposition relating to depleted uranium.

Expert Report of Charles McLane.

Expert Report of Robert Zoch, November 16, 2009.

Federal Acquisition Regulations, Subpart 31.2. https://www.acquisition.gov/far/loadmainre.html.

Military Specification, Propellant for 20mm Ammunition approved by the Naval Air Systems Command, Department of the Navy, May 16, 1975.

Notes to Consolidated Financial Statements, GenCorp, Inc. 10-K, February 12, 1994.

Statement by Dr. Suzanne Phinney, Vice President, Environmental, Aerojet General Corporation to the Legislation and National Security Subcommittee of the Committee on Government Operations, May 20, 1993, page 55, 56, 63.

Corrected Attachments to Expert Reports of Matthew Low dated 8/24/09 and 12/14/09

January 26, 2010

The purpose of this report is to update the allocation framework attachments that I submitted with my August 24, 2009 and December 14, 2009 Expert Reports.  The reasons for the updates are as follows:

1.  I understand that CDM issued revised soil volume estimates for perchlorates, as set forth in CDM's draft Remedial Action Plan, and those estimates were not available when I prepared my August 24 report.  Accordingly, I have updated Attachment 3 to my August 24, 2009 report to reflect the most recent CDM data for perchlorate contaminated soils.
2.  To avoid potential confusion about the impact of the adjustments that I recommended with respect to cooperation and care, I have calculated and shown the decrease in the U.S. allocation percentage from these adjustments on the allocation framework attachments.
3.  During my deposition on January 22, 2010, I became aware of a small math error in two of the previous attachments.  I have made corrections, where necessary.

Updated allocation framework attachments are attached.

The U.S. allocation percentages shown in the updated allocation frameworks are as follows:

| Contaminant | U.S. % w/o Care, Coop. Adjust | U.S. % with Care, Coop. Adjust. | Decrease in U.S. % from Care, Coop. Adjust. |
|---|---|---|---|
| Perchlorates | 8.676% | 8.042% | 0.634% |
| VOCs | 6.590% | 6.128% | 0.462% |
| UXO, MEC | 6.000% | 5.484% | 0.516% |
| DU | 9.500% | 8.712% | 0.788% |

The update percentages do not cause me to revise my opinion that the U.S. should be allocated no more than a 10% share for the contaminants in question.

_____

Matthew Low

**ALLOCATION FRAMEWORK -- VOCS -- WHITTAKER-BERMITE SITE**

ATTACHMENT 2 -- Revised

| Area | CONTAMINANT CONTRIBUTION | | | | DEGREE OF INVOLVEMENT ALLOCATION | | | | | | | | OTHER FACTORS ADJUSTMENT | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cont. Soil (CY) | % of Cont. Soils | % of Cont. from Govt. Work | Adjusted % from Govt. Work | | Ownership of Land, Buildings, Infrastructure, Equipment | Involvement in Overall Facility Operations | Involvement in Use, Disposal and Release of Contaminants | Ownership of Contaminants or Work in Progress | Knowledge | Economic Benefit | Total Degree of Involvement % | U.S.% w/o Care or Coop. Adjust | Care Adjust. | Coop. Adjust. | Adjust. | Adjusted (Normalized) Degree of Involvement % | U.S. Allocation % | Decrease in U.S. % due to Care or Coop. Adjust. |
| | | | | | Weight % --> | 20% | 20% | 30% | 20% | 5% | 5% | 100% | | | | | | | |
| Northern Production Area (OU-5, OU-1Dn) | 1,163,953 | 15.82% | 50.00% | 7.91% | U.S | 5% | 0% | 10% | 0% | 10% | 0% | 4.50% | 0.356% | 1 | 1 | 4.50% | 4.11% | 0.325% | 0.031% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 90% | 100% | 90% | 100% | 95.50% | | 1.1 | 1 | 105.05% | 95.89% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.55% | 100.00% | | |
| Southern Production Area (OU-1A, B, C, Ds, E and OU-2) | 4,018,906 | 54.61% | 90.00% | 49.15% | U.S | 5% | 0% | 15% | 5% | 30% | 0% | 8.00% | 3.932% | 1 | 1 | 8.00% | 7.33% | 3.600% | 0.331% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 85% | 95% | 70% | 100% | 92.00% | | 1.1 | 1 | 101.20% | 92.67% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.20% | 100.00% | | |
| Burn Valley and Burn Area (OU-3) | 2,094,336 | 28.46% | 85.00% | 24.19% | U.S | 0% | 0% | 20% | 5% | 50% | 0% | 9.50% | 2.298% | 1 | 1 | 9.50% | 9.09% | 2.198% | 0.099% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 80% | 95% | 50% | 100% | 90.50% | | 1.05 | 1 | 95.03% | 90.91% | | |
| | | | | | | | | | | | | 0.00% | | | | 104.53% | 100.00% | | |
| Hula Bowl Landfills Area and Unpermitted Landfills (OU-4) | 82,561 | 1.12% | 85.00% | 0.95% | U.S | 0% | 0% | 0% | 0% | 10% | 0% | 0.50% | 0.0048% | 1 | 1 | 0.50% | 0.45% | 0.0043% | 0.0004% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 100% | 100% | 90% | 100% | 99.50% | | 1.1 | 1 | 109.45% | 99.55% | | |
| | | | | | | | | | | | | | 6.590% | | | 109.95% | 100.00% | 6.128% | 0.462% |

7,359,756   100.00%   82.20%

ALLOCATION FRAMEWORK

SUMMARY OF VOC-IMPACTED SOIL VOLUMES

| Operable Unit | Area | Area Number Descrition | Estimated Volume of Impacted Soil (yd3) | Comments | |
|---|---|---|---|---|---|
| **VOC-Impacted Soils** | | | | | |
| OU-1 | 7 [*Roadway E, Roadway N*] | Former Building 308 | | Grinding; Waste Storage Area for propellent plant untill 1982; Non-RCRA permitted Sump | |
| | (26) [*OU-1Ds Drainage*] | Building 353 | | Hog-out Area; Test Bay Pad for Sidewinder and Chapparel QC | |
| | 55 [*OU 1B, OU1C, Roadway*] | Near Former Buidlings (326), 327 | 96,200 | Production -- Grinding and mixing | |
| | 77 | (Buildings 328, 329) | 1,200 | Production -- Baker Oil, propellent grinding and mixing, | |
| | 7 | Propellant Grinding, Building 308 | 2,800 | Storage | |
| | 43 | Former Buildings 324 and 325 | 16,700 | Storage -- component mixing and blending (of amonium perchlorate) | |
| | | Surface Scrapes | | | |
| | **OU-1 Totals** | | **116,900** | | |
| | | | | | |
| OU-6 (within OU-2) | 1 | Former 317 Impoundment, Ravine South of 317 Machine Shop, Spin Rocket | 1,160,838 | Hog-out Area? Dump Site; Dumped Production Wastes; 1982 memo commented on inadequate capacity for waste flows into it. | Solvents used in Hog-out process; Building 317 impoundment used as catchment for liquid wastes from hog-out operations |

SUMMARY OF VOC-IMPACTED SOIL VOLUMES

| OU 2 | 1A-South | (Building 330) | 79,798 | Baker Oil, Spin Motors, Land Farming (dump) | Solvents used to clean lathe in Building 330 |
|---|---|---|---|---|---|
| | 1A-North | (Buildings 301, 303) | | Baker Oil, Spin Motors, Land Farming | TCE used for machine clean-up in Building 303; Drums stored |
| | 4/22 | | | | |
| | 4/37 | | | | |
| | 4 | 339 Area/Building 339 Ravine | 1,884,404 | Dump Site | Multiple Drums stored |
| | 6 | Ravine Near 342 Area; 342 Impoundment -- Pho | 35,189 | 342 Impoundment. Deficiencies were noted by Whittaker-Bermite and Los Angeles County | drums and debris;Phosphorous Area Dump |
| | 19 | (Buildings 300, 317); Sandblast Residue | 14,031 | Assembly Builidings; Cutting and Sanding in 317; Trough from Building 314 to Building 317 impoundment | Degreaser in Building 300 |
| | 22 | Former Building 340/BP-1 Sump | | Non-RCRA permitted Sump | |
| | 25 | 314 Area [Canyon] and Former Building 314 | | Grinding; Dump Site | Open storage of drums |
| | 27 | Former Buidling 373 | 61,678 | Land Farming; Non-RCRA permitted Sump | Drums, containers stored |
| | 28 | Near Former Buildings 376 and 377 | | Land Farming; Non-RCRA permitted Sump | |
| | 34 | Near Former Buildings 313 (314); Building 313 Sump | 20,059 | Grinding; Dumped Production Wastes; Non-RCRA permitted Sump | |
| | 36 | Former Building 341 | | | |
| | 63 | The Point Dump and Flare Production | 184,633 | Landfarming | |

ALLOCATION FRAMEWORK
SUMMARY OF VOC-IMPACTED SOIL VOLUMES

ATTACHMENT 2 -- Revised

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 53/54/72 | Near Former Building 306, Near Former Building 307, Pacific Soil Boring B-49 | 461,376 | Casting, Mixed propellent cast into rocket motors; Drums and containers | PCE dumped on ground near Building 307 |
|  | 56/58 | Near Former Building 337/Old Flare Production Area |  | Land Farming |  |
|  | 58 | Old Flare Production Area |  |  |  |
|  | 63 | Building 347 Tank |  | Land Farming |  |
|  | 74 |  |  | Land Farming |  |
|  | **OU-2 Totals:** |  | **3,902,006** |  |  |
|  |  |  |  |  |  |
| OU-3 | RCRA 10 | Burn Cage, Pans, and Rails |  |  |  |
|  | RCRA 11 | Burn Area [2] |  | Baker Flares; Dump Site |  |
|  | RCRA 12 | East Fork Detonation |  | Organized Landfill (minimal perchlorate |  |
|  | 14 | Burn Area Valley | 2,066,390 | Dump Site, Burn Pit | Area of DU contamination |
|  | 17 | East Fork Landfill | 27,946 | Dump Site |  |
|  | 30 | Former Building 371 | 84,739 | Storage |  |
|  | **OU-3 Totals:** |  | **2,094,336** |  |  |
|  |  |  |  |  |  |
| OU-4 | 16 | Hula Bowl Canyon I | 82,561 | Dump Site; Organized Manner |  |
|  | 16A | Hula Bowl Stockpile Areas |  |  |  |
|  | **OU-4 Totals:** |  | **82,561** |  |  |
|  |  |  |  |  |  |
| OU-5 | 2 | Below Water Tank No. 2 | 317,993 | Dump site -- possibly prior |  |
|  | 10 | Old Lead Azide Area |  | RCRA Impoundment |  |
|  | 11 | Near Former Building P-28 |  | Dump Site |  |
|  | 12 | Pipe Outside Former Building 195 |  | Baker Oil -- testing of power charges in standpipe outside building |  |
|  | 13 | New Lead Azide Area |  | RCRA units 1 through 5, Waste Storage |  |

ALLOCATION FRAMEWORK

SUMMARY OF VOC-IMPACTED SOIL VOLUMES

ATTACHMENT 2 -- Revised

| | 18 | Near Former Building 73 | 36,660 | Baker Oil, lab and | |
|---|---|---|---|---|---|
| | 20 | Former Buiding 211 | | | |
| | 21 | Former Building 219 and Rinse Water Tank | | X-Ray labs | |
| | 31/45 | Near Former Buildings 36 and 42; Building 37 | 322,016 | Storage -- Building 37 indicated as assembly process building | |
| | 33 | Near Former Buildings 46 (48, 49, 50, 52, 53, 58, 61, 63, 64)) | 70,326 | Baker Oil; Dump Site; Support (Lab) | |
| | 38 | Former Building 6 | | Non-RCRA permitted Sump | |
| | 41 | Former Building 88 Sump | | Fireworks Manufacturing | |
| | 46 | Near Former Budildings 59 and 60 | | Baker Oil | |
| | 48/49 | Former Buildings 99 and 101 | 416,958 | Buildings 99 and 101 not present in 1965 photo. Machine Shop -- Leaking | Machine Shop -- Leaking Degreaser; Outdoor Storage Area |
| | 50 | Near Former Buidling 217 | | Non-RCRA permitted Sump | |
| | 51 | Near Former Building 225 | | Baker Oil Manufacturing Area; Dump Site | |
| | 52 | Near Former Budiling 226 | | | |
| | 60 | Behind the Cafeteria, Paint Storage (Building 80A) | | Baker Oil; Dump Site | |
| | 61 | Former Building 41/Lower Lab and Flammable Solvent Mixing | | Dump site; Non-RCRA permitted Sump | |
| | 67 | Building 45 Septic System | | | |
| | 68 | Pacific Soil Boring B-6 | | Building 5B used for testing, instrumentation, laboratory, and arc image | |
| | 69 | Pacific Soil Boring B-20 | | Dump Site | |
| | **OU-5 Totals:** | | **1,163,953** | | |

ALLOCATION FRAMEWORK -- UXO /MEC, DU -- WHITTAKER -BERMITE SITE

ATTACHMENT 3 -- Revised

| Area | | DEGREE OF INVOLVEMENT ALLOCATION | | | | | | | OTHER FACTORS ADJUSTMENT | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Ownership of Land, Buildings, Infrastructure, Equipment | Involvement in Overall Facility Operations | Involvement in Use, Disposal and Release of Contaminants | Ownership of Contaminants or Work in Progress | Knowledge | Economic Benefit | Total Degree of Involvement % | Care Adjust. | Coop. Adjust. | Adjust. | Adjusted (Normalized) Degree of Involvement % | U.S. Allocation % | Decrease in U.S. % due to Care or Coop. Adjust. |
| | Weight % --> | 20% | 20% | 30% | 20% | 5% | 5% | 100% | | | | | | |
| UXO/ MEC | U.S | 10% | 0% | 10% | 0% | 20% | 0% | 6.00% | 1 | 1 | 6.00% | 5.48% | 5.48% | 0.52% |
| | Whittaker-Bermite or Prime Contractors | 90% | 100% | 90% | 100% | 80% | 100% | 94.00% | 1.1 | 1 | 103.40% | 94.52% | | |
| | | | | | | | | | | | 109.40% | 100.00% | | |
| | | | | | | | | | | | | | | |
| DU | U.S | 10% | 0% | 20% | 0% | 30% | 0% | 9.50% | 1 | 1 | 9.50% | 8.71% | 8.71% | 0.79% |
| | Whittaker-Bermite or Prime Contractors | 90% | 100% | 80% | 100% | 70% | 100% | 90.50% | 1.1 | 1 | 99.55% | 91.29% | | |
| | | | | | | | | | | | 109.05% | 100.00% | | |

**ALLOCATION FRAMEWORK -- WHITTAKER-BERMITE SITE -- Perchlorates**

ATTACHMENT 3 -- Revised

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 14 | 15 | 16 | 17 | 18 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **CONTAMINANT CONTRIBUTION** | | | | | **DEGREE OF INVOLVEMENT  ALLOCATION** | | | | | | | | | | **OTHER FACTORS ADJUSTMENT** | | | |
| Area | Cont. Soil (CY) | % of Cont. Soils | % of Cont. from Govt. Work | Adjusted % from Govt. Work | | Ownership of Land, Buildings, Infrastructure, Equipment | Involvement in Overall Facility Operations | Involvement in Use, Disposal and Release of Contaminants | Ownership of Contaminants or Work in Progress | Knowledge | Economic Benefit | Total Degree of Involvement % | U.S. % w/o Care or Coop. Adjust. | Care Adjust. | Coop. Adjust. | Adjust. | Adjusted (Normalized) Degree of Involvement % | U.S. Allocation % | U.S. % decrease due to Coop. or Care or Coop. |
| | | | | | Weight % --> | 20% | 20% | 30% | 20% | 5% | 5% | 100% | | | | | | | |
| Northern Production Area (OU-5, OU-1Dn) | 144,566 | 23.73% | 50.00% | 11.87% | U.S | 5% | 0% | 10% | 0% | 10% | 0% | 4.50% | 0.534% | 1 | 1 | 4.50% | 4.11% | 0.487% | 0.047% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 90% | 100% | 90% | 100% | 95.50% | | 1.1 | 1 | 105.05% | 95.89% | | |
| | | | | | | | | | | | | 0.00% | | | | 109.55% | 100.00% | | |
| Southern Production Area (OU-1A, B, C, Ds, E and OU-2) | 356,287 | 58.50% | 90.00% | 52.65% | U.S | 5% | 0% | 25% | 10% | 30% | 0% | 12.00% | 6.3175% | 1 | 1 | 12.00% | 11.03% | 5.8065% | 0.511% |
| | | | | | Whittaker-Bermite or Prime Contractors | 95% | 100% | 75% | 90% | 70% | 100% | 88.00% | | 1.1 | 1 | 96.80% | 88.97% | | |
| | | | | | | | | | | | | 0.00% | | | | 108.80% | 100.00% | | |
| Burn Valley and Burn Area (OU-3) | 104,426 | 17.14% | 85.00% | 14.57% | U.S | 0% | 0% | 30% | 5% | 50% | 0% | 12.50% | 1.822% | 1 | 1 | 12.50% | 11.98% | 1.745% | 0.076% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 70% | 95% | 50% | 100% | 87.50% | | 1.05 | 1 | 91.88% | 88.02% | | |
| | | | | | | | | | | | | 0.00% | | | | 104.38% | 100.00% | | |
| Hula Bowl Landfills Area and Unpermitted Landfills (OU-4) | 3,807 | 0.63% | 85.00% | 0.53% | U.S | 0% | 0% | 0% | 0% | 10% | 0% | 0.50% | 0.003% | 1 | 1 | 0.50% | 0.45% | 0.00% | 0.00% |
| | | | | | Whittaker-Bermite or Prime Contractors | 100% | 100% | 100% | 100% | 90% | 100% | 99.50% | | 1.1 | 1 | 109.45% | 99.55% | | |
| | | | | | | | | | | | | | 8.676% | | | 109.95% | 100.00% | 8.042% | 0.634% |
| | 609,086 | 100.00% | | 79.62% | | | | | | | | 400% | | | | | | | |

ALLOCATION FRAMEWORK

SUMMARY OF PERCHLORATE-CONTAMINATED SOIL VOLUMES

| Operable Unit | Area | Area Number Descrition | Estimated Volume of Impacted Soil (yd3) | | Comments |
|---|---|---|---|---|---|
| **Perchlorate Impacted Soils** | | | | | |
| OU1 | 7 [Roadway E, Roadway N] | Former Building 308 | 2,800 | | Grinding; Waste Storage Area for propellent plant untill 1982; Non-RCRA permitted Sump |
| | (26) [OU-1Ds Drainage] | Building 353 | 15,300 | | Hog-out Area; Test Bay Pad for Sidewinder and Chapparel QC |
| | 55 [OU 1B, OU1C, Roadway] | Near Former Buidlings (326), 327 | 96,200 | | Grinding and mixing |
| | 77 | (Buildings 328, 329) | 1,200 | | Baker Oil, propellent grinding and mixing, |
| | | Surface Scrapes | 18,480 | | |
| | | | **133,980** | | |
| | | | | | |
| OU2 | 1 | Former 317 Impoundment, Ravine South of 317 Machine Shop, Spin Rocket | 0 | 0 | Hog-out Area; Dump Site; Dumped Production Wastes; 1982 memo commented on inadequate capacity for waste flows into it. |
| | 1A-South | (Building 330) | 11,563 | 11,563 | Baker Oil, Spin Motors, Land Farming |
| | 1A-North | (Buildings 301, 303) | 6,386 | 6,386 | Baker Oil, Spin Motors, Land Farming |
| | 4/22 | | 4,471 | 4,471 | |
| | 4/37 | | 7,675 | 7,675 | |
| | 4 | 339 Area | | | Dump Site |
| | 6 | Ravine Near 342 Area | 26,255 | 26,255 | 342 Impoundment. Deficiencies were noted by Whittaker-Bermite and Los Angeles County |
| | 19 | (Buildings 300, 317) | 2,092 | 2,092 | Assembly Buildings; Cutting and Sanding in 317; Trough from Building 314 to Building 317 impoundment |
| | 22 | Former Building 340/BP-1 Sump | | | Non-RCRA permitted Sump |
| | 25 | 314 Area [Canyon] and Former Building 314 | 26,254 | 26,254 | Grinding; Dump Site |

ALLOCATION FRAMEWORK

ATTACHMENT 3 -- Revised

SUMMARY OF PERCHLORATE-CONTAMINATED SOIL VOLUMES

| | 27 | Former Buidling 373 | 38,586 | 38,586 | Land Farming; Non-RCRA permitted Sump |
|---|---|---|---|---|---|
| | 28 | Near Former Buildings 376 and 377 | 3,264 | 3,264 | Land Farming; Non-RCRA permitted Sump |
| | 34 | Near Former Buildings 313 (314) | 42,295 | 42,295 | Grinding; Dumped Production Wastes; Non-RCRA permitted Sump |
| | 37 | The Point | 0 | 0 | Dump Site |
| | 53/54/72 | Near Former Building 306, Near Former Building 307, Pacific Soil Boring B-49 | 12,779 | 12,779 | Casting, Mixed propellant cast into rocket motors |
| | 56/58 | Near Former Building 337/Old Flare Production Area | 19,542 | 19,542 | Land Farming |
| | 58 | Old Flare Production Area | 3,552 | 3,552 | |
| | 63 | Building 347 Tank | 1,523 | 1,523 | Land Farming |
| | 74 | | 16,070 | 16,070 | Land Farming |
| | **OU2 Totals:** | | **222,307** | **222,307** | |
| | | | | | |
| OU3 | RCRA 10 | Burn Cage, Pans, and Rails | | | |
| | RCRA 11 | Burn Area [2] | | | Baker Flares; Dump Site |
| | RCRA 12 | East Fork Detonation | | | Organized Landfill (minimal perchlorate |
| | 14 | Burn Area Valley | 104,186 | 104,186 | Dump Site, Burn Pit |
| | 17 | East Fork Landfill | 240 | 240 | Dump Site |
| | **OU3 Totals:** | | **104,426** | **104,426** | |
| | | | | | |
| OU4 | 16 | Hula Bowl Canyon I | 2,293 | 2,293 | Dump Site; Organized Manner |
| | 16A | Hula Bowl Stockpile Areas | 1,514 | 1,514 | |
| | **OU4 Totals:** | | **3,807** | **3,807** | |
| | | | | | |
| OU5 | 2 | Below Water Tank No. 2 | 11,184 | 11,184 | Dump site |
| | 10 | Old Lead Azide Area | 493 | 493 | RCRA Impoundment |
| | 11 | Near Former Building P-28 | 7,621 | 7,621 | Dump Site |
| | 12 | Pipe Outside Former Building 195 | 4,773 | 4,773 | Baker Oil -- testing of power charges in standpipe outside building |
| | 13 | New Lead Azide Area | 2,484 | 2,484 | RCRA units 1 through 5, Waste Storage |
| | 18 | Near Former Building 73 | 3,086 | 3,086 | Baker Oil, lab and warehouse |
| | 21 | Former Building 219 and Rinse Water Tank | 3,206 | 3,206 | X-Ray labs |
| | 31 | Near Former Buildings 36 and 42 | 219 | 219 | Storage |

ALLOCATION FRAMEWORK

SUMMARY OF PERCHLORATE-CONTAMINATED SOIL VOLUMES

ATTACHMENT 3 -- Revised

| | | | | | |
|---|---|---|---|---|---|
| | 33 | Near Former Buildings 46 (48, 49, 50, 52, 53, 58, 61, 63, 64)) | 822 | 822 | Baker Oil; Dump Site |
| | 38 | Former Building 6 | 632 | 632 | Non-RCRA permitted Sump |
| | 41 | Former Building 88 Sump | 385 | 385 | Fireworks Manufacturing Area;  Sump in violation of RCRA |
| | 46 | Near Former Budildings 59 and 60 | 10,400 | 10,400 | Baker Oil |
| | 48/49 | | 2,233 | 2,233 | |
| | 50 | Near Former Buidling 217 | 34,421 | 34,421 | Non-RCRA permitted Sump |
| | 51 | Near Former Building 225 | 43,987 | 43,987 | Baker Oil Manufacturing Area; Dump Site |
| | 52 | Near Former Budiling 226 | 199 | 199 | |
| | 60 | Behind the Cafeteria, Paint Storage  (Building 80A) | 1,574 | 1,574 | Baker Oil; Dump Site |
| | 61 | Former Buidling 41/Lower Lab and Flammable Solvent Mixing | 1,316 | 1,316 | Dump site; Non-RCRA permitted Sump |
| | 67 | Building 45 Septic System | 2,688 | 2,688 | |
| | 68 | Pacific Soil Boring B-6 | 6,222 | 6,222 | Building 5B used for testing, instrumentation, laboratory, and arc image |
| | 69 | Pacific Soil Boring B-20 | 6,621 | 6,621 | Dump Site |
| | **OU5 Totals:** | | **144,566** | **144,566** | |