# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant.<br>_____ | Case No. CV09-01734 AHM (RZx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW (ALLOCATION PHASE; POST-TRIAL) |

## I.
## PRELIMINARY OBSERVATIONS

The presentation of evidence in Phase II was disappointing. The Court recognizes that both sides have faced difficult challenges, first in trying to ascertain a full and accurate history of the site and then in "cherry picking" the information to support their respective positions.[1] Understandably, both sides relied heavily on expert testimony. Much of that testimony was unconvincing. Sometimes the experts appeared to be shameless advocates. For example, Mr.

---

[1] The Court is compelled to note that the citations that AISLIC provided in its April 25, 2012 Response (Dkt. 313) to the Court's April 4, 2012 Order were far more accurate than the citations the government came up with in its response (Dkt. 310).

Zoch could not find a single instance where Whittaker functioned below the standard of care. According to Mr. Zoch, moreover, Mr. Jisa's testimony was to be discounted and disregarded in its entirety. In addition, he opined that the United States should be deemed liable for allocation of response costs as an operator, despite the Court's previous ruling that it could not be held legally liable as an operator.[2] For his part, Mr. Linkletter ascribed 100% of the perchlorate contamination in 9 out of the 10 largest areas to the activity of the government. Similarly, the government's witness, Mr. Low, gave zero credit to Whittaker for its remediation efforts since 1994 because of its supposedly bad conduct.

Furthermore, some of the experts, as well as some lawyers in their questioning and arguments, too often displayed excessive nit-picking. Almost every immaterial and minor point raised by one side was countered with an equally immaterial or minor point by the other side.

Next, it appears to the Court that the function of performing "Project Oversight" has almost become a cottage industry, at least in this case. For example, Ms. Diebenow reviewed Mr. Pirnie's reviews of the Arman Grinding invoices and charged for her review of Pirnie's review. Moreover, Ms. Diebenow acknowledged that AISLIC paid a sister company (AIG Consultants) for reviewing costs associated with the policy, yet it seeks to recover those payments. And Ms. Fish admitted that part of the $2,883,225 project management costs that AISLIC seeks was for review of escrow costs, but she couldn't say how much. *(See* Exh. 6528.) Later she said "it was around 50%, but it could be two-thirds." Similarly, Mr. Dovell did not review Exhibit 6528 to determine if there was

---

[2] Mr. Zoch's explanation was a wholly unpersuasive, conclusory tautology: "[I]t's not an allocation of liability, it's an allocation of response costs." R.T. 148-149. His attempt at an explanation on re-direct was unsuccessful. R.T. 223 ff. By assessing the government with allocation costs as both an arranger and an operator, Mr. Zoch did not strengthen AISLIC's arguments.

duplication. (He didn't review the attorneys' work product either.)

A major reason why AISLIC signed the CLWA Settlement Agreement as administrator was undoubtedly to keep the costs down. Indeed, keeping those payments low was actually AISLIC's *principal* objective, as established by Ms. Fish's admission that her primary goal was to assure that AISLIC paid not a single penny more than it was required to pay under the policy. That AISLIC should be reimbursed for a high portion of its administrative costs incurred in keeping its coverage payments below the policy limits is questionable, even if those efforts also would reduce the payments that might later be required from the government as its share of the response costs.[3]

The Court, which unsuccessfully urged the parties to settle, acknowledges that it is unaware of just what the barriers to settlement were. But eight or nine lawyers handled various facets of the trial presentation, (at least four on each side, with a fifth lawyer also making an appearance for the government.) There is nothing inherently inappropriate about that. Indeed, sometimes efficiency can be promoted by allocating specific responsibilities to given individuals. Nevertheless, the Court would not be surprised if in retrospect the parties conclude that they wasted some of their money by proceeding in the fashion that they did.

In any event, the Court hereby incorporates by reference its June 30, 2010 Findings of Fact and Conclusions of Law (Liability Phase; Post Trial) (Dkt. 179), as well as its prior summary adjudication rulings, its October 31, 2012 Order re the insurance premiums (Dkt. 318) and any other rulings referred to *infra*. The

---

[3] The Court recognizes that cost savings achieved by AISLIC's project management team - - or by others, for that matter - - are applicable to the project as a whole and to all liable parties. An example of such savings is the collaborative effort of DTSC, AISLIC and Whittaker that resulted in the determination that GEDIT was unlikely to be cost effective.

Court further incorporates by reference Phase Two Trial Exhibits A (Joint Chronology), B (Cast of Characters) and C (Glossary), (Dkt. Nos. 112-3, 112-4 and 112-5, respectively.)  And the Court further incorporates by reference the parties' "Stipulation for Claims for Past Costs" (Dkt. 256), as well as their "Stipulation Regarding Testimony of Kathleen Anderson and Payments Toward the ACOE Study" (Dkt. 298).  In the following entries, all references to "Whittaker" also include Bermite and the Bermite site.

      The Court is not required to make pinpoint rulings on all of the parties' numerous respective proposed findings, which cover virtually every aspect of the history of the site, including the "Burn Area," the hogging out procedures, the 317 impoundment and other impoundments, etc.  (A pithy enumeration of the areas most badly affected by perchlorate contamination is in Exhibit 6620.)  Whittaker's practices indisputably caused contamination, but the government shoulders some of the responsibility for the cost of repairing the damage.

## II.

## FINDINGS OF FACT

1.     AISLIC claims to have incurred $18,843,398 in total Past Response Costs as of January 31, 2010.  The United States does not dispute that $11,018,055 of these costs may be considered for equitable allocation, but it does contend that the $8 million insurance premium payment AISLIC received from Whittaker should be deducted from that sum.  The Court has previously ruled that "only" $4 million of that premium payment may be deducted from the otherwise undisputed portion of the total Past Response Costs.  (Dkt. 318).  Thus, for the category of what is otherwise undisputed, $7,018,055 may be considered for equitable allocation.

2.     The United States contends that the remaining $7,825,343 that AISLIC claims to have incurred may not be considered at all.  That sum represents AISLIC's payments to water purveyors as well as AISLIC's claimed project

1  management costs.  Of that disputed amount, the Court finds that only $7,266,751
2  reflects costs that are necessary and consistent with the National Contingency Plan
3  ("NCP").

4      3.    The amount of Past Response Costs owed to AISLIC by the United
5  States is determined in the following manner.  All of the eligible past response
6  costs incurred by both parties through January 31, 2010 are added to determine
7  total past response costs through January 2010.  Total past response costs through
8  January 2010 and is then multiplied by the United States' allocation percentage to
9  determine total Past Response Costs through January 2010 allocated to the United
10 States.  Past Response Costs already paid by the United States through January
11 2010 are subtracted from total Past Response Costs through January 2010
12 allocated to the United States to arrive at total Past Response Costs through
13 January 2010 due to AISLIC from the United States.  See #36.

14     **A.**    **Past Cost Claims:  Payment to Water Purveyors ("Offsite Costs")**

15     4.    In the "CLWA Litigation" that Steadfast commenced in 2001, the
16 Court held that Whittaker is a responsible party under CERCLA and is liable for
17 the perchlorate contamination in the Water Purveyors' wells.  AISLIC is entitled
18 to bring a CERCLA Section 113 contribution claim for response costs it paid to
19 those Water Purveyors.  These are referred to as "Offsite Costs."

20     5.    The evaluations contained in the Interim Remedial Action Plan
21 ("IRAP") are consistent with the requirements of the NCP.  The IRAP properly
22 addresses the need for the Water Purveyors to replace the lost pumping <u>capacity</u>
23 of the wells contaminated by perchlorate, not the average actual production of
24 those wells.  The total planned replacement pumping capacity is 8,700 gpm (see
25 Ex. 6504) but that level does not exceed the pumping capacity lost from closing
26 the contaminated wells.  This remediation is necessary to protect human health
27 and the environment.

28     6.    The DTSC oversaw the development and implementation of the

1  IRAP and concluded that it satisfactorily addressed all applicable state and federal
2  statutes and regulations, thus prompting it to approve the IRAP.

3      7.    AISLIC seeks to recover $4,096,050 of the money it paid to the
4  Water Purveyors for "Past Environmental Claims." This is approximately 94% of
5  the $4,357,500 it paid to the Water Purveyors for such Past Environmental
6  Claims. This amount is based on a formula. (See Ex. 6622.) The government
7  does not dispute the accuracy of these calculations, but has not stipulated to the
8  accuracy of the underlying numbers themselves. The Court concludes that the
9  justification for the underlying numbers is sufficient.

10      8.    The Court rejects the United States' contentions as to why $825,600
11  of the cost of constructing water supply wells and related pipelines should be
12  disallowed.

13      9.    The Court also rejects the government's opposition to the $20,468
14  AISLIC seeks for well treatment design.

15      10.    The determination of the amount (in rounded-off dollars) subject to
16  allocation for Offsite Costs to Water Purveyors thus is:

|   | $4,096,050  | (#7) |
|---|-------------|------|
| + | $ 20,468    | (#9) |
| + | $825,600    | (#8) |
| = | $4,942,118  |      |

21      11.    The United States paid $4,442,831.08 for the ACOE study, and the
22  parties agree that the court should consider some portion of this amount in
23  determining the equitable allocation. The Court finds that 90% of it
24  ($3,998,547.97) should be included in the allocation.
25  / / /
26  / / /
27
28      **B.**    **<u>Past Response Costs:  Project Management Costs</u>**

12. AISLIC seeks to recoup $2,883,224.75 in Project Management Costs (See Exh. 6528). Although AISLIC calculated the fees it paid to attorneys as $836,849.49, its expert, Mr. Zoch, determined that certain deductions from that initial amount claimed by AISLIC were warranted (Exh. 6628). This results in AISLIC seeking $590,265.26 in attorneys' fees, almost 80% of which are attributable to payments to one of the three firms it retained. (See Exh. 6528.) But Mr. Zoch did not go far enough. Portions of the work performed by the lawyers at the Sonnenschein firm were neither necessary nor consistent with the NCP, and some of it overlapped with the two other firms. The Court reduces the amount of attorneys' fees by $100,000, leaving $490,265.26 as the appropriate amount of attorneys' fees for AISLIC to have included in the allocation.

13. The Court in the introduction to this ruling discussed the remaining Project Management Costs for which AISLIC seeks recovery. They arise out of payments to four other firms and an additional (fifth) payment to a sister firm, AIG Consultants. (See Exh. 6528). The total of those payments is $2,292,959.49. That some of those payments were not necessary or consistent with the NCP is apparent. Mr. Zoch testified that the technical documentation that AMEC generates is sufficient in its own right for NCP purposes. (R.T. 126-27). He also admitted that AISLIC sent its own representatives to join Whittaker's representatives in meetings with DTSC and that AISLIC was billing the government for both sets of consultants sitting in the same conference room at the same time. (R.T. 135-137). *See also* Exhs. 7001 and 7002 and the testimony surrounding those exhibits. The Court awards only 80% of these remaining Project Management Costs, or $1,834,367.59.

14. Thus, the Past Response Management Costs for which AISLIC may seek equitable recovery are $490,265.26 (attorneys) plus $1,834,367.59 (other Project Management Costs). This totals $2,324,632.85.

15. The sum of rounded-off paragraphs 10 ($4,942,118) and 14

7

($2,324,633) is $7,266,751.

### C. Equitable Factors

16. The single most important factor in assessing the parties' respective responsibilities for the contamination at the site is which of them was the operator. Even Mr. Zoch testified that the operator is responsible for making waste disposal decisions at the site. (R.T. 144-145). The most reasonable and appropriate "base" equitable allocation is as follows. (See Ex. 6614):

| Owner | Operator | Arranger |
|---|---|---|
| 25% | 50% | 25% |

17. The most reasonable and appropriate allocation of the parties' involvement in the above aspects of the overall liability is as follows:

|  | Ownership | Operation | Arranger | Overall |
|---|---|---|---|---|
| U.S.A. | 10% | 0% | 20% | 30 % |
| Whittaker | 15% | 50% | 5% | 70% |

18. The most reasonable and appropriate adjustments for equitable factors are as follows:

|  | Knowledge | Care and Cooperation | Benefits Derived |
|---|---|---|---|
| U.S.A. | Add 5% | Add 5% | Add Nothing |
| Whittaker | Decrease 5% | Decrease 5% | Decrease Nothing |

19. Thus, the overall equitable allocation is as follows:

| U.S.A. | 40% |
|---|---|
| AISLIC | 60% |

These allocations are based on the totality of the evidence, including (but not limited to) what is specified below.

20. In assessing the parties' relative degree of involvement in this case, the Court finds that Bermite and Whittaker had overarching responsibility as an owner of all land, buildings, waste disposal infrastructure (pipes, sumps,

1  impoundments, and burn pits), vehicles and conveyances used to transport
2  materials and waste at the Site.  Bermite and Whittaker also controlled the day-to-
3  day operation of the plant, which included responsibility for performing all waste
4  disposal activities either at the Site or at other available disposal locations.  In
5  partial contrast, the United States' activities at the Site were primarily focused on
6  the quality of the products that Whittaker manufactured, as the customer.

7       21.    The contamination at the Site was caused in large part by inadequate
8  care on the part of Whittaker in its waste disposal practices.  Even some of its own
9  corporate officers admitted that Whittaker committed a number of violations of
10 state and federal environmental laws, exacerbated the perchlorate and VOC
11 problems by failing to disclose the presence of numerous waste dumping grounds
12 on the Site and moved and graded contaminated soils throughout the Site.

13      22.    The amount of perchlorate contamination attributable to the
14 production of commercial fireworks is insignificant.

15      23.    The amount of perchlorate contamination attributable to the
16 operations of Baker Oil is minor compared to the amount attributable to rocket
17 motor manufacture.

18      24.    Perchlorate was not formally recognized as a contaminant of concern
19 until after 1997.  Before then, there is no evidence that DTSC conducted tests, or
20 required that tests be conducted, to ascertain whether perchlorate was present.

21      25.    Nevertheless, irrespective of the state of the parties' knowledge about
22 perchlorate, as early as October 1980, the then-Manager of Bermite's Safety
23 Department (Zoyd Luce) acknowledged that Bermite was violating RCRA.  (Ex.
24 22 and 23).  Indeed, in 1973 the County Fire Department revoked Bermite's
25 permits to burn waste explosive material and the CRWQCB ordered it to cease
26 using a specified area as a "cut and cover dump."  (Exh. 3069).  This was some six
27 years before Zoyd Luce began work (in around 1979), and according to Edwin
28 Tigue, during those earlier years the rules for plant safety were not strongly

enforced.

26.  Whittaker's own environmental consultant concluded that Whittaker spread more than 50,000 cubic yards of contaminated soil from the Building 317 impoundment to at least 8 other areas of the site.  This soil contained perchlorate, as well as additional VOCs.

27.  The excavation and regrading in Burn Valley in around 1990 also resulted in the spread of contaminated material.

28.  Whittaker's burial of wastes and unexploded ordnance in various locations at the site and in unpermitted landfills has required efforts to address the potential hazard of buried UXO.

29.  For many years, Whittaker's care and cooperation was hardly exemplary.  For example, Whittaker failed to disclose to DCAS that the 1982 fire in the facility used to grind ammonium perchlorate was caused in part by deficient maintenance.  At his deposition, Alan Sorsher, a DTSC manager, characterized one disclosure that Whittaker did make as a "whitewash document" and he characterized certain of Whittaker's cleanup activities as attempts "to avoid regulatory oversight."  In 1986 the State of California sued Whittaker for making misrepresentations and false statements to environmental regulators and treating hazardous waste in an unauthorized manner.  (Exh. 3007).  This matter was settled, with Whittaker paying a $400,000 civil penalty.

30.  It is nevertheless also true that beginning in 1987 Whittaker commissioned over 80 site-wide investigations and it has undertaken off-site remediations.  Even Matthew Low acknowledged that the maximum deduction from the government's share of liability for Whittaker's deficient "care and cooperation" would not exceed 5% even if, consistent with Mr. Zoch's testimony, the government's share of liability was as high as 70%.   As Mr. Low also acknowledged, Whittaker conducted studies,  performed remediation work and cooperated with various regulatory authorities between 1994 and 2012.  During

that period, the DTSC issued no known complaints about Whittaker.

31. There are certain countervailing considerations requiring the government to shoulder a 40% allocation. To start with, some 90% (by volume) of the major areas contaminated by perchlorate were areas where production of government-procured items occurred. Such perchlorate contamination has been found at numerous other DOD sites.

32. The United States knew that Bermite's production processes would generate hazardous waste and at the least it was aware of some of the crucial decisions Bermite made about how it would dispose of such materials, such as burning explosive wastes, using surface impoundments, using high-pressure water to hog-out rocket motors, and washing out grind buildings with water. These decisions all led to the contamination at issue.

33. The United States maintained a constant presence of DCAS inspectors at the Site.

34. The evidence is conflicting as to the nature of the government's precise involvement in the perchlorate contamination. Mr. Calkins, Whittaker's Vice President of Program Administration, acknowledged that the government played no role in Whittaker's waste disposal at the site. In addition, Whittaker's former safety inspector, Mr. Jisa, testified at deposition that DCMA/DCAS inspectors were not present at the burn site "in the early years" and he never saw them inspect company sumps at the site. Yet Theodore Tamada admitted that DCAS periodically would have performed inspections of the Whittaker site, including the burn and hog out areas.

35. Overall, compared to Bermite and Whittaker, the United States' role at the Site was not as culpable. Whittaker had superior knowledge and control over the activities that resulted in the contamination. Consequently, the Court finds that the United States should pay no more than 40% of AISLIC's recoverable costs.

36. Pursuant to Paragraph 3, the Court calculates (in rounded off numbers) the following "bottom line" concerning AISLIC's eligible Recoverable Past Response Costs and what the United States owes to AISLIC.

| | | |
|---|---|---|
| (A) | AISLIC's Undisputed Response Costs | $11,018,055 |
| (B) | Less Reduction of $4 million for premium receipt | -  $ 4,000,000 _____ = $7,018,055 (¶1) |
| (C) | Plus AISLIC's Offsite Costs ($4,096,050 + $825,600 + $20,468) | +  $4,942,118 (¶10) = $11,960,173 |
| (D) | Plus AISLIC's Project Management Costs | +  $2,324,633 (¶14) |
| (E) | Total Past AISLIC Response Costs (C & D) | = $14,284,806 |

| | | | |
|---|---|---|---|
| (F) | Plus United States' Response Costs (¶11) | | + $3,998,548 |
| (G) | Total of Both Parties' Response Costs (E + F) | | = $18,283,354 |
| (H) | U.S. Allocation Percentage (40%) of Total Parties' Response Costs | | $7,313,342 |
| (I) | Less Past Response Costs Paid by U.S. (¶11) | | - $3,998,548 |
| (J) | (H) minus (I):  Total Past Response Costs Due from U.S. to AISLIC | | $3,314,794 |

## III.
## CONCLUSIONS OF LAW

37.    AISLIC's claims for contribution are brought under CERCLA Section 113(f)(1).  The parties have stipulated that the United States is subject only to several liability.  *See* Order dated January 28, 2010 (ECF No. 95).

38.    A party that has incurred its own response costs to clean up contamination may also be entitled to bring a cost recovery claim under CERCLA Section 107 for those response costs. *United States v. Atlantic Research*, 551 U.S. 128, 139 (2007).[4]

39.    A response action of a private party will be considered consistent

---

[4] Because the parties have not raised any issue about the availability of recovery under both Sections 107(a)(4)(B) and 113(f) of CERCLA, the Court will not discuss the impact (if any) of *Bernstein v. Bankert*, 2012 WL 6601218 (7th Cir. Dec. 10, 2012).

13

with the NCP if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements of the NCP set forth in paragraphs (5) and (6) of 40 C.F.R. § 300.700(c), and results in CERCLA-quality cleanup requirements. A response action satisfies these CERCLA quality requirements where (1) the remedy is protective of human health and the environment; (2) it utilizes permanent solutions and alternative treatment technologies or resource recovery technologies; (3) it is cost-effective; and (4) it is selected after meaningful public participation. *Carson Harbor Vill. Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1160 (C.D. Cal. 2003), *aff'd*, 433 F.3d 1260 (9th Cir. 2006).

40. A right of contribution exists only in favor of a party that has paid more than its share of a common liability. *See United States v. Atlantic Research Corp.*, 551 U.S. 128, 139 (2007). Thus, it is AISLIC that has the burden of establishing that the money that it has paid or will pay toward the cleanup exceeds Whittaker's share of liability.

41. Almost all of the evidence that AISLIC has presented concerning cleanup costs relates to perchlorate and volatile organic compounds. The Court finds that under CERCLA Section 101(14), AISLIC also is entitled to include ordnance and unexploded ordnance among the materials subject to cleanup cost recovery. (See ¶50.)

42. Under CERCLA, attorneys' fees and litigation expenses generally are not recoverable by private parties. In *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994), the United States Supreme Court held that CERCLA "does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." 511 U.S. at 819. Attorneys' fees are recoverable under CERCLA only if 1) they were incurred for work that is closely tied to the actual cleanup; or 2) if they were incurred for work that benefitted the entire cleanup effort and served a purpose apart from the reallocation of response costs. *Key*

14

*Tronic* at 819-820. Thus, legal work that is primarily intended to protect a party's interests regarding the extent of its liability is not recoverable under CERCLA. *Id.* at 820-21; *see also Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 936 (6th Cir. 2004). Recoverable attorneys' fees include, but are not limited to, (1) discussions with clients regarding additional site work, site cleanup matters, and site visits to view the cleanup; (2) investigatory efforts to identify the contaminants on the property; and (3) PRP search efforts. *In re Combustion, Inc.*, 968 F. Supp. 1112, 1114 (W.D. La. 1996).

43. The Armed Services Regulation Section 7-104.35 ("Progress Payments"), referred to in the Phase I Findings of Fact and Conclusions of Law, ECF No. 179 at ¶ 45, provides that Whittaker retained title to any property not delivered to the United States upon completion of the contract. Thus, even though this Court previously concluded that the United States maintained a property interest during the manufacturing process, that interest was effectively terminated upon delivery of the final product. Based on that factor, it is fair to conclude that ownership responsibility for what remained at the Site after completion of the contract, including waste, should primarily rest with the contractor.

44. Portions of AISLIC's claimed $2,883,225 in asserted "adjusting" or "project management" costs were not necessary to address a threat to human health or the environment and are duplicative of the work that Whittaker's own consultants performed at the Site. Such costs were driven by AISLIC's view of how to manage its business profitably.

45. In allocating response costs among liable parties in a contribution case, a court may use such equitable factors as the court determines are appropriate. 42 U.S.C. § 9613(f)(1). In any given contribution case, "a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of circumstances presented to the court."

*Environmental Transp. v. Inc. v. Ensco, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992). Although CERCLA itself provides no precise list of equitable factors, courts have looked to the so-called "Gore" factors for guidance. These factors, however, are neither mandatory nor exclusive. *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000) (district court has "discretion to decide what factors ought to be considered" in contribution scheme).

46. The "Gore factors" that are most applicable here are the following:
    (a) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of hazardous waste;
    (b) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account characteristics of such hazardous waste; and
    (c) the degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment.

47. Other factors that have been held relevant in an allocation analysis, particularly where there is a single site operator and an additionally liable arranger and/or owner, are:
    (a) the "knowledge and/or acquiescence of the parties in the contaminating activities," *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1426 (D. Md. 1991);
    (b) the "benefits received by the parties from the contaminating activities," *Weyerhaeuser,* 771 F. Supp. at 1426; *Cadillac Fairview/Cal., Inc. v. Dow Chemical Co.,* 299 F.3d 1019, 1026 (9th Cir. 2002)); and
    (c) where production of munitions are involved, the value to the

government of furthering national defense efforts. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1060 (9th Cir. 2002); *Cadillac Fairview,* 299 F. 3d at 1026.

48. The economic benefits to the parties were roughly equal. The Government received over 20,000 rocket motors needed during the time of the Viet Nam War and beyond, while Bermite received payments for these products.

49. With respect to the specific contaminants at issue, there is no challenge per se to most of the response costs expended to remediate or remove the contaminants discussed in the Court's Phase I findings. These contaminants were perchlorates, VOCs, and depleted uranium.

50. AISLIC also has incurred necessary and NCP-consistent response costs to address other hazardous substance contamination at the Bermite Site. These response costs include costs to address hazardous substance contamination from Unexploded Ordnance ("UXO") and Munitions and Explosive Waste of Concern ("MEC").

51. Any credit claimed by the United States must be pro-rated between the three claims brought against the United States by AISLIC, Chubb Custom Insurance Company and Whittaker Corporation. There does not appear to be a credit here, however, so I decline to direct the parties to confer and propose a fair allocation of any credit claimed by the United States in this case between and among Whittaker, Chubb and AISLIC.

52. Amounts paid by the United States to Steadfast Insurance Company are not included in the United States' past response costs because the settlement agreement between Steadfast and the United States specifically provides that "this agreement does not apply to the claims alleged by [AISLIC]…" *See Steadfast Insurance Company v. United States*, Case No. 06-cv-4686 (C.D. Cal.) at Docket No. 98.

### Declaratory Judgment

53.     CERCLA provides that in "any such action described in this subsection [cost recovery under CERCLA Section 107], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).  The Ninth Circuit has held that a court has the authority in a CERCLA action to award a declaratory judgment setting a percentage liability for future response costs.  *Boeing Co. v. Cascade Corp.*, 207 F.3d at 1191-92.

54.     AISLIC is entitled to and hereby is GRANTED a declaratory judgment that the United States shall pay it $3,314,794 for Past Response Costs.

55.     AISLIC is entitled to and hereby is GRANTED a declaratory judgment that 40% of its future necessary response costs at or for the Bermite Site that are consistent with the NCP will be allocated to the United States and shall be paid by the United States.

### Prejudgment Interest

56.     Prejudgment interest is calculated from the later of (1) the date payment of a specified amount is demanded in writing; or (2) the date of the expenditure.  42 U.S.C. § 9607(a)(4)(D).  The Parties have agreed that prejudgment interest on all response costs incurred by AISLIC that the Court finds are recoverable shall accrue from the later of (1) the date of the expenditure; or (2) December 31, 2007.  The Parties also have agreed that no prejudgment interest shall accrue for the period from February 7, 2008 to June 14, 2008.  The Parties have agreed that prejudgment interest on any recoverable past costs will continue to run until the date of the entry of Final Judgment.  The Parties have agreed that the prevailing Superfund interest rate as calculated by the federal government for each fiscal year is used to calculate prejudgment interest.  The Parties have agreed that prejudgment interest is compounded annually for recoverable response costs

at the rate in effect for each fiscal year. In light of these agreements between the Parties, I direct them to confer and propose to the Court within 21 days the amount of prejudgment interest to be paid consistent with the findings and conclusions set forth in this opinion.

57. The Court notes that AISLIC has incurred additional response costs since January 2010. AISLIC is entitled to prejudgment interest on any recoverable response costs expended between January 2010 and the date of the Final Judgment in this action. Such amount can only be determined at a later date. The Court expects the parties to reach an agreement in light of this opinion.

58. AISLIC is further awarded prejudgment interest on all amounts it has paid, including such response costs that are necessary and consistent with the NCP that were paid after January 31, 2010, through the date of final judgment. The proper calculation of such interest is set forth in detail *supra*. The parties are directed to calculate prejudgment interest consistent with this Order.

59. The Court recognizes that some of the above listed Findings of Fact may also be Conclusions of Law. Similarly, some of the Conclusions of Law may also be Findings of Fact.

60. Partial judgment shall be entered in accordance with this ruling. AISLIC is ORDERED to file a "[Proposed] Partial Judgment" containing the agreed-to calculation of prejudgment interest by not later than January 30, 2013.

IT IS SO ORDERED.

Dated: January 9, 2013  _____

A. Howard Matz
United States District Judge, Senior